# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF FIRST
NBC BANK HOLDING COMPANY,

      Plaintiff,

vs.

ASHTON J. RYAN, JR., MARY BETH
VERDIGETS, WILLIAM J. BURNELL,
GREGORY ST. ANGELO, OFFICER
DOES 1-20, ERNST & YOUNG LLP,
MARK BELL, and AUDITOR DOES 1-20,

      Defendants.

Civil Action No. _____

<u>Jury Trial Demanded</u>

## <u>COMPLAINT FOR RECOVERY OF DAMAGES</u>

Plaintiff, the Official Committee of Unsecured Creditors of First NBC Bank Holding Company files this complaint (the "Complaint") to recover damages against, individually, Ashton J. Ryan, Jr., Mary Beth Verdigets, William J. Burnell, and Officer Does 1-20 (collectively, the "Officer Defendants"); against Gregory St. Angelo; and against Ernst & Young LLP ("EY"), Mark Bell, and Auditor Does 1-20 (collectively, the "Auditor Defendants"), showing this Court as follows:

## <u>INTRODUCTION</u>

1.      This Complaint institutes an action to recover damages suffered by First NBC Bank Holding Company ("FNBC" or the "Holding Company") resulting from the breach by the Officer Defendants, in their respective roles as the most senior officers of FNBC, of the fiduciary duties they owed directly to FNBC. As the duly-appointed Committee of Unsecured Creditors of First NBC Bank Holding Company (the "Committee") in FNBC's Chapter 11 bankruptcy case,

Case No. 17-11213 pending in the United States Bankruptcy Court for the Eastern District of Louisiana, the Committee has standing to bring the claims asserted herein on behalf of FNBC's bankruptcy estate (the "Estate").

2.     Until its demise in 2017, FNBC was a public company, organized under the laws of the State of Louisiana.  Among other things, the Holding Company functioned as a holding company for First NBC Bank ("First NBC" or the "Bank"), a commercial bank chartered under the laws of Louisiana and not a member of the Federal Reserve system.  The Bank was wholly owned by, and was the primary asset of, the Holding Company.

3.     First NBC was founded by Defendant Ryan, who was its Chairman of the Board and Chief Executive Officer.  Ryan held these same positions at FNBC (the Holding Company) from its formation in 2007, through its initial public offering ("IPO"), and until late 2016.

4.     This case has been brought because during the Relevant Period (defined below), the Officer Defendants deceived the Board of Directors of the Holding Company by, among other things: (1) overstating FNBC's reported profitability, (2) failing to disclose material weaknesses in its internal controls over accounting and financial reporting, (3) concealing the true extent of the Holding Company's exposure to weak and overextended loans issued by the Bank, (4) misstating the risks involved with the Bank's investments in short-term receivables, (5) misstating the risks and position strengths associated with the Bank's investments in tax credit investments, and (6) manipulating the Bank's and the Holding Company's examinations by its primary regulators, the Louisiana Office of Financial Institutions ("OFI") and the Federal Deposit Insurance Corporation ("FDIC").  This deceptive conduct also had the effect of making the Holding Company's capital position appear vastly stronger than it actually was to regulators, the Holding Company's Board of Directors, and the general public.

5.    Among other things, the manipulative accounting techniques knowingly or recklessly employed by the Officer Defendants contributed to the appearance of solid earnings growth.  Purportedly based on the Bank's operations, FNBC's reported net income increased from $29.4 million for 2012, to $40.9 million for 2013, to $55.6 million for 2014.  On February 1, 2016, the Officer Defendants caused FNBC to issue unaudited financial results for 2015, reporting yet a further increase in net income, to $67.3 million.  These same techniques contributed to the appearance of a well-capitalized capital position for the Holding Company. As 2016 unfolded, however, a series of disclosures revealed that much of FNBC's reported strong earnings growth, and capital strength, had been illusory.

6.    The Officer Defendants are former senior officers of the Holding Company who held their respective offices during the operative events.  Each Defendant, while an officer of the Holding Company, acted as an agent of the Holding Company and owed fiduciary duties to the Holding Company.  These duties included the responsibilities to discharge his or her duties in good faith, and with the diligence, care, judgment, and skill required under the law, including not acting with gross negligence (i.e., in reckless disregard of, or with carelessness amounting to indifference to the best interests of, the Holding Company and involving a substantial deviation below the standard of care expected to be maintained by a reasonably careful person under the circumstances).  In addition, each Officer Defendant while an officer, owed the Holding Company fiduciary duties of loyalty, good faith, independence, oversight, and candor.  Among the above duties of the Officer Defendants, in their capacities as officers of the Holding Company, were to take such actions as necessary to cause effective internal controls over financial accounting and risk management to be implemented by FNBC, and to cause financial information presented to the Holding Company's Board to be accurate.  In performing their

duties as officers, and therefore agents, of the Holding Company, the Officer Defendants were not shielded by the business judgment rule due to their fraud, disloyalty, self-dealing, conflicts of interest, bad faith, and gross negligence.   The Officer Defendants are sued herein in their capacities as officers (and in Ryan's case, as a director) of the Holding Company, and not as officers (or a director) of the Bank.   Because of their primary duties to the Holding Company, in their dealings with the Board of Directors of the Holding Company (the "Holding Company's Board"), the Officer Defendants interacted with the Holding Company's Board as officers of the Holding Company, and not as officers of the Bank.

7.      The Holding Company was a publicly traded corporation (Nasdaq ticker symbol: FNBC) that filed regular reports with the United States Securities and Exchange Commission ("SEC").   These reports included financial information upon which the Holding Company's Board, depositors, and the general public relied.

8.      The Holding Company raised capital during the Relevant Period, all or a substantial portion of which it contributed to the Bank to support the Bank's lending and investment activities.

9.      As explained herein, from 2011 until the Holding Company's Chapter 11 filing in May 2017 (the "Relevant Period"), one or more of the Officer Defendants presented incomplete and inaccurate information to the Holding Company's Board and to the investing public about (1) the financial condition of the Holding Company and the Bank, (2) the Bank's risk management policies and overall risk to the Holding Company presented by the improper lending and investing activities of the Bank, and (3) the Holding Company's and the Bank's control over financial reporting and accounting.

10.     The incomplete and inaccurate information presented by the Officer Defendants to the Holding Company's Board during the Relevant Period, in conspiracy with, and aided and abetted by, St. Angelo, prevented the Board from accurately assessing the risks posed to the Holding Company by its investments in tax credit entities, trade receivables, and concentrated single loans to non-creditworthy borrowers, among other things.  Accordingly, the inaccurate information prevented the Board from making informed decisions about whether the Holding Company should have, after 2010, continued to make capital contributions to the Bank.

11.     The Officer Defendants breached their fiduciary duties to the Holding Company by not discharging their respective responsibilities as officers of the Holding Company:  (1) to devote sustained, affirmative attention to ensuring that effective internal controls were established and maintained over the Holding Company's financial accounting and reporting; (2) to ensure that effective systems and procedures were implemented and sufficient and qualified personnel were employed to enable the Holding Company to account for and accurately report the Holding Company's consolidated financial results; (3) to ensure that effective internal risk assessment and management functions were implemented to enable the Holding Company's Board to accurately assess and manage the risks to the Bank's loan portfolio; (4) to provide accurate and complete disclosures to the Holding Company's Board regarding (a) the financial condition of the Holding Company (b) the effectiveness of the Holding Company's internal controls over financial accounting and reporting, and (c) the effectiveness of the systems, procedures, and personnel in place to enable the Holding Company and its subsidiaries properly to account for and accurately to report on the financial results of the Holding Company on a consolidated basis; (5) to avoid material misrepresentations and omissions in consolidated financial statements presented to the Holding Company's Board and filed with federal regulators;

and (6) to protect the Holding Company against the loss of its capital investments in the Bank by ensuring that the Bank was managed properly. Such fiduciary breaches by the Officer Defendants rose above even gross negligence and constituted breaches of the duty of loyalty, acts or omissions not in good faith, acts involving intentional misconduct, acts involving a knowing violation of law, and/or transactions from which they derived improper personal benefits, all in violation of Louisiana law.

12. By breaching their fiduciary duties to the Holding Company in their respective capacities as officers of the Holding Company, the Officer Defendants caused direct harm to the Holding Company by: (1) causing the Holding Company's Board to approve the infusion of $201 million of the Holding Company's funds into the Bank at times when the Bank was poorly controlled and faced exceptional risk; (2) deepening the Holding Company's eventual insolvency through the improvident incurrence of $60 million in additional debt at a time when the Holding Company's insolvency was unavoidable, which artificially prolonged the Holding Company's existence and caused it to incur additional losses; (3) failing to protect the Holding Company's assets by causing or acquiescing in the unsafe and unsound lending and investing practices of the Bank, which caused the Bank to be closed by the OFI and the FDIC to be appointed receiver for Bank on April 28, 2017, rendering valueless the Holding Company's interest in the Bank and precipitating the Holding Company's bankruptcy; and (4) failing to cause the Holding Company to exercise its authority as the controlling shareholder of the Bank, to correct the Bank's unsafe and unsound practices.

13. As officers of the Bank and the Holding Company, the Officer Defendants had the responsibility to ensure the integrity of the Bank's operations, control risks, and accurately report the status of internal controls and financial results to the Holding Company's Board. The

Officer Defendants egregiously failed in these responsibilities.

14.     This action also asserts claims for accounting malpractice, professional negligence, and breach of contract against the Auditor Defendants—namely, defendant EY and its partners and employees Bell and Auditor Does 1-20.

15.     For the years 2010 (or earlier) to 2015, EY audited FNBC's financial statements, and for 2014 and 2015, EY audited FNBC's internal controls over financial reporting.  Each year, FNBC paid EY hundreds of thousands or millions of dollars for its services.

16.     EY provided its audit services to FNBC pursuant to contractual engagement letters directed to FNBC's Audit Committee.  In these engagement letters, EY agreed, among other things, to perform its audits in accordance with applicable professional standards and generally accepted auditing standards.

17.     The Auditor Defendants owed FNBC a duty to exercise reasonable and professional care in the conduct of their audits which included, among other things, the duty to perform their audits in accordance with applicable professional standards and generally accepted auditing standards.

18.     As set forth herein, the Auditor Defendants breached the contractual and professional duties they owed to FNBC by failing to provide audit services in accordance with applicable professional standards and generally accepted auditing standards.

19.     The Holding Company's Board, despite having paid substantial fees for the Auditor Defendants' auditing services, were left in the dark regarding the true nature of FNBC's financial position.  As a result of the Auditor Defendants' negligence, malpractice, and breach of contract, the Holding Company's Board and legitimate senior management were unable to prevent FNBC from incurring losses that could have and would have been avoided if the Auditor

Defendants had competently performed their duties.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1334.

21.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1409.

22.     This Court has personal jurisdiction over the Officer Defendants, St. Angelo, and the Auditor Defendants (collectively, the "Defendants") pursuant to Federal Rule of Bankruptcy Procedure 7004(f).  All Defendants reside in or transact business in this District.  Most or all of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

23.     This action relates to *In re First NBC Bank Holding Company*, Chapter 11 Case No. 17-11213 (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the Eastern District of Louisiana (the "Bankruptcy Court").

24.     The statutes of limitation for the claims asserted herein were tolled pursuant to the provisions of 11 U.S.C. § 108, for a period of no less than two years from the date of the order for relief in the Bankruptcy Case.

## PARTIES

25.     First NBC Bank Holding Company is a bank holding company incorporated under Louisiana law.  FNBC's executive offices were previously located at 210 Baronne Street, New Orleans, Louisiana 70112.  On May 11, 2017, FNBC filed a voluntary petition for relief in the United States Bankruptcy Court for the Eastern District of Louisiana under Chapter 11 of Title 11 of the United States Code.

26.     Plaintiff is the Official Committee of Unsecured Creditors of First NBC Bank Holding Company and, by orders dated December 1, 2017 and May 6, 2019 has been granted standing to investigate, assert, and pursue all claims asserted in this Complaint for the benefit of the bankruptcy Estate of FNBC.  Bankruptcy Case, Docket Nos. 261 and 563.

27.     On April 17, 2019 FNBC filed a proposed Chapter 11 Plan of Reorganization, and on May 3, 2019 FNBC filed an amended proposed Chapter 11 Plan of Reorganization (the "Plan"). Under the Plan, if confirmed, a Liquidation and Distribution Trust will be established and managed by a Liquidation and Distribution Trustee. The Plan contemplates that upon its confirmation, the establishment of the Liquidation and Distribution Trust, and the appointment of the Liquidation and Distribution Trustee, the claims asserted herein will belong to the Liquidation and Distribution Trust and the Liquidation and Distribution Trustee, for the benefit of FNBC's bankruptcy estate.   Upon confirmation of the Plan, the Committee expects and intends to substitute the Liquidation and Distribution Trustee as plaintiff in this action.

28.     Defendant Ryan served as Chief Executive Officer ("CEO") of the Bank since its inception in 2006 until December 1, 2016.  Ryan served as Chief Executive Officer of the Holding Company from its formation in 2007 until December 1, 2016.  Ryan served as Chairman of the Board of the Bank from its inception in 2006, and as Chairman of the Board of the Holding Company from its formation in 2007 until September 16, 2016.  Ryan continued to serve on the Board of Directors of the Bank and of the Holding Company, and as the President of both, until April 5, 2017.

29.     Defendant Verdigets served as Chief Financial Officer ("CFO") and Executive Vice President of the Holding Company from 2011 until September 16, 2016.

30.     Defendant Burnell served as Chief Credit Officer of both the Bank and the

Holding Company from 2007 until April 20, 2017.  As such, Burnell was responsible for, among other things, the overall quality of the Bank's lending function, its credit policies and administration, its loan recovery and collection efforts, and its monitoring and managing of past due loans, including the approval of the Bank's internal list of past due loans, and similar roles for the Holding Company.

31.     Defendant St. Angelo served as the General Counsel for the Bank during the Relevant Period.  St. Angelo is not sued as an officer of the Holding Company but rather as a co-conspirator with the Officer Defendants, whose breaches of fiduciary duty he aided and abetted in directly harming the Holding Company.

32.     Officer Does 1-20 are former officers of the Holding Company who participated in the senior management of its operations and in the misconduct alleged herein.  The identities of Officer Does 1-20 are presently unknown to Plaintiff.  Plaintiff will name Officer Does 1-20 after a reasonable opportunity for discovery.

33.     Defendant Ernst & Young LLP is a Delaware limited liability partnership. EY's principal executive offices are located at 5 Times Square, New York, New York 10036. EY maintains offices in this district at 3900 One Shell Square, 701 Poydras Street, New Orleans, Louisiana 70139. EY provided audit and related services to FNBC during the Relevant Period.

34.     Defendant Mark Bell is a partner at Ernst & Young, based out of its office at 100 West Houston Street, Suite 1800, San Antonio, Texas 78205. Bell is named in the 2015 engagement letter between EY and FNBC. Based on information and belief, Bell materially participated in providing audit and related services to FNBC on behalf of EY.

35.     Auditor Does 1-20 are current and former partners and employees of EY or its affiliates who materially participated in providing the deficient audit and related services to

FNBC on behalf of EY.  The identities of Auditor Does 1-20 are presently unknown to Plaintiff.

Plaintiff will name Auditor Does 1-20 after a reasonable opportunity for discovery.

## FACTUAL BACKGROUND

### I.    Procedural History

36.    On May 11, 2017 (the "Petition Date"), FNBC filed a voluntary petition for relief

under Chapter 11 of Title 11, United States Bankruptcy Code (the "Bankruptcy Code") in the

Bankruptcy Court.  FNBC is operating its businesses and managing its properties as a debtor-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

37.    On April 28, 2017, the OFI closed the Bank and appointed the FDIC as receiver.

38.    FNBC's primary assets consist of cash, tax attributes, and litigation claims.

39.    On December 1, 2017, the Bankruptcy Court expressly granted the Committee:

> Standing to assert, commence, prosecute, and, if appropriate, settle (with Court approval), any and all claims of any nature whatsoever, known or unknown, which [FNBC] has, may have, or may have had, against its officers and directors, whether or not apparent or yet to be discovered, or which may hereafter develop, on behalf of and for the benefit of [FNBC]'s estate . . . .

Bankruptcy Case, Docket No. 261.

40.    Further, on May 6, 2019, the Bankruptcy Court expressly authorized the

Committee:

> to assert and pursue:  (i) the claims of FNBC and its bankruptcy estate against the current and former officers and directors thereof for breach of fiduciary duty and similar matters, (ii) the claims of FNBC and its bankruptcy estate against Ernst & Young, and any other current or former auditor or accountant of FNBC, (iii) claims regarding FNBC's breach of various securities laws, statutes, and regulations that are property of FNBC and its bankruptcy estate, (iv) disputes (including with the Federal Deposit Insurance Corporation) regarding competing claims to the ownership of FNBC, its bankruptcy estate, or their standing to assert any of the foregoing and (v) any and all of FNBC's rights concerning coverage disputes regarding coverage afforded FNBC or its bankruptcy estate under any and all relevant insurance policies.

Bankruptcy Case, Docket No. 563.

## II. The Officer Defendants Direct and Oversee the Rapid Growth of Improper Investing and Lending Practices, with Poor to Nonexistent Controls, Placing the Holding Company at Exponentially Growing Risk

41.     First NBC Bank began operation as First National Bank in May 2006, when it received its charter to begin operations from the OFI.  With substantial local support, and in the immediate aftermath of Hurricane Katrina, the Bank raised initial capital of $60 million from the local community, which set a record for the largest initial capital raised by a Louisiana chartered institution.

42.     In its early years, the Bank focused on being a community, relationship-centered bank.  After six years, the Bank, led by CEO Ryan, determined to become a public-traded company through an IPO of common stock.   To that end, FNBC filed a draft Form S-1 Registration Statement with the SEC on November 9, 2012 which was declared effective by the SEC on May 9, 2013.  Together with a Prospectus filed with the SEC, these constitute the "IPO Offering Materials."

43.     In the IPO Offering Materials, the Officer Defendants caused the Holding Company to identify itself as a rapidly growing bank dedicated to strong risk management that differentiated itself from its competitors by its strong capital levels, experienced management team, and sound asset quality.

44.     The IPO Materials touted FNBC's financial strength, including total assets of $2.7 billion, net loans of $1.9 billion, total deposits of $2.3 billion, and shareholders' equity of $248.1 million as of December 31, 2012.  Recent results featured a nearly 50 percent increase in net interest income, to $74.8 million, based on "significant growth in average interest-earning

assets."  The materials reiterated that FNBC's business model would "focus on a ***traditional, relationship-based, community bank structure guided by . . . disciplined risk management; responsive, high-quality service; focus on building long-term relationships; credibility within our communities; [and] creativity and efficiency***."  (Emphasis added.)  Further, the Registration Statement emphasized the Officer Defendants' focus on risk management, assessment and testing of internal controls, and their engagement of an "experienced independent public accounting firm."

45.     In the IPO, FNBC sold 4,791,667 shares of its common stock to investors throughout the United States.

46.     Before the IPO, FNBC's primary focus was on commercial real estate and commercial lending in the Louisiana, Mississippi, and Florida Panhandle coastal areas.  FNBC's lending activities placed heavy emphasis on local construction, commercial real estate, and consumer real estate loans, particularly in the New Orleans metropolitan area.  FNBC's primary source of funding for its loans was deposits, which were invested in U.S. Government obligations, mortgage-backed securities, municipal securities, and corporate bonds.

47.     After the IPO, the Officer Defendants directed the Bank to pursue, with more aggressiveness each year, a financial strategy of investing heavily in tax credits.  This strategy, which the Bank followed to a vastly increased extent compared to its many competitors, involved the Bank deliberately choosing real estate loan investments that allowed the lender to reduce its income tax obligations by a certain amount.  The tax "credit" achieved thereby reduced the tax on income otherwise earned on the loan, such that net, after-tax income is higher.

48.     The chief benefit derived from such an investment was the opportunity to claim a federal or state tax credit.  In the case of a Federal Low-Income Housing tax credit ("LIHTC")

investment, for example, the credit was earned over a 15-year period but was claimed over an accelerated 10-year time frame, beginning in the year the property was placed in service and as units were occupied.  Because qualifying investments resulted in decreased tax liability, the economic return to the Bank was not subject to state or federal taxation.  Thus, the tax credits they generated were, on paper, more valuable than the same dollar amount of taxable income earned from an alternative investment.

49.     Investors in LIHTC properties were also able to shelter otherwise taxable income from both federal and state taxation through deductions for depreciation.  Additional state housing tax credits might be available in the states in which LIHTC properties were located, further enhancing investment returns.

50.     The Officer Defendants' pursuit of the tax-credit investment strategy for FNBC carried with it substantial risks.  First, tax credits were only offered by the federal or state governments on selected projects, viewed as socially desirable without regard to their financial risk/reward profile.  Second, the projects themselves – which serve as the collateral securing the investments – were often illiquid, requiring FNBC to remain invested for set time periods (sometimes up to 15 years) regardless of deteriorating project fundamentals.  Third, FNBC typically conducted its investments by acquiring large (up to 99 percent) economic interests in tax-credit entities, typically limited liability companies; however, FNBC lacked voting, financial, or managerial control over the entities.  In other words, FNBC was entirely dependent on the competence and integrity of general partners in the projects over whom it had zero control.  Fourth, the strategy depended for its effectiveness on FNBC actually achieving some level of taxable income over the near term, since the tax credits, by their nature, could only shelter taxable income.  Fifth, because the highest tax credit effects occurred in the early years of

14

projects, if the program as a whole was not carefully managed, FNBC would be tempted to increase its investments in tax-credit projects each year in any event, simply to maintain the prior year's level of tax credits.  Sixth, FNBC risked losing the tax credits if its investments cease to comply with applicable laws.  All of these risks did, in fact, materialize, as a result of the Officer Defendants' fiduciary breaches, in conspiracy with, and aided and abetted by, St. Angelo.

51.     During the Relevant Period, the Officer Defendants disregarded these risks and abdicated their responsibilities to exercise care or oversight over FNBC's tax-credit investments, putting FNBC's financial stability as a whole at risk.  FNBC's investments in tax-credit projects increased every year, as the Officer Defendants allowed FNBC to grow dependent on the early-year tax credits associated with the investments.  Worse, as the risks began to materialize, causing losses on the investments, the Officer Defendants did not reduce but, rather, increased FNBC's exposure to the investments.

52.     As the Bank's situation worsened, the Officer Defendants simply doubled down on the enhanced accounting profits that the tax-credit investments would generate.  Bad money chased out the good, as FNBC became more and more dependent on tax credit benefits for its illusory profitability on paper.  The Officer Defendants rationalized their decision by boasting of their superior "understanding of tax credits," which "makes us the lender of choice for real estate projects in our markets [and] has enabled us to dominate this type of lending in New Orleans." (CEO Ryan's Letter to Shareholders, 2014 Annual Report, p. 8.)

53.     By the spring of 2016, the Officer Defendants could no longer ignore the realities of their disastrous mismanagement.  On February 1, 2016, FNBC disclosed that its earnings for the fourth quarter of 2015 and fiscal 2015 as a whole had significantly underperformed analysts' expectations, based in substantial part on FNBC having been forced to book an $8.2 million tax

credit impairment.  Just six weeks later, FNBC was required to disclose that it had discovered errors in its accounting for Federal and State Historic Rehabilitation tax credit entities that could require FNBC to restate its previously reported 2015 financial results.

54.     On April 8, 2016, FNBC announced that it would be forced to restate its consolidated financial statements for the fiscal years 2011, 2012, 2013, and 2014, together with interim quarterly periods during 2013, 2014, and 2015.   In addition, shareholders were admonished that FNBC's quarterly and annual financial statements from 2011 through 2015 could no longer be relied upon.  In other words, results during FNBC's *entire reporting history* as a publicly traded company were a sham.

## III.    The Officer Defendants Portray the Holding Company as Well-Capitalized when in Fact, Extraordinary Risks Existed as to its Viability almost from the Start

55.     From the inception of the Bank in 2006 and the formation of the Holding Company in 2007, the Officer Defendants consistently maintained that both were "well capitalized," the soundest capital classification for FDIC-insured institutions.

56.     For example, in the Holding Company's IPO offering materials in 2013, the Officer Defendants represented that the company's "strong capital position [gave FNBC] an instant advantage over [its] competitors."   The Officer Defendants repeated this assertion in FNBC's 2013 Form 10-K and 2014 Form 10-K.  In fact, the Officer Defendants asserted that the Bank was "chartered with an initial capitalization of $61.8 million from local investors and highly sophisticated institutional investors, making it the largest initial capitalization of a *de novo* financial institution to commence operations under a Louisiana charter."  The Officer Defendants also represented that

> [a]s of December 31, 2012, 2011 and 2010, First NBC Bank Holding Company
> and First NBC Bank were in compliance with all applicable regulatory capital

requirements, and First NBC Bank was classified as "well capitalized," for purposes of the FDIC's prompt corrective action regulations. "Well capitalized" is the highest capital classification for FDIC-insured financial institutions in the United States.

57.    The Officer Defendants made similar representations in the Holding Company's Forms 10-Q and 10-K made available to the Board and investors after 2013. In each of these filings through the third quarter of 2015, the Holding Company represented that it was in compliance with all capital regulatory requirements, and that the Bank was classified as "well capitalized" for purposes of the FDIC's prompt corrective action regulations. The Holding Company also provided a table showing regulatory capital ratios in its financial statements, and specifically the minimum ratios required to be considered well-capitalized along with the Holding Company's reported ratios, which were all reported as well in excess of the minimum ratios.

58.    The Officer Defendants caused the Holding Company to further disclose that federal banking regulators were required to take various mandatory supervisory actions and were authorized to take other discretionary actions with respect to institutions that were undercapitalized, with the severity of the action depending upon the capital category in which the institution is placed. The Holding Company made its Board believe that a failure to meet minimum capital requirements could initiate certain mandatory and possibly additional discretionary actions by regulators that, if undertaken, could have a direct material effect on the consolidated financial statements of the Holding Company. Thus, the absence of such regulatory actions—through, *inter alia*, the Officer Defendants' knowledge that additional capital injections might "paper over" the material weaknesses—were relied upon by the Board in determining to authorize such capital infusions.

17

59.     The Officer Defendants' misconduct alleged herein concealed the fact that the Bank's capital position was not as strong as the Holding Company's Board and investors had been led to believe.  In fact, the Bank was not even adequately-capitalized and, if anything, was under-capitalized.

60.     The Bank engaged in numerous improper practices that actually increased risks to its capital position.  In analyzing the oversight of the Bank by management, including the Officer Defendants, in the years leading up to its failure, the Office of Inspector General of the FDIC, in a report dated November 2017, identified a number of grave factors that had led to the Bank's failure (with its corresponding ultimately fatal effect on the Holding Company's solvency). These factors included:  (1) rapid growth funded by high-cost ("volatile") deposits; (2) large lending relationships and concentrations (i.e., too many dollars lent to too few borrowers) without adequate risk management controls to mitigate risks, including loans to financially weak borrowers; (3) large concentrations of investments in trade receivables; (4) large investments in complex tax credit investments coupled with accounting improprieties; (5) weak risk management practices; and (6) a CEO, Ryan, who demanded exceptionally broad financial and operational control of the Holding Company, which manifested in several increasing risks to the Bank and the Holding Company, including:  (a) loan extensions on large, concentrated, risky loans; (b) unjustified granting and extension of credit; (c) double-dealing, including on one occasion obtaining a $2 million personal loan from one of the Bank's borrowers who had recently received a $9 million unsecured loan from the Bank; (d) inadequate staffing of internal review function; and (e) fluctuating but generally excessive personal lending authority, including $13 million in 2009, reduced to $5 million in 2011, but subsequently increased back up to $7.5 million.  *See* Office of Inspector General, Office of Program Audits and Evaluations, Report No.

AUD-18-002, *Material Loss Review of First NBC Bank, New Orleans, Louisiana* (Nov. 2017) (the "Inspector General Report" or the "Report").

A. ***Rapid growth funded by high-cost deposits***

61.     The Inspector General Report concluded that the Bank (as controlled by the Officer Defendants, each of whom had a parallel title and role at the Bank and at the Holding Company) pursued a growth and funding strategy which elevated its risk profile:

62.     The Inspector General noted as follows:

First NBC exhibited two other characteristics common to institutions that failed during the financial crisis — pursuit of ***rapid and aggressive growth and over reliance on volatile funding***, including brokered deposits.  ***First NBC conducted these activities without appropriate mitigating risk management and contingency funding strategies***.

* * *

In 2010, examiners again noted that the bank's strategic planning process, including the Board's participation, should be reviewed. The bank updated its *Capital and Strategic Plan* in April 2011, but examiners commented that ***growth seemed to be more aggressive than the bank projected in 2010***. From the examiner's perspective, the ***level of growth was straining the bank's infrastructure*** (i.e., staffing and the sophistication of risk management processes relative to the bank's portfolio).

* * *

***To fuel the bank's early growth, First NBC relied heavily on volatile funding*** beyond the level permitted in the bank's *Asset/Liability Management Policy*.  In general, reliance on volatile funding reduces a bank's ability to meet any unforeseen liquidity needs that may arise should these more volatile funding sources leave.  In contrast, core deposits are generally stable, lower cost funding sources.  Liquidity is essential in all banks to meet customer withdrawals, compensate for balance sheet fluctuations, and provide funds for growth. Liquidity also reflects a financial institution's ability to fund assets and meet financial obligations.  ***In response to examiners' concerns, First NBC management indicated that it monitored the bank's liquidity position on a daily basis and informed the Board of the liquidity position monthly.***

In 2008, First NBC's volatile funding sources comprised almost 50 percent of the bank's total liquidity and although volatile funding decreased over the next

several years, *the bank's use of volatile funding consistently exceeded that of its peer banks.*  The bank's funding strategy generally included offering the highest interest rates on deposit accounts across the New Orleans metropolitan area. That strategy depended on the bank's ability to satisfy customers' desire for higher interest rates and increased its cost of funds.  For example, in 2015, the bank's cost of funds was over 100 basis points higher than the bank's national peer group.  *The extremely high cost of funding presented risks to earnings, capital, and liquidity.*

Report at 6-7 (footnotes and chart omitted) (emphases added).

63.      The Inspector General made clear that the Officer Defendants' pursuit of a high-cost, high-risk deposit strategy played a role in the Bank's ultimate failure:

Offering high interest rates also attracted large deposits – in the form of certificates of deposits larger than insured deposit limits.  By March 31, 2016, the bank reported approximately $1.2 billion in uninsured deposits, which represented approximately 30 percent of total deposit liabilities.  *Uninsured deposits are considered volatile because rising interest rates or negative publicity about the institution can cause these uninsured deposits to flee quickly, which happened at First NBC.*  Specifically, in October 2016, the media reported that the Federal Reserve Bank of Atlanta and OFI deemed the holding company to be in "troubled condition." This caused many First NBC depositors, primarily large non-core depositors, to withdraw their deposits.

Report at 7 (footnote omitted) (emphasis added).

**B.      *Large lending relationships and concentrations***

64.      The Inspector General noted that deficiencies related to loan extensions and loan reviews were the most prevalent examples of risk management deficiencies at the Bank. Moreover, the Bank "had several large loan concentrations to single borrowers, which at one point led to *four individual borrowers having loan relationships that each exceeded 25 percent of Tier 1 Capital* (i.e., one of the FDIC's concentration threshold guidelines)."  Report at 8 (emphasis added).

65.     With regard to "**Loan Extensions**," the Inspector General concluded as follows:

First NBC's liberal lending practices presented elevated risk to the bank. Specifically, from 2008 through 2016, examiners criticized the bank's liberal lending practices to financially distressed borrowers, *such as numerous renewals with little or no repayment of principal, new loans or renewals with additional advances, and questionable collateral protection. The bank extended additional funds to borrowers with apparent cash flow shortfalls through working capital lines of credit.* For two borrowers, these lines of credit evolved into short-term, interest-only working capital loans made in 2008 and 2009 and then became long-term fixed borrowings with little or no requirement for repayment of principal within the contractual terms.

*Management extended new loans that were used to make payments on existing loans and to cover current taxes and insurance.* First NBC also extended loans and allowed proceeds to be used to pay off other delinquent bank loans, again without any requirement for principal payments from the borrowers. Further, many of these loans lacked current appraisals, included limited owner's equity, and had renewals or extensions without principal reduction. *The CEO also approved credit line extensions and overdrafts to adversely classified borrowers.* First NBC's loan policy did not include maximum maturity dates, capital limits, or other common controls for these relationships.

*These extensions masked potential delinquencies and jeopardized the overall safety and soundness of the bank. For instance, a borrower needing multiple loan renewals is likely having cash flow problems.* Further, if the bank does not ensure that loan advances are supported by sufficient collateral, the bank's credit risk increases (i.e., the borrower may not repay a loan and the lender may lose the principal of the loan or the interest associated with it). When principal or interest payments are not being paid as scheduled, loans should be reflected as nonperforming. These large loans had on-going renewals or extensions without principal reductions. First NBC suffered significant losses related to large loan relationships that were extended multiple times. The development of large lending relationships and/or individual concentrations without implementing adequate risk management controls to mitigate the risks was another characteristic 9 commonly found in prior financial institutions that failed. Table 2 illustrates the extent to which three loan relationships grew as a result of multiple loan extensions described by examiners.

**Table 2: Selected First NBC Loan Extensions**

| Borrower | Loan Balance | Increase in Loan Balance Including Loan Extensions | 2017 Loan Balance | Percent Increase |
|---|---|---|---|---|
| A | $5,737,000 | $16,954,000 | $22,691,000* | 296 |
| B | $5,801,176 | $12,714,824 | $18,516,000 | 219 |
| C | $7,000,000 | $103,545,000 | $110,545,000 | 1,479 |

Source:  OIG analysis of First NBC Reports of Examination and visitations.
* Balance based on 2016 Examination Report.

One of these credits related to oil and gas lending. This was an area for which First NBC did not develop guidance before engaging in this type of lending. The FDIC notes in FIL-49-2016, *Prudent Risk Management of Oil and Gas Exposures*, that lending for oil and gas exploration and production activities requires conservative underwriting, appropriate structuring, experienced and knowledgeable lending staff, and sound loan administration practices. Given the size of the loan, the Board should have established a policy to ensure that the risk limits were defined and the bank's risk exposure could be monitored by the Board. Examiners noted that the loan was not properly underwritten originally in 2011 and the advances were used to finance operating expenses. According to the 2015 examination, the purpose of the credit was to finance oil and gas production at various wells scattered across southern Louisiana. ***First NBC did not follow any of the common risk management practices for lending in this industry to reduce the impact of pricing and operation risks associated with energy production. By extending additional advances for this loan First NBC exacerbated its risk exposure.***

Report at 8-9 (emphases added).

66.     With regard to "**Loan Review**," the Inspector General found:

Loan reviews provide the basis for funding the Allowance for Loan and Lease Losses (ALLL) and identifying problem assets in need of workout plans. ***First NBC loan reviews were overseen by the CEO. Larger institutions typically establish separate loan review departments staffed by independent credit analysts and loan review personnel that report their findings directly to the Board or a Board committee.***

Examiners reported weaknesses in First NBC's loan review function in four of six examination reports issued between 2010 and 2016 (see the adjacent text box for specific concerns). First NBC began establishing an internal loan review function in 2011; however, ***in 2012, examiners reported that the staffing level of two internal reviewers was inadequate***. The bank also did not maintain an effective external loan review program as it grew larger and more complex. For example,

22

in 2012 examiners noted instances of the external loan review function not identifying problem credits in a timely manner and by 2016, examiners described the external loan review program as ineffective for the size and complexity of the bank. In addition, the external loan review function failed to cover technically difficult areas of the bank's lending portfolio, such as loans made under the bank's tax credit program.

***Examiners also noted that staffing shortages led to accounting, reporting, and credit review deficiencies.*** In 2010, examiners pointed out that the bank's failure to evaluate the adequacy of the credit analysis staff relative to the growth, size, and complexity of the loan portfolio exacerbated the risk posed to the bank in the credit administration area. According to examiners, the total volume of adversely classified items increased in 2012 to 30 percent of total capital during a time when the loan review function was understaffed. Examiners also attributed apparent violations and contraventions of Statements of Policy to inadequate staffing. Further, due to the ongoing weaknesses in First NBC's loan review program and improper classification of problem loans, First NBC overstated the true condition of the loan portfolio and underfunded the ALLL.

Report at 9-10 (emphases added).

67.     With regard to "**Poor Quality Assets**," the Inspector General concluded:

***First NBC's practice of liberally extending additional credit to poorly performing or weak borrowers significantly increased the bank's risk profile***, as evidenced by the increase in the volume of adversely classified items relative to capital and the size of individual adversely classified items relative to capital. As shown in Table 3 below, ***a small number of the bank's large loan relationships comprised a large percentage of the total Adversely Classified Items (ACI) coverage ratio***. The ACI coverage ratio is a measure of asset risk and ability of capital to protect against that risk. A higher ratio indicates exposure to poor-quality assets and less ability for the bank's capital to absorb any losses associated with those assets.

Table 3:  Large Loans' Percentage of ACI in Selected Examinations, 2011 to 2016

| Examination Date | Number of Loans | Percentage of ACI |
|---|---|---|
| October 11, 2011 | 2 | 48 |
| December 3, 2012 | 3 | 49 |
| February 23, 2015 | 1 | 38 |
| May 2, 2016 | 2 | 51 |

Source:  First NBC Reports of Examination.

Examiners highlighted in the 2015 examination report that, as an indication of the risks being taken as part of the overall growth of the bank, the volume of ACI increased 274 percent between 2010 and 2015, which was 47 percent faster than the 227 percent growth in assets during the same timeframe. This indicated the high degree of risks taken by the bank as part of its growth strategy. At the 2016 examination, the volume of adversely classified items had more than tripled to $506 million, with at least $90 million in new loan extensions made since the prior examination.

Report at 10 (emphases added).

68.    The Inspector General's Report was just the tip of the iceberg.  In reality, a substantial portion of the total dollar amount of the loans extended by the Bank during the Relevant Period was, by the design and conscious intent of the Officer Defendants, in conspiracy with, and aided and abetted by, St. Angelo, **not** attributable to legitimate lending decisions of the Bank but, rather, a scheme and artifice to conceal the deteriorating capital position of the Bank. These Defendants routinely caused the Bank to enter into new loans, and loan extensions, for the sole purpose of retiring old loans that were unlikely (and, in many cases, never intended) to be repaid.

69.    Indeed, in the wake of the Bank's collapse (and the Holding Company's insolvency), many Bank borrowers averred that, under the Officer Defendants' direction, the Bank extended loans to them even while well aware that they were in danger of defaulting on existing loans and that these borrowers, in fact, needed the additional loans to pay principal and interest on **existing** loans.  These borrowers have averred—including in several instances under penalty of perjury—that the sole purpose of the additional loans was to artificially keep older loans by the Bank "current" by continuing to advance funds so as to generate interest which was then paid to the Bank as loan payments became due.  Such borrowers have alleged that the Officer Defendants, including Ryan, benefited themselves by misrepresenting to the borrowers

that there was sufficient collateral in their business or other security assets to back the entire balance of the growing, cumulative loan balance. *See, e.g., Academy Place, LLC v. First NBC Bank, et al.*, No. 18-10389 (Civil Dist. Ct. New Orleans Parish) (filed Oct. 15, 2018), and *St. Theresa Specialty Hospital, L.L.C., et al. v. First NBC Bank, et al.*, No. 2018-01991 (Civil Dist. Ct. New Orleans Parish) (filed May 16, 2018), and No. 2:18-CV-04961-EEF-KWR (E.D. La.). *See also State of Georgia v. O'Dom et al.*, No. 2015-CV-258501 (Ga. Super. Ct. Fulton County).

70.     For example, in the *St. Theresa Specialty Hospital* lawsuit, the Petitioner set forth the following allegations:

> Petitioner Borrower operated a long term acute care facility in Louisiana, St. Theresa Specialty Hospital, managed by Robert Liljeberg, Sr.
>
> Beginning in or about 2008, First NBC Bank made a series of loans to Petitioner Borrower to help finance its operations.
>
> ***First NBC Bank president Ashton Ryan repeatedly extended loans to Petitioner Borrower even though he was aware that the operation was in danger of defaulting on existing loans, and that it in fact needed these additional loans to pay the principal and interest on existing loans made by Defendant. First NBC Bank and Ashton Ryan made these additional loans in order to artificially keep Petitioner Borrowers' loans "current" by continuing to advance funds to pay itself interest as loan payments became due.*** Some of these loans were secured by personal guarantees from the Petitioner Guarantors.
>
> * * *
>
> First NBC Bank and Ashton Ryan loaned Petitioner Borrower more than these corporations had in assets, while misrepresenting to Petitioner Guarantors that there was sufficient collateral to back the entire cumulative loan balance. In fact, ***Mr. Ryan and First NBC Bank were in possession of documents showing the collateral was worth only $23.1 million, while Mr. Ryan continued to assure Petitioner Guarantors, some <u>over eighty years of age</u>***, that the assets were sufficient for the corporation to pay back the $38.6 balance.
>
> Ashton Ryan made promises to Petitioner Guarantors regarding the value of Petitioner Borrowers' operations in order to secure these additional loans, ***which he knew were necessary to keep Petitioners' existing First NBC Bank loans from defaulting***. First NBC Bank and Ashton Ryan represented to Bob Liljeberg

that these loans passed each time they were inspected by regulators, in order to keep the Guarantors' confidence and **conceal the true state of Petitioner Borrower's finances**.

\* \* \*

At least thirty-six (36) such loans were made by First NBC Bank to Petitioner Borrowers from 2008 to 2017.

\* \* \*

**These loans were marked as performing by the FDIC right up until the day before First NBC Bank collapsed.**

\* \* \*

. . . Mr. Ryan sidestepped the loan approval process without the knowledge of Petitioner Guarantors by allowing Petitioner Borrower to purposefully overdraw its checking account, then funded the overage and added that to the obligation of Petitioner Guarantors without their explicit knowledge. Furthermore, upon information and belief, Mr. Ryan forced an overdraft to avoid going before the committee. [Emphases added.]

71.     Similar allegations were set forth in the *Academy Place* lawsuit.

72.     The allegations in the *O'Dom* lawsuit were described in the following press report:

NEW ORLEANS — First NBC Bank, which was recently acquired by Hancock Whitney, still is facing legal challenges.

The latest lawsuit, which was filed by the Georgia Insurance Commission, was moved in May to a federal court. Another suit filed by Thinkstream, a Baton Rouge company, against First NBC also was moved to a federal court.

The Georgia suit, which was filed by Ralph Hudgens, Georgia's insurance commissioner, alleges that the bank employed a loan scheme that it used to do business with Southern Casualty Insurance Company (SCIC), which sells auto insurance to customers in Georgia, Mississippi and Louisiana.

Listed as defendants in the case are Richard O'Dom, Key Insurance Network, Key Claims Services, Wesley T. Sivley, John Robinson, Willard Peacock, Alan Yeager, AES Claims Partners, Clifford Olsen, First NBC holdings company, Federal Deposit Insurance Corporation and Ashton Ryan.

According to the lawsuit, the bank furthered its business by granting suspect loans to the insurance company.

In the Georgia suit, insurance regulations prevented First NBC from directly making loans to SCIC.

The suit claims the two parties got around that by the bank making loans Richard O'Domo [sic], CEO of SCIC, along with Clifford Olsen, SCIC's director, and Key Insurance Network, a firm that handles claims management for SCIC.

*According to the suit, the bank would restructure the loans to make them good on its books.*

*The suit says Ryan made numerous loans so the dollar amount would be lower and it would not have to be reported to the loan committee.*

Regulators, though, were wary and they required the bank come up with more capital to shore up the company and pay for its losses,

The suit alleges that First NBC then loaned Olsen $7 million and that Olsen would then buy shares in Key Insurance and transfer the money to SCIC.

The money was placed in a SCIC account and shown to the Georgia Department of Insurance. and it was transferred back to the bank a week later. *That was an illegal transfer, according to the insurance department.*

Once the money was placed in a SCIC account and shown to the Georgia Department of Insurance around Nov. 26, 2012, *the money was then transferred back to First NBC Bank on Dec. 3, 2012, another fraudulent transfer, according to the department.*

The allegations were similar in the Baton Rouge case.

* * *

Thinkstream claimed First NBC "kept lending more and more money" even though the company was default on existing loans. First NBC "artificially kept the loans 'current' by continuing to advance funds under the loans to pay itself interest as it became due."[1]  [Emphases added.]

---

[1]     "Suit claims First NBC Bank was involved in loan scheme," *Louisiana Record*, July 12, 2017, available at https://louisianarecord.com/stories/511144667-suit-claims-first-nbc-bank-was-involved-in-loan-scheme (last visited May 9, 2019).

73.    On information and belief, based on such averments, the Officer Defendants, in fact, favored their own interests by falsely convincing borrowers to extend their loan maturities and borrow higher and higher amounts of money to preserve the illusion that the loans were current and that the Bank was solvent and well-capitalized.  The Officer Defendants well knew that these techniques were false and fraudulent, misrepresented the Bank's asset base and the Holding Company's balance sheet, and, by omission, deceived the Holding Company's Board into retaining them as officers of the Bank and the Holding Company and into justifying further capital injections from the Holding Company to the Bank.  The Officer Defendants were motivated to preserve the illusion of the Bank's "well capitalized" position to ensure that they continued to receive lucrative compensation packages and, in the case of Ryan, to preserve his personal borrowing power using his FNBC stock as collateral.

**C.    *Improperly-accounted-for investments in trade receivables***

74.    The Inspector General found that the Bank experienced avoidable losses associated with investments in trade receivables:

> Under the CEO's direction, First NBC also became involved in the purchase of short-term trade receivables in 2013, which were acquired through a third-party intermediary. Specifically, First NBC invested in short-term receivables traded over The Receivables Exchange (TRE).  This activity involved purchasing accounts receivable from sellers willing to take a discount on the overall amount owed to them in exchange for immediate returns.  Sellers guaranteed repayment of the receivables within a certain period of time, usually less than 120 days. These investments presented credit, liquidity and concentration risk. ***First NBC entered the market for purchasing trade receivables when it was relatively new and became one of the largest national investors.*** . . .  By 2015, the bank's $250 million investment in trade receivables represented more than 50 percent of total capital.    Additionally, First NBC ***had a substantial concentration in one company, which further elevated its credit risk.***
>
> . . . [E]xaminers identified two other risks created by these investments:
> - Liquidity Risk.  Liquidity risk is the potential that a bank will be unable to meet its obligations as they come due because of an inability to liquidate

assets or obtain adequate funding. In a liquidity stress event, it is unknown if the bank can reduce its position on its trade receivables on very short notice without the value of the receivable declining.

- Credit Risk.  Credit risk refers to the risk that a borrower may not repay a loan and that the lender may lose the principal of the loan or the interest associated with it. Repayment of the trade receivables is dependent on the financial condition/cash flow from the selling entities.

***Examiners determined that the bank had been reporting the receivables as asset-backed debt securities instead of loans as required by Call Report instructions and related accounting standards.*** The misclassification resulted in a material Call Report error. Further, the bank was not allocating amounts to the ALLL for this category of loans. Banks must maintain an ALLL adequate to absorb estimated credit losses associated with the loan portfolio. ***By 2016, examiners noted that the bank had an unrecognized impairment in its accounts receivable investments. The charge off of the accounts receivable investments, when coupled with errors related to its tax credit investments discussed below, contributed to the financial decline of the bank.***

Report at 11-12 (emphases added).

### D.    *Improperly-accounted-for investments in tax credit investments*

75.    The Inspector General further concluded that the Bank made accounting errors related to its tax credit investments that significantly impacted its earnings and capital:

First NBC had a significant investment in projects that generated tax credits totaling $108.6 million as of December 31, 2015. The structure of these investments and related tax credits varied depending on the type of transaction. Further, ***the bank's significant tax credit investments created another concentration risk.  Examiners noted that investing significant sums of money in such instruments carried credit and economic risks and added a dimension of complexity, thus heightening the bank's risk profile.***

The bank generally invested in three key types of tax credit transactions:

- New Market Tax Credits. Funded by the U.S. Treasury Department's Community Development Financial Institutions Fund, these credits attract private-sector capital investment into urban and rural low-income areas to help finance community development projects, stimulate economic growth, and create jobs.
- Historic Tax Credits. Tax credits that are generated by the re-development of historic properties, which are then sold to inject additional equity into the project upon completion.

- Low-Income Tax Credits. Tax credits that are issued upon completion of housing units and apartments with a percentage of housing designated for low income renters.

As long as these projects were structured properly, they were government approved and would yield tax credits that flowed through to First NBC's earnings. Excess credits that were not used in the current year were recorded as a DTA on the bank's financial statements and could be used in future years when the bank had a tax obligation and income. These "tax carryforwards" are realized only if the institution generates sufficient future taxable income during the carryforward period. ***Examiners reported that the practice of generating tax credits through loans and direct investments appeared to be an effective strategy as long as the bank remained profitable.***

The CEO viewed the investment tax credits to be attractive because they helped to meet requirements under the Community Reinvestment Act (CRA), generated significant earnings, and reduced First NBC's income tax liability. ***However, two issues existed with this premise: (1) impairments could occur on some of the tax credits because of issues with the related investment project and (2) the bank had to generate enough pre-tax earnings to use the DTA associated with the tax credits. As the bank's investments in complicated federal and state tax credit entities continued to grow, the bank became increasingly reliant on these tax credits to boost earnings performance.*** As explained in its 2014 annual report, the bank's investment in tax credits was a key part of a strategy to provide shareholders with exceptional returns. Examiners reported that by 2014, recognized tax benefits from tax credit investments ***accounted for 47 percent of net income***.

During the external audit of the bank holding company's 2015 financial statements, the ***auditors determined that the bank had been incorrectly accounting for tax credit investments***. The impairments primarily related to the investments in historic tax credits and resulted in an adjustment of $54 million to retained earnings going back to 2009 with the majority of the impairments recognized in 2014 and 2015. Later in March 2017, the bank recognized a $45 million write-down against retained earnings on its tax credit investments. In addition, just prior to the bank's failure, external auditors determined that the majority of the DTA totaling $400 million would need to be charged off or recognized as significantly impaired, increasing the bank's net losses.

***The combination of the losses the bank realized related to its large loan relationships, accounts receivable, and investment tax credits severely diminished the bank's earnings and depleted capital to a point at which the bank could not recover.***

Report at 12-13 (footnotes omitted) (emphases added).

### E.    *Severely compromised risk management practices*

76.    The Inspector General further concluded that the Bank pursued weak risk

management practices, which significantly exacerbated credit risks:

> Despite significant growth in assets and in the breadth of its activities, the
> organizational structure and controls at First NBC did not materially
> change.   In the context of newly chartered institutions, the FDIC's
> Examination Manual states that "changes lead to increased risk and
> financial problems if accompanying controls and risk management
> practices are inadequate." Critical elements of effective management and
> Board supervision include ensuring that appropriate policies, organizational
> controls, and risk parameters are in place. . . .  ***[M]anagement failed to
> establish an adequate risk management program commensurate with the
> risk in the bank's loan portfolio.***  Risk management deficiencies related to
> loan extensions and loan reviews were the most prevalent.

Report at 8 (emphasis added).

### F.    *Domination by Defendant Ryan*

77.    Finally, the Inspector General concluded the Bank was led by a dominant official,

Defendant Ryan, with broad lending authority and limited oversight.

78.    In general, the Inspector General noted,

> Dominant officials and weak Board oversight have been common contributing
> factors identified in previous MLRs [Material Loss Reviews] and proved to be a
> factor at First NBC. Bank officers are responsible for running day-to-day
> operations in a safe and sound manner and in compliance with applicable laws,
> rules, and regulations. This responsibility includes implementing appropriate
> policies and business objectives.  The Board is responsible for the formulation of
> sound policies and objectives of the bank, effective supervision of its affairs, and
> promotion of its welfare. First NBC's officers had extensive banking experience
> and were familiar with the New Orleans banking environment.  Examiners noted
> that the Board members exhibited a diverse set of backgrounds and experiences to
> help guide the bank.  However, an institution may be exposed to potential abuse
> and/or poor risk selection when the Board relies excessively on a dominant
> individual or group for its strategy, policy, membership selection, and other
> decision-making processes.

Report at 4.

79.     These risks materialized too an exceptionally high degree at the Bank, as Defendant Ryan seized and kept tight reins over other officers and directors.  As the Inspector General concluded:

> Throughout its history, examiners characterized First NBC's Chief Executive Officer (CEO) *[Ryan] as a dominant official who made most, if not all, of the operational and executive decisions*.  FDIC guidance related to a dominant official notes that *the presence of such an official should not be construed as a supervisory concern in and of itself.  Rather, the presence of a dominant official coupled with other risk factors is a concern*. These risk factors included a lack of adequate Board oversight, and engaging in questionable or risky business strategies irrespective of the financial performance of the bank. According to a statement in the 2016 examination report, *the First NBC CEO dominated the bank's strategy, risk appetite, credit culture, and daily operations through December 2016, when the Board replaced him*. According to examination reports, the CEO:
> - Was the driver behind the bank's aggressive growth and funding strategy, which is described in more detail in the next section of the report.
> - Fulfilled roles not usually compatible with that of a CEO.  For example, he acted as the Chief Financial Officer (CFO) overseeing the bank's accounting and financial activities for the first 4 years of the bank's existence, served on the Audit Committee early in the bank's history, and directly oversaw the audit function and its reporting.
> - Operated the bank outside policy guidelines at times and engaged in certain lending practices that were not prudent.
> - *Continued to make loan extensions and other risky credit and investment decisions during his tenure even when those activities were subject to examiner criticisms*.
> - *Was involved in questionable lending decisions. For example, the CEO obtained a $2 million personal loan from one of the bank's borrowers, who had recently received a $9 million unsecured loan from the bank*.

Report at 4-5 (emphases added).

**IV.    Instead of Addressing Improper Investment Practices, Risk Management Failures, and Accounting Improprieties, the Officer Defendants, in Conspiracy with the Bank's General Counsel, Conceal the Issues and Convince the Holding Company to Serve as a Piggy Bank for their Scheme to Run the Bank for their Personal Benefit**

80.     In the Report, the Inspector General found that Bank "examiners [had] identified repeated risk management weaknesses" but had "relied . . . heavily on the [B]ank's financial

condition and ability to raise capital [including from the Holding Company] in taking supervisory action and assigning management and asset quality ratings."  *See id.* (Executive Summary) at ii.

81.   In particular, the Inspector General noted that although "examiners reported repeated concerns with bank management and asset equality," they nonetheless "assigned improved ratings to both areas in 2011 and 2014, years that [the Bank] received significant capital injections."  Report at ii.

82.   In particular, the Inspector General found,

asset quality and management ratings improved in 2011 and 2014, years that [the Bank] received significant capital injections [from the Holding Company], despite the fact that various risk factors were consistently identified.  Moreover, [the Bank]'s composite rating was a "2" (i.e., fundamentally sound) until the institution experienced financial decline in 2016 and then it was downgraded to a "4" (i.e., exhibiting unsafe and unsound practices).

*Id*. at 17.

83.   The Inspector General further noted that

Examiners told us that they were concerned by First NBC's rapid growth and inadequate staffing levels relative to the breadth and complexity of the growing bank's operations.  But in 2008 and 2009, examiners were confident that management would ensure adequate staffing was in place to handle the rapid growth.  In 2010, the management rating was downgraded to a "3," which indicated improvements were needed and risk management practices were less than satisfactory.  The level of management-related issues identified in subsequent examinations could have supported a "3" rating of management – especially considering similarities of issues reported.

*Id.* at 19.

84.   Nonetheless,

According to the Division of Risk Management Supervision's (RMS) own analysis of the bank's supervisory history, ***increased capital levels supported the component rating increase in 2011***.

*Id*. (emphasis added).  Moreover,

> The 2014 examination stated that the management component "2" rating reflected improvements and placed emphasis on the financial condition of the bank, *__including a $67 million capital injection from the holding company__*.

*Id.* (emphasis added).  Further,

> In 2009, only three years after the bank opened, examiners identified a dramatic increase in adversely classified items, concentrated in two large loans. Examiners also highlighted underwriting and credit administration weaknesses, including lack of current appraisals, limited owner's equity, and renewals or extensions without principal reduction.  Examiners upgraded the asset quality rating to a "2" in 2011 and 2014, in part, because First NBC's ACI coverage ratio declined. The ratio measures the amount of capital at risk should an asset be written off or down due to loan quality issues.  We noted that *__the ACI coverage ratio improved because of increased capital, not because of a significant decrease in the dollar amount of adversely classified items__*.

*Id*. at 22 (emphasis added).

85.    The Officer Defendants—who were experienced bankers and financial professionals—knew or recklessly disregarded that the Bank was essentially getting a "free pass" from its primary regulator as to risk management weaknesses that put the Bank and the Holding Company at significant risk.  In particular, the Officer Defendants knew that so long as the Bank continued to receive injections of capital—including from its parent, FNBC—regulators would look the other way, the Bank and the Holding Company would continue to be regarded as well-capitalized, and the risky practices could continue (which would directly benefit the Officer Defendants at the expense of the Bank and the Holding Company).  This strategy involved and depended on convincing the Holding Company's Board of the safety and soundness of the Bank and its worthiness of receiving continued capital injections.

86.    Through such capital injections, and corresponding favorable ratings from regulators, the Bank was allowed by the Board of Directors to continue giving free license to the

Officer Defendants to run the Bank.  The quality of the Bank's supervision of its investments, accounting procedures, and risk management procedures suffered correspondingly.

87.  For example, as the Inspector General noted, "[B]ank loan reviews were overseen by the CEO.  Larger institutions typically establish separate loan review departments staffed by independent credit analysts and loan review personnel that report their findings directly to the Board of a Board committee."  Report at 9.

88.  At the Bank, however, "[e]xaminers . . . noted that ***staffing shortages led to accounting, reporting, and credit review deficiencies***."  Report at 10 (emphasis added). Moreover,

> In 2010, examiners pointed out that the bank's failure to evaluate the adequacy of the credit analysis staff relative to the growth, size, and complexity of the loan portfolio exacerbated the risk posed to the bank in the credit administration area. According to examiners, the total volume of adversely classified items increased in 2012 to 30 percent of total capital during a time when the loan review function was understaffed. Examiners also attributed apparent violations and contraventions of Statements of Policy to inadequate staffing. Further, due to the ongoing weaknesses in First NBC's loan review program and improper classification of problem loans, First NBC overstated the true condition of the loan portfolio and underfunded the [Allowance for Loan and Lease Losses].[2]

*Id*.

89.  The Inspector General prepared a chart in which it clearly noted that "Management rating improved ***when capital was injected***" and "Asset quality rating improved ***when capital was injected***":

---

[2]  This measure, referred to as "ALLL," is an estimate of uncollectible amounts that is used to reduce the book value of loans and leases to the amount that is expected to be collected.

**Figure 4: Analysis of Asset Quality and Management-Related Issues, 2008 to 2016**



Report at 18.

**V.     In Reliance on the Officer Defendants' Deceptive and other Wrongful Conduct, the Holding Company's Board Approves Various Actions which Deplete Capital from from the Holding Company and Ensure its Eventual Demise**

90.     In direct reliance on misstatements and concealments by the Officer Defendants of material information concerning the Bank, its risk management practices, its management and asset quality, and other information, the Holding Company's Board approved numerous capital contributions from the Holding Company to the Bank from 2011 to 2015 in the following amounts:

| **2011** | **2012** | **2013** | 2014 | 2015 |
|---|---|---|---|---|
| $67,508,000 | $16,600,000 | $67,000,000 | 0 | $50,000 |

91.     The total of such capital injections to the Bank, documented in the Holding Company's Forms 10-K, was $201,108,000.[3]

92.     In February 2015, the Officer Defendants caused the Holding Company's Board to approve the issuance of subordinated debentures (i.e., borrow) in the amount $60.0 million. The Holding Company's Form 10-Q for the first quarter of 2015 disclosed that:

> During February 2015, FNBC issued $60.0 million in subordinated debentures, with a rate of 5.75% and a maturity date of February 2025, unless early [sic] redeemed. Interest on the debentures is payable semiannually in arrears on February 18 and August 18 of each year, commencing August 18, 2015. FNBC plans to use the net proceeds from the sale of the subordinated notes for general corporate purposes, which may include supporting the continued growth of its business, acquisitions, and the redemption or repayment of other fixed obligations.

93.     Only later was it disclosed that this $60 million loan was, in fact, taken for purposes of investing some or all of the funds into the Bank.  As set forth in the Form 10-Q for the second quarter of 2016, "FNBC issued the subordinated debentures during the first quarter of 2015 due to the favorable rate environment and the opportunity to inject additional capital into the First NBC Bank to fund growth."

94.     Even this statement, which the Officer Defendants caused FNBC to make, was false.  The Officer Defendants well knew that the Bank's capital position was highly precarious due, among many other factors, to the concentration of loans to noncreditworthy borrowers, including renewals, extensions, and replacement loans that were deliberately designed to make

---

[3]     The Inspector General noted differently-timed, but roughly similar, amounts injected into the Bank by the Holding Company:  $67,043,000 in 2011, $16,600,000 in 2012, $0 in 2013, $67,000,000 in 2014, and $27,662,000 in 2015, for a total of $178,305,000.

nonperforming loans appear performing. The only "growth" to be funded at the Bank by the Holding Company's capital injections was, in effect, an ever-increasing base of poor-quality and nonperforming investments (including loans and tax credit investments, among others) whose dominant purpose was to pay off or help obscure earlier poor-quality and nonperforming investments. In sum, the capital injections at issue were, by design, not geared to the growth of legitimate businesses at the Bank but simply to temporarily postpone its inevitable collapse.

95.     By causing the Holding Company to make the capital contributions to the Bank, the Officer Defendants deprived the Holding Company of the benefit of being better capitalized when the Bank became insolvent. The Officer Defendants failed to provide the Holding Company and the Holding Company's Board with the truthful, accurate, and complete information regarding the Holding Company and its subsidiary, the Bank, that the Holding Company's Board required to evaluate whether the Holding Company actually should make the capital contributions to the Bank. The result of this failure was that the capital contributions were lost when the Bank was placed into receivership.

96.     Moreover, the Officer Defendants' fiduciary breaches in this regard increased the harm to the Holding Company in the form of causing it to incur $60 million of debt in early 2015, which artificially prolonged the Holding Company's existence and caused it to incur additional losses, including but not limited to an improvident $50 million capital injection into the Bank later that same year.

## VI.     The Officer Defendants and St. Angelo Turn their Scheme into Millions of Dollars in Unjust Compensation and Ill-Gotten Gains

97.     At the same time they were perpetuating the insolvent Bank and adding to the Holding Company's growing losses, the Officer Defendants caused the Holding Company's

Board to approve millions of dollars in unjust compensation to themselves.

98.    As publicly reported in SEC filings, all three of the Officer Defendants received lavish compensation packages from 2012 to 2015, in the form of salaries, bonuses, stock awards, option awards, incentive plan participation, and other compensation.  The amounts grew each year, even as the Holding Company's losses mounted.

99.    In total, at the same time that the Officer Defendants drove FNBC into insolvency, the Officer Defendants received total compensation packages collectively worth just under *$8 million*:

|  | **2012** | **2013** | **2014** | **2015** |
|---|---|---|---|---|
| **Ryan** | 921,489 | 1,231,353 | 1,467,078 | 1,612,855 |
| **Verdigets** | 296,906 | 340,986 | 372,016 | unknown |
| **Burnell** | 404,887 | 484,995 | 563,648 | 653,884 |
| **TOTAL** |  |  |  | $7,978,081 |

100.    As alleged in the St. Angelo criminal information, St. Angelo received millions of dollars in ill-gotten gains from the Bank, including more than $9.6 million in fraudulent payments.  In addition, St. Angelo received a monthly retainer as General Counsel to the Bank in the amount of $40,000.   Given his actions alleged herein, such compensation was entirely inappropriate and unjustly enriched St. Angelo.  St. Angelo's receipt of such funds was pursuant to his conspiracy and common enterprise with the Officer Defendants alleged herein.

**VII.    The Board Relies on Public Misstatements by the Officer Defendants**

101.    Hiding the extent of their own mismanagement from the Holding Company's Board formed an integral part of the Officer Defendants' misconduct.  Throughout the Relevant Period, the Officer Defendants caused the Holding Company to make false and misleading statements, as well as failed to disclose material adverse facts about its business, operations, and

prospects.  The Officer Defendants knew that the Board would rely upon these statements and omissions, but the Officer Defendants knew or recklessly disregarded their falsity.

102.    In the IPO Offering Materials dated May 9, 2013, the Officer Defendants disclosed that after the issuance of its audited financial statements for 2011, issued on April 30, 2012, FNBC had determined that it was required to restate its previously issued 2009, 2010, and 2011 financial statements.  The restatement was necessary due to improper allocation among various periods of amounts related to the Holding Company's deferred income taxes.  Further, the Holding Company had determined that the errors requiring restatement were caused by a lack of accounting employees with appropriate technical skills and knowledge regarding income tax accounting for tax credit investments, leading to a material weakness in internal controls. However, the Officer Defendants caused FNBC to assure the public that the Holding Company had addressed the material weakness, including "appropriate actions to . . . hir[e] additional accounting personnel, provid[e] training to our personnel to develop the expertise in tax credits, us[e] outside accountants and consultants to supplement our internal staff when necessary, and implement[] additional internal control procedures."  Further, the Officer Defendants stated that the Holding Company's Board, in coordination with its audit committee, would "continually assess the progress and sufficiency of these initiatives and make adjustments, as necessary."

103.    On June 24, 2013, the Officer Defendants filed FNBC's Form 10-Q for the first quarter of 2013, the period ending March 31, 2013.  In it, the Officer Defendants represented that FNBC had gained a net income of over $8.2 million, an increase of over $1.8 million compared to the first quarter of 2012.  As it related to the Bank's investments in tax credit entities, the Holding Company stated that it "engages in material investments in entities that are designed to generate tax credits" and that these investments rose to nearly $66.7 million as of March 31,

2013.  Specifically with respect to the FNBC's accounting for its investments related to low-income housing and federal historic rehabilitation tax credits, the Holding Company represented that, based on the structure of such transactions, it would recover its investments solely through use of the tax credits that were expected to be generated by the investments, and that these amounts would be amortized on a straight-line basis over the period during which the Holding Company retained, or maintained, it 99.9% interest in the property.  FNBC did not disclose or discuss any impairment with respect to its investments in tax credit entities.

104.    On July 30, 2013, the Officer Defendants caused FNBC to issue a press release announcing FNBC's 2Q13 financial results for the interim period ended June 30, 2013.  FNBC reported net income of $8.6 million, or $0.48 diluted earnings per share ("EPS"), and total assets of $3.0 billion.  One day later, FNBC filed a Form 8-K with the SEC announcing that Defendant Ryan would present to investors later that month, including slides stating that FNBC's tax credit business was a "unique feature" with "[s]trong financial returns" that was "an integral part of [FNBC]'s commercial banking business" and "core to [FNBC]'s corporate strategy."  The presentation also represents that FNBC's management, including the Officer Defendants, had special expertise and aptitude for tax credit investments, stating unequivocally that "[m]anagement has a deep understanding of this business."

105.    These same claims regarding the strength and aptitude of FNBC's management were reiterated on November 14, 2013 and February 13, 2014.

106.    On August 14, 2013, the Officer Defendants caused FNBC to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2013, which was signed and certified under the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Ryan and Verdigets.  The 2Q13 10-Q reiterated the financial results reported on July 30, 2013.  The 2Q13 10-Q also

reiterated FNBC's comments the previous quarter concerning the structure of tax credit investments.

107.   On November 7, 2013, the Officer Defendants caused FNBC to issue a press release announcing its 3Q13 financial results for the interim period ended September 30, 2013. FNBC reported net income of $10.4 million, or $0.54 diluted EPS, and total assets of $3.2 billion.

108.   On November 14, 2013, the Officer Defendants caused FNBC to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2013, which was signed and certified under SOX by defendants Ashton and Verdigets.  The 3Q13 10-Q reiterated the financial results reported on November 7, 2013.  The 3Q13 10-Q also reiterated FNBC's comments the previous quarter concerning the structure of tax credit investments.

109.   On February 11, 2014, the Officer Defendants caused FNBC to issue a press release announcing its 4Q13 and FY13 financial results for the periods ended December 31, 2013. FNBC reported net income of $13.5 million, or $0.69 diluted EPS, for 4Q13, and net income of $40.9 million, or $2.32 diluted EPS, and total assets of $3.3 billion for FY13.

110.   On March 31, 2014, the Officer Defendants caused FNBC to file its annual report on Form 10-K with the SEC for the period ended December 31, 2013, which was executed on behalf of FNBC by each of the Officer Defendants, and certified under SOX by defendants Ashton and Verdigets.  The 2013 10-K reiterated the financial results reported on February 11, 2014.  The 2013 10-K also reiterated FNBC's comments the previous quarter concerning the structure of tax credit investments.  The 2013 10-K contained a letter addressed to "The Board of Directors and Shareholders of First NBC Bank Holding Company," dated March 31, 2014, and signed by EY.  The letter stated that, "In our opinion, the financial statements referred to above

*present fairly, in all material respects, the consolidated financial position of First NBC Bank Holding Company at December 31, 2013 and 2012, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2013*, in conformity with U.S. generally accepted accounting principles."  (Emphasis added.)

111.    As it related to investments in tax credit entities, the 2013 10-K disclosed that such investment had risen to nearly $118 million as of December 31, 2013, an increase of $50.3 million compared to the previous year.  The 2013 10-K reiterated, with respect to the material weakness in internal controls discovered at FNBC in 2013, that the Holding Company had taken appropriate steps to address the weakness.  Further, the Officer Defendants caused the Holding Company to assert that it had "carried out an evaluation under the supervision and with the participation of its management [i.e., including the Officer Defendants] of the effectiveness of the design and operation of [FNBC]'s disclosure controls and procedures" which were deemed by the Holding Company to be "effective."

112.    On May 1, 2014, the Officer Defendants caused FNBC to issue a press release announcing its 1Q14 financial results for the interim period ended March 31, 2014.  FNBC reported net income of $12.8 million, or $0.66 diluted EPS, and total assets of $3.5 billion.

113.    On May 15, 2014, the Officer Defendants caused FNBC to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2014, which was signed and certified under SOX by defendants Ashton and Verdigets.   The 1Q14 10-Q reiterated the financial results reported on May 1, 2014.  The 1Q14 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to FNBC's internal control over financial reporting.

114.    On July 28, 2014, the Officer Defendants caused FNBC to issue a press release announcing its 2Q14 financial results for the interim period ended June 30, 2014.   FNBC reported net income of $12.7 million, or $0.65 diluted EPS, and total assets of $3.6 billion.

115.    On August 14, 2014, the Officer Defendants caused FNBC to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2014, which was signed and certified under SOX by defendants Ashton and Verdigets.   The 2Q14 10-Q reiterated the financial results reported on July 28, 2014.   The 2Q14 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to FNBC's internal control over financial reporting.

116.    On October 28, 2014, the Officer Defendants caused FNBC to issue a press release announcing its 3Q14 financial results for the period ended September 30, 2014.  FNBC reported net income of $14.4 million, or $0.73 diluted EPS, and total assets of $3.6 billion.

117.    On November 12, 2014, the Officer Defendants caused FNBC to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2014, which was signed and certified under SOX by defendants Ashton and Verdigets.  The 3Q14 10-Q reiterated the financial results reported on October 28, 2014.  The 3Q14 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to FNBC's internal control over financial reporting.

118.    On January 30, 2015, the Officer Defendants caused FNBC to issue a press release announcing its 4Q14 and FY14 financial results for the periods ended December 31, 2014. FNBC reported net income of $15.7 million, or $0.80 diluted EPS, for 4Q14, and net income of $55.6 million, or $2.84 diluted EPS, and total assets of $3.8 billion for FY14.

119.   On February 18, 2015, FNBC privately placed $60 million of its 5.75% Subordinated Notes due 2025 with certain qualified institutional investors, subject to FNBC's promise to later register those notes for resale publicly.

120.   On March 31, 2015, the Officer Defendants caused FNBC to file its annual report on Form 10-K with the SEC for the period ended December 31, 2014, which was executed on behalf of FNBC by each of the Officer Defendants, and certified under SOX by defendants Ashton and Verdigets.   The 2014 10-K reiterated the financial results reported on January 30, 2015.   The 2014 10-K further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to FNBC's internal control over financial reporting.   The 2014 10-K contained a letter addressed to "The Board of Directors and Shareholders of First NBC Bank Holding Company, dated March 31, 2015, and signed by EY. The letter stated that, "In our opinion, the financial statements referred to above ***present fairly, in all material respects, the consolidated financial position of First NBC Bank Holding Company at December 31, 2014 and 2013, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 13, 2014***, in conformity with U.S. generally accepted accounting principles."  (Emphasis added.)

121.   On April 30, 2015, the Officer Defendants caused FNBC to issue a press release announcing its 1Q15 financial results for the period ended March 31, 2015.   FNBC reported net income of $16.0 million, or $0.82 diluted EPS, and total assets of $4.1 billion.

122.   On May 8, 2015, the Officer Defendants caused FNBC to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2015, which was signed and certified under SOX by defendants Ashton and Verdigets.   The 1Q15 10-Q reiterated the financial results reported on April 30, 2015.   The 1Q15 10-Q further attested that the financial results were

accurate and prepared in compliance with GAAP and that it disclosed any material changes to FNBC's internal control over financial reporting.

123.    On August 11, 2015, FNBC filed an NT 10-Q, Notification of Late Filing, on Form 12b-25, which disclosed in pertinent part as follows:

> In connection with the preparation of its Form 10-Q for the quarter ended June 30, 2015, *the registrant identified errors in its accounting for certain of its investments in tax credit entities*.  As a result of the time needed by the registrant to evaluate the impact of the errors in its accounting for certain of its investments in tax credit entities, and for the registrant and its auditors to evaluate the implications of the adjustments on current and historical financial statements and the registrant's evaluation of internal control over financial reporting, the registrant requires additional time to complete and file its Form 10-Q.  The registrant expects to file its Form 10-Q within the extended time period prescribed under Exchange Act Rule 12b-25.

124.    On August 17, 2015, the Officer Defendants caused FNBC to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2015, which was signed and certified under SOX by defendants Ashton and Verdigets.   The 2Q15 10-Q reported net income of $17.2 million, or $0.88 diluted EPS, and total assets of $4.1 billion for 2Q15.   The 2Q15 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to FNBC's internal control over financial reporting.

125.    On August 27, 2015, FNBC conducted a registered exchange of its $60 million of 5.75% Subordinated Notes due 2025 privately placed in February 2015 with notes registered for resale under the federal securities laws.   The registered exchange offering was conducted pursuant to a registration statement filed with the SEC on Form S-4 on May 18, 2015, which had been amended several times based on comments received from the SEC and declared effective by the SEC on August 20, 2015.   The registration statement for the exchange offering expressly incorporated by reference FNBC's 2014 10-K and its 1Q15 and 2Q15 Forms 10-Q.

126.    On November 2, 2015, the Officer Defendants caused FNBC to issue a press release announcing its 3Q15 financial results for the interim period ended September 30, 2015. FNBC reported net income of $17.8 million, or $0.92 diluted EPS, and total revenue of $4.3 billion.

127.    On November 9, 2015, the Officer Defendants caused FNBC to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2015, which was signed and certified under SOX by defendants Ashton and Verdigets.  The 3Q15 10-Q reiterated the financial results reported on November 2, 2015.  The 3Q15 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to FNBC's internal control over financial reporting.

128.    Each of the above public filings in paragraphs 101-127 was materially false and misleading when made, in that it failed to disclose and misrepresented the following adverse facts which were known to the Officer Defendants or recklessly disregarded by them.

129.    The disclosures concerning FNBC's internal controls were false and misleading because, as admitted in part in the Holding Company's delayed Form 10-K filing for 2015 on August 25, 2016, the Holding Company's disclosure controls and procedures and internal control over financial reporting were not effective due to material weaknesses with respect to (1) FNBC's control environment and risk assessment; (2) the lack of a sufficient number of accounting personnel with the appropriate technical expertise and knowledge of the accounting for the Holding Company's investments in certain of its tax related entities and the related evaluation of impairment associated with those investments; (3) the monitoring of certain borrowers' ability to repay loans related directly to the Officer Defendants' concealment of the Holding Company's risk of loss from such loans; and (4) the monitoring of the financial stability

and creditworthiness of companies from which it had acquired trade receivables.

130.    The disclosures concerning actual financial results were false and misleading because, with the absence of effective risk and internal controls, the generated financial results could not be trusted, and, more particularly, because, *inter alia*:   (1) FNBC was improperly accounting for its federal and state rehabilitation tax credit entities; (2) the carrying value of investments, including tax credit entities, was overstated in that the Holding Company should have marked such investments as impaired and taken charges against them much earlier; (3) the Holding Company had not properly consolidated its variable interest entities related to low-income housing tax credit entities; (4) the Holding Company had a larger exposure to the oil and gas industry than it had disclosed in the past; (5) the Holding Company had failed to take adequate reserves against its growing oil and gas industry exposure; (6) the Bank had made numerous, concentrated, improvident loans to borrowers who lacked creditworthiness, based on financial measures such as accounts receivable which had deliberately and personally been inflated by the Officer Defendants, in connection with efforts to unjustly enrich the Officer Defendants at the Bank's and the Holding Company's expense; and (7) the Bank had invested in entities that did not qualify for tax credit status at all, as a favor to certain persons who were either Bank borrowers or had lent money to the Officer Defendants personally, often based on deliberately false documentation.

## VIII. FNBC's Audited Financial Statements and Internal Controls were Materially Deficient at all Relevant Times

131.    As discussed below, FNBC's audited financial statements and internal controls suffered from material deficiencies at all relevant times.

### A.    *Improper Accounting for Tax Credit Investments*

#### 1.    Background

132.    FNBC and its banking subsidiary First NBC Bank were organized in 2006 in the aftermath of the devastation of the New Orleans metropolitan area by Hurricane Katrina, and their business was focused on taking advantage of opportunities to be found in the recovery of New Orleans including tax credits that were generated through reconstruction efforts. Throughout the Relevant Period, FNBC invested in tax credit entities that qualified for Federal tax credits under the Community Reinvestment Act ("CRA"). FNBC's participation and investment in such entities afforded it the associated Federal tax credits from investments – namely Federal New Market Tax Credits ("NMTC"), Low-Income Housing Tax Credits ("LIHTCs"), and Federal Historic Rehabilitation Tax Credits ("FHRTCs") – to offset FNBC's income tax liability.[4]

133.    FNBC's investments in such entities greatly impacted FNBC's profits and losses because these types of investments generally afford companies "tax benefits in the form of tax deductions from operating losses and tax credits" (Accounting Standards Codification ("ASC") 323-740-05-3) and such benefits were an integral part of FNBC's business model to grow profits throughout the Relevant Period. These investments in tax credit entities, as disclosed by FNBC and discussed throughout this Complaint, provided substantial boosts to FNBC's net income. For

---

[4]    FNBC's accounting misstatements related primarily to investments in entities that obtained LIHTCs and FHRTCs.

instance, on the originally reported 2013 and 2014 Forms 10-K, tax credit benefits alone accounted for 48.2% and 48.5% of FNBC's net income.[5]

134.    During the Relevant Period, FNBC publicly reported financial results, audited and approved by the Auditor Defendants, indicating that FNBC was a rapidly growing company reaping strong returns from its investments in tax credit entities. Indeed, for the years ended December 31, 2011 through 2014, FNBC originally reported net income of $19.7 million, $29.5 million, $40.9 million, and $55.6 million – a growth rate of approximately 180%. And in quarterly earnings press releases and other filings throughout the Relevant Period, FNBC similarly reported a consistent trend of, among other things, increasing net income, accumulated earnings, and total assets.

135.    During the Relevant Period, the Auditor Defendants were on notice of the importance of tax credits to FNBC because FNBC's directors and officers highlighted these strong financial trends while simultaneously trumpeting the strength and uniqueness of FNBC's investments in tax credits, noting that FNBC's tax credit business generated "[s]trong financial returns," and was "an integral part of First NBC's commercial banking business" and "core to First NBC's corporate strategy."

136.    According to FNBC's audited financial statements, during the Relevant Period FNBC was performing extremely well. However, as was ultimately revealed, FNBC's financial returns were materially misstated due to faulty accounting and weak internal controls, which remained undetected for years by the Auditor Defendants.

---

[5]    During these years, FNBC recorded $19.751 million and $26.976 million in tax credits from investments in tax credit entities.

137.    As noted above, through the CRA, the United States government incentivizes investors, frequently banks, to invest capital into projects that improve underprivileged communities as well as historic properties. The entities through which such investments are made into these types of projects are referred to as "tax credit entities" or "tax credit partnerships." A tax credit entity, often a partnership, is a vehicle through which parties may invest in real estate – a low-income rental property, historic buildings, etc. – that generates "tax benefits in the form of tax deductions from operating losses and tax credits" for the investor. ASC 323-740-05-3. The tax deductions and credits obtained through the partnership ultimately reduce the investor's income tax liability.

138.    For tax purposes, an obligation to pay income tax can be reduced by way of either deductions or credits. An income tax deduction is a reduction of an entity's taxable income on its Federal income tax return. After all tax deductions are subtracted from a taxpayer's income, the pre-tax net income is multiplied by a company's applicable income tax rate to calculate its income tax liability. A *deduction* reduces an entity's tax liability by an amount equal to that obtained by multiplying the statutory tax rate of the company, which in the case of FNBC was roughly 35% during the Relevant Period, by the amount of the deduction. Thus, for every $1 deduction, FNBC could have expected to receive a $0.35 tax savings.

139.    On the other hand, an income tax *credit* directly reduces a taxpayer's liability on a dollar-for-dollar basis. As such, a tax credit often generates greater tax savings. Thus, for every $1 in tax credits, FNBC expected a $1 reduction in its tax liability (as opposed to, for example, $0.35 for an equivalent $1 deduction). As such, tax credits were extremely valuable to FNBC's reduction of its tax liability.

2.     **Nature and Effect of the Tax Credit Misstatements**

140.    As described above, FNBC engaged in the business of investment in tax credit entities in order to supplement the profitability that could be achieved through traditional banking activities. Indeed, FNBC in its first two years as a public company relied on its tax credit investments for up to nearly half of the profitability reported in FNBC's audited financial statements.

141.    The underlying real estate rehabilitation and construction projects of the tax credit entities generated losses in their early phases due to depreciation of the real estate, interest expense from debt financing, construction costs and an inability to realize rental income before a certificate of occupancy can be obtained. However, FNBC erroneously adopted, and the Auditor Defendants negligently failed to identify and correct, improper accounting policies with respect to these investments that failed to recognize the full amounts of losses and expenses required by applicable accounting rules.

142.    The misstatements in FNBC's audited financial statements relating to FNBC's investments in tax credit entities emanated from three primary issues: (1) an inappropriate use of the 'amortized cost method' of accounting for investments in tax credit entities that effectively reduced FNBC's reported expenses throughout the Relevant Period; (2) failing to recognize any impairment (or far too little impairment) of its tax credit investments despite having information available at the time the Auditor Defendants' audited FNBC's financial results indicating that such investments were in fact impaired, also resulting in a reduction of FNBC's reported expenses throughout much of the Relevant Period; and (3) for a portion of investments that generated LIHTCs, failing to properly identify and consolidate those entities into its balance sheets during the Relevant Period, which resulted in FNBC foregoing recognition and reporting

of losses generated by these investments. Due to the materiality of these misstatements, individually and in the aggregate, as discussed herein, FNBC's audited financial statements were materially misstated and violated GAAP throughout the Relevant Period.

### a.    *Inappropriate Use of the Cost Amortization Method*

143.    GAAP provides the accounting treatment guidance to investors who have non-controlling interests in partnerships or LLCs that also can exert significant influence over the entity. *See* ASC 970-323: *Real Estate–Investments–Equity Method and Joint Ventures*. GAAP is universally clear that investors must assess the rights of the owner of an LLC regardless of whether the owner is a LP or GP in the partnership. Such an assessment should be based upon the terms of the operating agreement and the substance of the arrangement, which dictates the rights of each owner.

144.    The "substance" of the partnership arrangement also dictates the accounting method an investor should utilize when accounting for an investment in a partnership such as a tax credit entity. GAAP guidance provides, in relevant part:

> The equity method of accounting for investments in general partnerships is generally appropriate for accounting by limited partners for their investments in limited partnerships.
>
> ASC 970-323-25-6.

*  *  *

> If the substance of the partnership arrangement is such that the general partners are not in control of the major operating and financial policies of the partnership, a limited partner may be in control. An example could be a limited partner holding over 50 percent of the total partnership interest. A controlling limited partner shall be guided in accounting for its investment by the principles for investments in subsidiaries.
>
> ASC 970-323-25-8.

145.    Throughout most of the Relevant Period, FNBC's audited financial statements used the cost method to recognize the original cost of its investment as an asset on the balance sheet and then amortized the cost over the asset's estimated holding period. The cost method, however, is available only to investors who exert minimal or no influence over an investee. ASC 970-323-25-8. In its second quarter 2015 Form 10-Q, FNBC stated that "the Company determined that based on its equity ownership structure in certain of these investments [i.e., in tax credit entities] the equity method of accounting should have been applied." Thus, FNBC and the Auditor Defendants eventually recognized that at the time FNBC made its tax credit investments the "substance" of the operating agreements of the LLCs required FNBC to account for these investments by the equity method, rather than the cost method.

146.    The use of the amortized cost method to account for FNBC's tax credit investments had profound ramifications for FNBC's audited financial statements. By inappropriately amortizing its investments using a straight-line amortization over periods of 10 or 15 years depending upon the type of investment and credit sought, the audited financial statements reflected a ratable amortization expense that was substantially smaller than the accumulated losses that would have "flowed through" to FNBC's income statement if the investments had been properly accounted for under the equity method. Thus, FNBC's noninterest expenses as reported on its audited financial statements were substantially understated during the period, and its reported earnings were correspondingly overstated.

147.    Furthermore, had FNBC's audited financial statements utilized the equity method required under GAAP, FNBC would have recorded its initial investment on the balance sheet at cost and, at each reporting period, FNBC would have adjusted the carrying value of its investment to reflect "its share of the earnings or losses of an investee in the periods for which

54

they are reported by the investee in its financial statements." *See* ASC 323-10-35-4. Thus, profits generated by the investment would have increased FNBC's assets on the balance sheet, while losses would have reduced its assets.[6]

148. As FNBC generally recorded 99% or more ownership of the tax credit entities, practically all of the losses recorded by the tax credit entities should have been recorded on FNBC's audited financial statements throughout the period. This is extremely significant because, due to the nature of tax credit entities, which are essentially investments in real estate rehabilitation and/or construction projects, tax credit partnerships invested in real estate generate substantial losses to the investor for both tax and financial reporting purposes from the beginning of the investment. These losses are generated by depreciation of the real estate, interest expense from debt financing, construction costs of the properties and the inability to realize rental income until a certificate of occupancy for the development project is issued. As FNBC's investment holdings in tax credit entities reached over $100 million towards the end of the Relevant Period, the increased activity led to increased losses generated by increases in the aforementioned expenses

149. By failing to identify and correct FNBC's mistaken accounting for investments in tax credit entities with the improper "amortized cost method" in violation of GAAP, the Auditor Defendants allowed the accounting to conceal these losses since they were not reflected upon FNBC's audited income statement.

---

[6] Under the cost method that was used in FNBC's audited financial statements, no such increase or reduction is applied to an investment based upon the investee's profits or losses. As such, the "financial statements of an investor prepared under the cost method may not reflect substantial changes in the affairs of an investee [*i.e.*, the LLC]." ASC 325-20-35-2.

### b. *Failure to Record and Report Impairment*

150.    In addition to the improper use of the "amortized cost method" of accounting for investments in tax credit entities, FNBC's audited financial statements also violated GAAP by failing to adequately assess such investments for impairment throughout the Relevant Period, as FNBC and EY ultimately acknowledged in FNBC's 2015 Form 10-K.  The Auditor Defendants negligently failed to identify and correct these errors. Similar to the use of an improper accounting method for these investments, failure to record the impairment of FNBC's investments in tax credit entities had the effect of materially understating FNBC's reported expenses during the Relevant Period on its audited financial statements.

151.    In assessing investments for impairment, GAAP requires an evaluation of whether the carrying amount of an asset is recoverable. The carrying amount is recoverable when the higher of its (i) fair value less costs of disposal or (ii) value in use, is higher than its carrying amount. In the case of an investment in a tax credit partnership, the carrying amount is the initial investment and the fair value is the net assets of the partnership. If the carrying amount is not recoverable, the asset is impaired. A loss representing the amount of the impairment should be included in the operating expenses section of the income statement, and the carrying amount of the investment on the balance sheet is then reduced to its recoverable amount.

152.    Under GAAP, "a loss in [the] value of an investment" that is not a temporary decline must be recognized in the period in which it occurs. ASC 970-323-35-12. During the Relevant Period, as FNBC later disclosed in its 2015 Form 10-K, FNBC's audited financial statements did not reflect proper "analyses of potential impairments given information that was available at the time the prior period statements were issued." Thus, FNBC's audited financial

statements failed to comply with GAAP and the Auditor Defendants negligently failed to identify and correct this failure.

153.    Collectively, combined with the misstatements relating to accounting for investments in tax credit entities, the lack of impairment charges reflected in FNBC's audited financial statements during the Relevant Period materially understated noninterest expenses. GAAP required the recognition of impairment charges in the periods from which they emanated. By failing to reflect these charges, FNBC's audited financial statements understated reported noninterest expenses throughout the Relevant Period in violation of GAAP. Indeed, in 2013 and 2014, noninterest expenses were approximately 40% higher than what FNBC's audited financial statements originally reported for those years.

### c.    *Failure to Consolidate Variable Interest Entities*

154.    FNBC also acknowledged in its 2015 Form 10-K that, during the Relevant Period, its audited financial statements failed to properly consolidate certain tax credit partnerships that were determined to be Variable Interest Entities ("VIEs") due to FNBC being a "primary beneficiary" of such entities. Based upon the structure of its investments in tax credit entities, GAAP required FNBC to assess whether such partnerships were in fact VIEs for the benefit of the investor, *i.e.*, FNBC. VIEs must be identified by an organization in order to properly ascertain whether the entity must be consolidated for financial reporting purposes. Consolidation is the means by which an investor, or parent company, recognizes the entirety of the assets, liabilities, revenues, and expenses of the investee, or subsidiary, in its financial statements. Consolidated financial statements are vital to users of the financial statements, as GAAP explains:

> The purpose of consolidated financial statements is to present [...] the results of operations and the financial position of a parent and all its subsidiaries [and investments] as if the consolidated group were a single economic entity. There is a presumption that consolidated financial statements are more meaningful than separate financial statements and that they are usually necessary for a fair presentation when one of the entities in the consolidated group directly or indirectly has a controlling financial interest in the other entities.

ASC 810-10-10-1.

155.    Furthermore, the design of a legal entity is important in determining what constitutes a VIE. Investors must assess their influence, control, and the benefit received from their ownership stake in an entity to consider if the investment is in fact a subsidiary or VIE that must be consolidated for financial reporting purposes. ASC 810-10-15-14.

156.    GAAP provides a clear step by step analysis to parent companies and investors to aid in evaluating VIEs for possible consolidation. *See, e.g*., ASC 810-10-25. Nevertheless, FNBC's audited financial statements failed to properly reflect this analysis and the Auditor Defendants negligently failed to identify and correct this error. Because FNBC's audited financial statements failed to properly consolidate investments in these LIHTC entities, FNBC only reported the cost less periodic systematic amortizations of these investments on its balance sheet rather than reporting the consolidated operations and earnings of these entities in its financial statements, which was required under GAAP. This concealed the losses generated by these investments during the Relevant Period. Along with the other accounting errors involving FNBC's investments in tax credit entities that violated GAAP as set forth above, the Auditor Defendants' failure to identify and correct these errors caused FNBC to issue materially incorrect financial statements during the Relevant Period.

B.  *Improper Accounting for Exposure to the Oil and Gas Industry*

1.  **Background**

157.  From approximately 2011 through June 2014, the price of oil hovered around $100 a barrel. But beginning in July 2014, the price of oil began to plummet, falling to less than $50 a barrel at the beginning of 2015. Because FNBC is based in Louisiana and conducted significant business with companies in the oil and gas industry, the Auditor Defendants should have given careful consideration to FNBC's risk of exposure to the oil and gas industry once the price of oil began to fall.

158.  FNBC issued materially misstated audited financial statements due to failure to properly account for a growing oil exploration and production loan that would eventually reach $90.2 million. FNBC's failure to properly account for and disclose that exposure violated GAAP, which the Auditor Defendants negligently failed to identify or correct.

159.  FNBC revealed its failure to properly account for that exposure through a series of disclosures beginning in early 2016.

2.  **Applicable GAAP Standards**

160.  FNBC's accounting during the Relevant Period, as approved by the Auditor Defendants, violated fundamental principles of GAAP. As it relates to FNBC's failure to account for its true risk of exposure to the oil and gas industry, including FNBC's exposure to plummeting oil prices and a growing exploration and production credit, FNBC's audited financial statements violated Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies" ("FAS 5"), under SFAS No. 168, ASC Topic 450.

161.  FAS 5 requires that estimated losses from loss contingencies such as losses from uncollectible loans, should be recorded in the provision for loan losses and accrued by charges to

income (*i.e.*, expenses) when two criteria are met (1) based on information available prior to the issuance of the financial statement, it is probable ("likely to occur") that the loans were impaired (or liabilities have been incurred) at the date of the financial statements, and (2) the amount of losses can be reasonably estimated.

162.    Under FAS 5, FNBC's audited financial statements were required to record a loss contingency in its provision for loan losses when it was probable that a loss would be incurred and that loss was reasonably estimable. Further, even if there was at least a reasonable possibility that a loss would be incurred, but one or both of the two conditions of FAS 5 was not met (*i.e.*, if it was not probable that the loan has been impaired and/or the amount of such impairment was not reasonably estimable), or if FNBC was exposed to losses in excess of the amount already accrued, FAS 5 still required that FNBC make a disclosure about the loss contingency in the footnotes to its financial statements.  This should have included the nature of the contingency and given an estimate of possible loss or range of loss, or stated that an estimate of loss could not be made.

163.    FNBC's audited financial statements reflected an allowance for loan losses ("ALL") on the balance sheet as a reduction in assets, and a provision for loan losses ("PLL") as a charge against income. The ALL was meant to reflect, at any point in time, the expected (*i.e.*, probable) and estimable losses in FNBC's portfolio of loans and, therefore, to serve as a current estimate of those losses. As FNBC determined that loans were not recoverable and charged them off, the amount of those loans was removed from the balance sheet and absorbed by the ALL. As such, the ALL needed to be sufficient at all times to cover probable and estimable losses. In order to properly account for the worsening credit quality in the oil and gas industry, FNBC was

required under GAAP to record periodic increases to the PLL to reflect its current estimate of probable credit losses.

164.    The PLL was not meant to correlate with loans that were charged off in the present quarter. Rather, GAAP recognizes that lenders are able to identify signs of impairment well before a loan is actually charged off, whether through the bank's knowledge of the borrower's future cash flows, or through economic trends that are likely to negatively affect the borrower's ability to pay the loan in accordance with the terms of the loan, including declining values for the collateral, *e.g.*, oil reserves, underlying the loan.

165.    Thus, the governing accounting literature speaks to "accounting for a loss contingency" rather than the actual charge off of the loan. Under GAAP, a provision for loan losses (*i.e.*, an increase of the ALL) is recorded as an expense, which reduces pre-tax earnings on a dollar-for-dollar basis. However, a provision for loan losses is not an irreversible admission of a loss. If a bank records a provision for losses that were probable at the time, but a change in circumstances render the loss unlikely and, as a result, the ALL is overstated, the bank will then record an increase in income. Thus, adjustments to the ALL are directly linked to net income and a bank's earnings. At all times FNBC's audited financial statements were required to reflect FNBC's ALL for its loan portfolio in accordance with GAAP.

166.    In light of the critical importance of an allowance of loan losses to a lending institution's financial statements, on December 13, 2006, the FDIC and the Board of Governors of the Federal Reserve System, together with other banking regulators, jointly issued an *Interagency Policy Statement Allowance for Loan and Lease Losses*, which stated, in part, that:

> The ALLL [allowance for loan and lease losses] represents one of the most significant estimates in an institution's financial statements and regulatory reports. Because of its significance, each institution has a responsibility for developing,

maintaining, and documenting a comprehensive, systematic, and consistently applied process for determining the amounts of the ALLL and the provision for loan and lease losses (PLLL). To fulfill this responsibility, each institution should ensure controls are in place to consistently determine the ALLL in accordance with GAAP, the institution's stated policies and procedures, management's best judgment and relevant supervisory guidance.

As of the end of each quarter, or more frequently if warranted, each institution must analyze the collectability of its loans and leases held for investment . . . and maintain an ALLL at a level that is appropriate and determined in accordance with GAAP. An appropriate ALLL covers estimated credit losses on individually evaluated loans that are determined to be impaired as well as estimated credit losses inherent in the remainder of the loan and lease portfolio.

### 3.   Nature and Effect of the Improper Loan Loss Accounting

167.   Beginning in the second half of 2014, when oil prices began to plummet, FNBC's accounting failed to properly reflect losses relating to its exposure to the oil and gas industry. Therefore, FNBC's audited financial statements, due to the Auditor Defendants' negligence and malpractice, violated GAAP (1) by failing to record any loss contingency related to FNBC's exposure to falling oil prices or related specifically to a large loan made by FNBC to an oil exploration and production company, even though such contingent losses were probable and estimable, and (2) by failing to provide any disclosure in the footnotes to the audited financial statements about potential losses in FNBC's oil and gas credits due to falling oil prices or due to this large loan.

168.   FNBC made a large loan to an oil exploration and production company that would become much larger over the course of 2015 and would eventually total $90.2 million. The oil well supporting repayment of this loan had been completely offline since a pipeline break on December 29, 2014, and FNBC was lending the borrower additional money to drill a new well throughout 2015, all the while failing to reserve against the possibility of any loss related to the loan.

169.    As more fully described below, FNBC's disclosures beginning in February 2016 revealed that FNBC's audited financial statements had violated GAAP by failing to properly reserve for exposure to the oil and gas industry, among other reasons.

170.    In a series of disclosures throughout 2016, FNBC admitted it had substantial exposure to the oil and gas industry, including to falling oil and gas prices and the large oil and gas exploration loan that had ballooned to a total of $90.2 million. Ultimately, FNBC acknowledged that an $11 million reserve was necessary to account for the substantial decline in oil and gas prices and that a $30.0 million reserve, or 40.0% of its total allowance for loan losses, was necessary to account for the status of the large loan to the oil exploration and production exploration company. FNBC also revealed a host of material weaknesses in its internal control over financial reporting, including material weaknesses that specifically impacted FNBC's ALL methodology.  The Auditor Defendants' audits of FNBC negligently failed to identify or correct these material deficiencies.

## C.    *Material Weaknesses in Internal Controls Relating to Short-Term Receivables*

171.    Throughout the Relevant Period, FNBC made significant investments in short-term receivables on The Receivables Exchange. But while FNBC significantly increased its investments in these short-term receivables, FNBC erroneously accounted for these assets due to material weaknesses in FNBC's internal controls for financial reporting, which the Auditor Defendants had negligently failed to identify.

172.    In late-2015, FNBC ran into problems collecting on a receivables contract from an ethanol company totaling $69.9 million. On February 1, 2016, FNBC issued financial results for the fourth quarter and full year 2015. Although FNBC's press release mentioned that $39.7 million of the balance was past due, the financial results released by FNBC violated GAAP

because, among other reasons, they failed to record any loss contingency related to this receivables contract, even though such a contingency was probable and estimable.

173.    In its 2013 Form 10-K, filed on March 31, 2014, FNBC revealed that it had "increased its investment in short-term receivables to $246.8 million compared to $81.0 million as of December 31, 2012." The $246.8 million in short-term receivable investments represented approximately 7.5% of FNBC's total assets as of December 31, 2013. The 2013 Form 10-K provided the following details about FNBC investments in short-term receivables: "The Company invests in short-term receivables which are purchased on an exchange. These short-term receivables have repayment terms of less than a year. The investments are recorded on the consolidated balance sheets at cost plus accreted discount."

174.    Throughout 2014 and 2015, FNBC's total investment in such receivables fell in a range of $236.6 million to $252.5 million. In its third quarter 2015 Form 10-Q, filed on November 9, 2015, however, FNBC reported that it had $182.9 million invested in short-term receivables as of September 30, 2015. By this time, more than $69 million of FNBC's total of $182.9 million was invested in a problematic receivables contract from an ethanol company purchased on The Receivables Exchange.

175.    On February 1, 2016, FNBC issued a press release disclosing its fourth-quarter 2015 and fiscal-year 2015 financial results. The February 1, 2016 disclosure also explained that a large portion of FNBC's investments in short-term receivables was due from a U.S. ethanol company:

> Included in the Company's investment in short-term receivables was $69.0 million due from a U.S. company that produces ethanol for blending in gasoline. As of December 31, 2015, $15.0 million of that balance was past due, with an additional $24.7 million past due as of the date of this release. In addition to the Company's rights against the obligor on the receivables, the Company and the

> receivables seller are parties to an agreement providing for certain repurchase obligations by the receivables seller with respect to past due receivables. At this time, based on its analysis of the financial capabilities of the obligor and the receivables seller and after consultation with independent counsel, management does not expect that the Company will incur any loss on its investment in its investment in short-term receivables related to the past due receivables.

At that time, the $69 million investment in short-term receivables due from the ethanol company represented over 72% of FNBC's total short-term receivables investments.

176.   On February 11, 2016, FNBC filed a Form 8-K with the SEC providing supplemental information. FNBC provided additional details about, among other things, its short-term receivables investments, revealing that the ethanol company that owed FNBC $69.0 million was having financial difficulties. FNBC nevertheless asserted that it did not expect to suffer any losses on its investment.

177.   The ethanol company was Abengoa S.A., an engineering and clean technology company, which had recently filed for protection under Spanish insolvency laws and has a number of U.S. subsidiaries that also have filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code.

178.   Abengoa S.A.'s financial troubles were public information by as early as August 2015. On August 3, 2015, the price of Abengoa S.A's bonds and shares plummeted on news that the company was unable to reassure investors that it could stop burning cash. *Bloomberg* reported that there were serious liquidity concerns and that investors had lost confidence in Abengoa S.A.'s ability to generate sufficient cash to service its debt.

179.   On November 25, 2015, Abengoa S.A. announced its intention to seek protection under Article 5bis of Spanish insolvency law—a pre-insolvency statute that permits a company to enter into negotiations with certain creditors for restructuring of its financial affairs. Then, on

February 24, 2016, Abengoa Bioenergy U.S. Holding, LLC filed a voluntary bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Missouri. The bankruptcy petition was filed on behalf of Abengoa Bioenergy U.S. Holding, LLC and five affiliated entities.

180.   Certain filings in those bankruptcy cases confirm that Abengoa S.A. is the Spanish company referenced in FNBC's February 11, 2016 Form 8-K. FNBC filed a notice of appearance in the Abengoa Bioenergy U.S. Holding, LLC bankruptcy case. Moreover, a creditor identified as The Receivables Exchange, LLC, based in New Orleans, Louisiana, filed a proof of claim against one of the U.S. subsidiaries—Abengoa Bioenergy Company LLC.

181.   Abengoa S.A. and certain of its U.S. subsidiaries were in financial trouble and ultimately sought bankruptcy protection, and it was probable that these entities would be unable to pay the full amount of the receivable balance. Indeed, as discussed above, Abengoa S.A.'s financial troubles were public information by as early as August 2015. These liquidity concerns were confirmed when Abengoa S.A. filed for protection under Spanish insolvency laws on November 25, 2015.

182.   On August 25, 2016, FNBC disclosed in its 2015 Form 10-K that it had identified a host of material weaknesses in its internal control over financial reporting which impacted, among other things, the "monitoring of credit to borrowers and investments in short-term receivables."

183.   FNBC was required to recognize a loss contingency under FAS 5 for these short-term receivables once information became available indicating that it was probable that the receivables had become impaired and that the amount of loss could be reasonably estimated. FNBC was subsequently forced to record a belated write down of its entire investment. These

errors resulted from FNBC's material weaknesses in internal control over financial reporting, which the Auditor Defendants had negligently failed to identify.

### D. *Rogue Employees Defrauded FNBC, Causing Further Undetected Deficiencies in FNBC's Financial Reporting and Internal Controls*

184.    Since FNBC filed for bankruptcy protection, various criminal and regulatory actions have been taken related to the actions of certain rogue employees of FNBC. Certain of these criminal and regulatory investigations or proceedings remain ongoing.

185.    On October 17, 2018 the United States of America filed a factual basis in the U.S. District Court for the Eastern District of Louisiana, signed and agreed to by Jeffrey Dunlap. Based on information and belief, "Bank President A" as discussed in the factual basis is Defendant Ryan. The factual basis revealed that:

a.    From in or around July 2009 through in and around December 2016 Dunlap and Ryan conspired to unjustly enrich themselves by fraudulently obtaining money from First NBC Bank;

b.    In furtherance of the conspiracy Dunlap and Ryan caused false documents and financial statements to be submitted to First NBC Bank, so that a company controlled by Dunlap could receive funds from the Bank, which funds the company was not qualified or entitled to receive;

c.    Dunlap and the company he controlled used these fraudulently obtained funds in part to further the financial interests of Ryan and a company under his control; and

d.    Dunlap's company had a revolving line of credit with First NBC Bank, which by the time First NBC Bank failed in late April 2017, had a balance of approximately $22

million, an amount that had been substantially increased due to Dunlap's and Ryan's fraudulent activities.

186.    Due to the Auditor Defendants' negligence and malpractice, the Dunlap/Ryan fraud was not detected by the Auditor Defendants or FNBC.

187.    On March 22, 2019 the United States of America filed a criminal bill of information against Defendant St. Angelo in the U.S. District Court for the Eastern District of Louisiana. Based on information and belief, "Bank President A" as discussed in the bill of information is Ashton J. Ryan Jr. Based on information and belief, the following allegations contained in the bill of information are true and correct:

a.    Beginning at least in or around 2006, through in and around April 2017, St. Angelo and Ryan conspired to unjustly enrich themselves by fraudulently obtaining money from First NBC Bank;

b.    In furtherance of the conspiracy St. Angelo and Ryan caused false documents and financial statements to be submitted to First NBC Bank, so that St. Angelo and companies controlled by him could receive funds from the bank, which funds St. Angelo and the companies were not qualified or entitled to receive; and

c.    By the time First NBC Bank failed in late April 2017, the balances on loans issued to St. Angelo and the companies he controlled totaled approximately $46.7 million, and First NBC Bank had also paid St. Angelo approximately $9.6 million for purported tax credit investments.

188.    Due to the Auditor Defendants' negligence and malpractice, the St. Angelo/Ryan fraud was not detected by the Auditor Defendants or FNBC.

189.    Press reports indicate that Ryan is a target of an ongoing criminal investigation related to his actions at FNBC.

190.    The foregoing fraudulent activities by rogue employees caused material misstatements in FNBC's financial reporting, and caused (and were enabled by) material weaknesses in FNBC's internal control over financial reporting, all of which the Auditor Defendants negligently failed to identify or correct.

IX.    **The Board, Regulators, Bank Depositors, and the General Public Only Begin to Discover the Truth in late 2016, Long Past the Point Where the Bank and the Holding Company Could be Saved**

191.    By the end of 2015, First NBC Bank was still regarded as "well capitalized" and the Holding Company's results and corresponding market capitalization continued to be positive. However, these results were based almost entirely on the Officer Defendants' misrepresentations to the Holding Company's Board and the investing public concerning the beneficial impacts of the Holding Company's investments in tax credit entities, its transactions in trade receivables, the quality and consistency of its internal controls, its purported minimal exposure to the oil and gas industry, and its allegedly "well capitalized" capital position.

192.    Contributing in material part to the perception of FNBC by the Holding Company's Board and the public generally were the Holding Company's audited financial statements and the Auditor Defendants' favorable, but negligently prepared, audit reports which failed to identify or correct improper accounting practices relating to investments in tax credit entities, transactions on the Receivables Exchange, exposure to the oil and gas industry, the Officer Defendants' fraud, and material weaknesses in internal controls.

193.    This false story began to unravel early in 2016 as the Holding Company reported its unaudited fourth quarter and full-year 2015 results.  Thus, on February 1, 2016, FNBC issued a

press release disclosing its 4Q15 and FY15 financial results.  FNBC reported net income of $15.8 million, or $0.82 diluted EPS, for 4Q15.  For FY15, FNBC reported net income of $67.3 million, or $3.44 diluted EPS, and total assets of $4.8 billion.  FNBC also disclosed that it had made a $69 million investment in a short-term receivable from a "U.S. company that produces ethanol for blending in gasoline" and that $39.7 million in payments on this receivable were past due. FNBC also reported that its exposure to exploration and production in its oil and gas portfolio was $90.2 million, a $16 million increase over the third quarter of 2015.  The reported earnings significantly underperformed what FNBC had led the public to expect, based, in large part, on an $8.2 million tax credit impairment FNBC disclosed it had been forced to take.

194.    As set forth below, the Holding Company was ultimately forced to retract the financial results it issued on February 1, 2016.  When, almost eight months later, FNBC finally issued its 2015 audited financial results, the Holding Company reported a net loss for the year of over $25 million—rather than the $67.3 in unaudited net income reported on February 1, 2016— based largely on (1) a vastly higher impairment of its tax credit investments, (2) the write-off of trade receivables, and (3) the establishment of a reserve allowance on oil and gas exploration projects.  Thus, the February 1, 2016, press release overstated the Holding Company's income by approximately $92 million.  This restatement, along with simultaneous restatements of audited financial results for earlier years, was approved by and developed in consultation with the Auditor Defendants, and represents the Auditor Defendants' admission that the prior audited financial statements they had reviewed and approved were materially misstated.

195.    The February 1, 2016, press release was so contrary to shareholder expectations encouraged by the Officer Defendants that within ten days, FNBC was obliged to issue a further public statement clarifying the earlier statements.   This clarification took the form of a

Supplemental Information Sheet utilizing a "Question and Answer" format.

196.    The Supplemental Information Sheet, for the first time, disclosed how the Officer Defendants' improper accounting for, and failure to maintain internal controls over, tax credit investments had adversely affected its true net income.

197.    In pertinent part, the sheet posed and answered the following questions:

**The fourth quarter net income of $15.7 million is less than the $18.1 million reported for the linked third quarter.  What caused this and is it a trend? Expenses seem to be very high in the fourth quarter and is this a trend?**

Both of these questions have the same answer, which is related to FNBC's accounting change in the second quarter of 2015 related to tax credit investments. Since inception, FNBC had accounted for its tax credit investments using the cost method and had amortized that cost over its expected holding period for the investment.  This method resulted in consistent expense recognition from quarter to quarter and from year to year after giving effect to the growth in FNBC's tax credit investment portfolio.  In June of 2015, FNBC adopted the equity method of accounting for its historic tax credits as a preferable method of accounting for these investments.  As discussed in FNBC's June 30, 2015 Form 10-Q, the cumulative effect of the change since the inception of our tax credit investments was immaterial and recognized in the second quarter.  The equity method does not utilize amortization (consistent write-off of the asset over a useful life) but rather impairment (recognized only as the investment is impaired, e.g. when it is probable that the investment balance will not be realized through future cash flow of the investment).  Under the equity method of accounting, some historic tax credit investments may not be impaired as long as they are held, while others may be written down to realizable value as impairment occurs.  This leads to uneven expense recognition from quarter to quarter as opposed to consistent amortization.

*With this background, FNBC recognized no impairment with respect to its historic tax credit investments during the 3rd quarter of 2015*; in the fourth quarter, three such investments became impaired.  The impairment of $5 million, when combined with the costs associated with the State Investors Bank acquisition of $703,000, accounted for substantially all of the difference in profits between the fourth quarter and the third quarter.  Excluding impairment and acquisition costs, FNBC's earnings increased $1.5 million, or 8%, from third to the fourth quarter of 2015 and $4.3 million, or 28%, from the fourth quarter of 2014. *The adoption of the equity method of accounting is expected to continue to impact the results of operations of FNBC in the following manner.*  First, the amount of impairment expense recognized by FNBC may continue to be inconsistent from quarter to quarter.  Second, over the term of the investment,

FNBC expects to recognize less impairment expense than it would have recognized as amortization expense because the prior method resulted in the amortization of the entire investment. Finally, substantially all of the impairment expense recognized by FNBC is expected to continue to be associated with the structure of the tax credit investment, rather than changes in operations or economic conditions, as less than 1% of all historic tax credit investment projects are recaptured because of business failure. Because substantially all of the impairment expense has been driven by the structure of the tax credit investment, **FNBC plans to modify the structure of future investments so as to minimize the likelihood of impairment, except in the case of changes in operations or economic conditions.** For so long as impairment remains a meaningful expense on FNBC's Statement of Income, FNBC intends to continue to present non-GAAP financial information adjusting for impairment and other expenses associated with FNBC's investment in tax credit entities to enable investors to better understand the results of operations of FNBC.

**Can the amount of historic tax credits generated in 2015 continue in 2016 and beyond?**

*In 2014, FNBC began to disclose the tax credits for which it had finalized tax credit investments for each of the next 5 years.* FNBC believed such a disclosure would provide investors with the ability to evaluate the continuity of its tax credit investment activity. *There is a time lag between the date FNBC enters into a commitment to invest in a tax credit transaction and the date in which the credits are earned.* Two of the types of Federal tax credits in which FNBC invests in are multi-year credits (New Markets - 7 years and Low Income Housing - 10 years) while the third (Historic) is earned when the renovation is placed in service. *FNBC intended to again present the table of tax credits already contracted for, by estimated year of recognition, in its 2015 Form 10-K. However, in response to inquiries from analysts, FNBC is providing the disclosure at this time.*

|  | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Historic | $47,336,517 | $43,350,474 | $ 144,855 | $ — | $ — |
| New Market | 16,871,711 | 14,851,823 | 8,901,852 | 5,099,838 | 2,100,000 |
| Low Income Housing | 5,050,642 | 5,525,400 | 5,525,400 | 525,400 | 4,854,361 |
| TOTAL | $69,258,870 | $63,727,697 | $14,572,107 | $5,625,238 | $6,954,361 |

The table above is based on expected date the credits will be earned per the original project plan. Project timetables may accelerate or slip due to a variety of reasons, which can affect the period in which the credit is actually earned. Also, credits actually earned may be more or less than estimated credits due to cost overruns and underruns. Finally, *the schedule includes only projects under contract as of December 31, 2015, and each year FNBC enters into contracts*

72

*for projects that generate tax credits in the year of the contract and in future years*; therefore, the later the year the higher the probability that the amounts shown above will be exceeded as FNBC identifies and contracts additional transactions.

198.    On March 16, 2016, FNBC filed an NT 10-K, Notification of Late Filing, on Form 12b-25 with the SEC, disclosing that the filing of FNBC's Form 10-K would have to be delayed:

> In connection with the preparation of its Form 10-K for the year ended December 31, 2015, *the registrant identified errors in its accounting for its Federal and State Historic Rehabilitation tax credit entities and is evaluating the accounting for certain other matters.*  As a result of the time needed by the registrant to evaluate *the impact of the errors in its accounting and assessment of internal control over financial reporting*, and for the registrant's auditors to evaluate the implications of the adjustments on current and historical financial statements and the registrant's internal control over financial reporting, the registrant requires additional time to complete and file its Form 10-K.
>
> The registrant issued a preliminary earnings release on February 1, 2016 for the quarter ended December 31, 2015. The registrant has determined that *the estimates of noninterest expense and income tax benefit contained in this preliminary release will likely be increased, and net income will likely be reduced*, from the amounts reported for 2015. The registrant is still trying to evaluate and determine the amount of the adjustments and the impact, if any, to the fourth quarter of 2015, prior quarters of 2015, or prior years. As a result, *the information contained in the preliminary earnings release should not be relied upon pending the filing of Form 10-K.*

199.    Then, on April 8, 2016, FNBC filed a Form 8-K and press release with the SEC disclosing that FNBC's audit committee and management had determined that FNBC's consolidated financial statements for the years ended December 31, 2014, 2013, 2012, and 2011, as well as each of the interim periods within the years ended December 31, 2015, 2014, and 2013, should no longer be relied upon. FNBC stated that it planned to include restated financial statements as of December 31, 2014 for the years ended December 31, 2014 and 2013, as well as restated selected financial data and a discussion of the effect of the restatement over all covered

periods, in its 2015 Form 10-K annual report. The 8-K further stated: "The Company's management determined that the financial statements referred to above should be restated due to an error in the Company's methodology for the recognition of impairment of its investment in tax credit entities and the Company had not properly consolidated variable interest entities related to Low-Income Housing Tax Credit entities. The Company is continuing to review and quantify these and other potentially other less significant matters, which are expected to be reflected in the restated financial statements."

200.    As FNBC further stated in its press release: "The estimated impact of the errors on current and prior periods remains under review and analysis . . .  The company is working to remediate the issues that caused the errors. The company is also assessing the impact of the identified errors on management's assessment of internal control over financial reporting for the year ended December 31, 2015 and the affected periods noted above."

201.    FNBC also attached to the Form 8-K a press release it had issued that evening, entitled "First NBC Receives Expected Notification of Deficiency from NASDAQ Related to Delay in Filing 2015 Form 10-K," stating in pertinent part as follows:

> First NBC Bank Holding Company ("First NBC") (NASDAQ: FNBC), the holding company for First NBC Bank, announced today that it received a notification from the Nasdaq Stock Market ("Nasdaq") informing First NBC that, because it had not timely filed its Annual Report on Form 10-K for the year ended December 31, 2015, it was not in compliance with Nasdaq Listing Rule 5250(c)(1).  First NBC had previously disclosed in a filing made with the Securities and Exchange Commission on March 16, 2016 that its 2015 Form 10-K was not expected to be filed timely for the reasons described therein.  The Nasdaq notification letter has no immediate effect on the listing or trading of First NBC's common stock on the Nasdaq Global Select Market.
>
> Under Nasdaq rules, First NBC has 60 calendar days from the date of the letter, or until June 3, 2016, to submit a plan to regain compliance.  If its plan is accepted, First NBC may be eligible for a listing exception of up to 180 calendar days or until September 26, 2016 to regain compliance.  If Nasdaq staff concludes that

First NBC will be unable to cure the deficiency, or if First NBC determines not to submit the required materials or make the required representations, First NBC's common stock will be subject to delisting by Nasdaq.

First NBC expects the audit of its 2015 consolidated financial statements to be completed, and its Annual Report on Form 10-K for the year ended December 31, 2015 to be filed, within the compliance period established by Nasdaq.

202.    In May 2016, FDIC examiners downgraded the Bank's capital to a "4" and concluded that the Bank's capital levels were deficient in relation to the Bank's continued high risk profile.  *See* Inspector General Report at 25.  According to the Report,

Examiners noted that the Tier 1 Leverage Capital ratio was 7.43 percent and the Total Risk Based Capital ratio was 9.61 percent, both well below the requirements outlined in the August 26, 2015 BR. Significant historical tax credit and short-term receivable losses had eroded the capital base. Moreover, capital levels were deemed insufficient given the excessive level of problem assets and rapid growth over the past 3 years.

203.    On May 17, 2016 and August 17, 2016, FNBC publicly filed Forms 8-K with the SEC disclosing that it had received Notices from the Nasdaq Stock Market LLC ("Nasdaq") stating that FNBC was not in compliance with Nasdaq Listing Rule 5250(c)(1) because it had not timely filed its quarterly reports on Form 10-Q for the period ended March 31, 2016 and the period ended June 30, 2016, respectively.

204.    On August 12, 2016, Holdco Asset Management ("HoldCo"), an investor of $8 million face value of FNBC's subordinated debt, published an open letter to FNBC.  The letter posed a series of questions that mostly concerned FNBC's accounting for its tax credit investments and the significance of FNBC's deferred tax asset arising from such investments to FNBC's capital position.  Holdco posited in the letter that FNBC would need to raise at least $300 million in new common equity over the next two years to be considered "well capitalized" by regulators.

205.   On August 15, 2016, FNBC issued a press release announcing the delay of the filing of its 2015 Form 10-K and the extension of a previous deadline under its Nasdaq compliance plan for filing the 2015 Form 10-K. In response, FNBC submitted a plan to regain compliance with the Nasdaq's listing rules through the filing of its past due quarterly reports. This plan was accepted by Nasdaq.

206.   On August 25, 2016, FNBC finally filed its annual report on Form 10-K with the SEC.   FNBC disclosed that the SEC had commenced an investigation of FNBC's financial reporting. The 2015 Form 10-K also revealed impairment charges in 2015 associated with (1) FNBC's investments in tax credit entities and the ethanol company receivable, (2) the establishment of a large reserve associated with the $90 million credit extended to oil and gas exploration company, (3) a restatement of previous financial results reaching back to 2011 that reflected steep declines in net income and other financial metrics as a result of FNBC's revised accounting for tax credit entities, (4) a host of material weaknesses in internal controls over financial reporting, and (5) a deteriorating regulatory capital position.

207.   The Form 10-K disclosed that the Holding Company had experienced a net loss of $25.2 million, primarily the result of three factors:

a.   a $59.5 million impairment charge on FNBC's investments in tax credit entities, arising from the Holding Company's delayed implementation of the equity method of accounting of such entities rather than the cost method;

b.   a $69.9 million write-down in trade receivables, related entirely to an investment in a single project involving an ethanol supplier; and

c.   a $30 million reserve associated with $90.2 million credit extended to an oil and gas exploration company that had been forced to replace a pipeline in its largest

oilfield.

208.    The 2015 Form 10-K also included a restatement of the Holding Company's financial results for the years ended December 31, 2013 and 2014 and for the quarters ending March 31, 2015, Jun 30, 2015, and September 30, 2015.  Although the Auditor Defendants should have identified these material deficiencies based on information available to it years earlier, they failed to do so and EY issued unqualified opinions on FNBC's audited financial statements for FNBC's 2011, 2012, 2013, and 2014 years.

209.    For the year 2013, the restatement increased expenses of investments in tax credit entities from $8.6 million to $13.1 million and decreased net income from $40.9 million to $33.6 million.

210.    For the year 2014, the restatement increased expenses of investments in tax credit entities from $14.1 million to $25.1 million and decreased net income from $55.6 million to $44.5 million.

211.    For the year 2015, the restatement increased expenses of investments in tax credit entities from $19.0 million to $59.5 million, increased the impairment of trade receivables from $0 to $100.0 million, and decreased net income from $67.3 million to a loss of $25.2 million.

212.    The 2015 Form 10-K further that its external auditors, EY, had issued a report containing an adverse opinion on the effectiveness of FNBC's internal control over financial reporting as a consequence of widespread material weaknesses in control procedures.  The material weaknesses at FNBC included "ineffective control environment and risk assessment, monitoring of credit to borrowers and investments in short-term receivables, accounting for investment in tax credit entities, identification and evaluation of variable interest entities and consolidation of variable interest entities, accounting for business combinations and review of

journal entries."

213.    The 2015 Form 10-K further acknowledged that FNBC was beset with numerous material weaknesses in its internal controls over financial reporting. As acknowledged by FNBC, "[t]he control deficiencies failed to prevent and detect a number of accounting errors, which led to the restatement" of financial results. Among other material weaknesses identified by FNBC were an "ineffective control environment" caused, in part, by "the dominant influence of the Chief Executive Officer over accounting and reporting matters without adequate transaction level and review controls, to arrive at appropriate conclusions." FNBC executive management also failed to "establish a tone and control consciousness that consistently emphasizes the importance of internal control over financial reporting." FNBC also acknowledged that it had insufficient qualified accounting personnel with appropriate expertise and experience in numerous areas, including, among others: accounting for investments in tax credit entities, variable interest entities and business combinations, application of the allowance for loan loss methodology, credit and receivable evaluations, and the journal entry and review process.

214.    Further, FNBC disclosed that it was unable, even now, to remediate the material weaknesses "until the necessary controls have been implemented and we have determined the controls to be operating effectively."

215.    The 2015 Form 10-K included EY's report on its audit of FNBC's internal controls over financial reporting. EY's audit report identified six categories of material weaknesses, including:   (1) Ineffective Control Environment and Risk Assessment; (2) Monitoring of Credit to Borrowers, Application of the Allowance for Loan Loss Methodology, and Investments in Short-Term Receivables; (3) Accounting for Investment in Tax Credit

Entities; (4) Identification, Evaluation, and Consolidation of Variable Interest Entities; (5) Accounting for Business Combinations; and (6) Review of Journal Entries.

216.   Although the Auditor Defendants should have identified these material weaknesses based on information available to them years earlier, they failed to do so and EY issued unqualified opinions on FNBC's internal controls for FNBC's 2014 year.

217.   Finally, the 2015 Form 10-K, for the first time, showed a deterioration in the Holding Company's capital position.  Specifically, as of December 31, 2015, the Bank fell below "well-capitalized" minimum capital ratios with respect to Tier 1 risk-based capital and total risk-based capital. The decline of these ratios below the minimum threshold for the well-capitalized classification was attributable to the restatements of FNBC's reported net income and capital base over the years, as well as FNBC's belated write-off of the $69 million ethanol receivable and the belated establishment of a $30 million reserve associated with the loan to the oil exploration and production borrower.

218.   The 2015 10-K contained a letter addressed to "The Board of Directors and Shareholders of First NBC Bank Holding Company," dated August 25, 2016, and signed by EY. The letter stated that, "In our opinion, the financial statements referred to above *present fairly, in all material respects, the consolidated financial position of First NBC Bank Holding Company at December 31, 2015 and 2014, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2015*, in conformity with U.S. generally accepted accounting principles."  (Emphasis added.)

219.   On September 2, 2016, FNBC filed a Form 8-K with the SEC disclosing that EY had declined to stand for re-appointment as the independent auditors of FNBC's financial statements for the year ending December 31, 2016, and the effectiveness of FNBC's internal

control over financial reporting for the same period.  FNBC further stated that EY's audit

services to FNBC would cease upon FNBC's filing of its respective Forms 10-Q for the quarters

ended March 31, 2016 and June 30, 2016. FNBC further disclosed:

> The reports of Ernst & Young with respect to First NBC's consolidated financial
> statements for the years ended December 31, 2015 and 2014 did not contain an
> adverse opinion or disclaimer of opinion and were not qualified or modified as to
> uncertainty, audit scope, or accounting principles. During the fiscal years
> ended December 31, 2015 and 2014, and in the subsequent interim period
> through August 30, 2016, there were no disagreements with Ernst & Young on
> any matters of accounting principles or practices, financial statement disclosure,
> or auditing scope and procedures which, if not resolved to the satisfaction of Ernst
> & Young, would have caused Ernst & Young to make reference to the subject
> matter in its report. During the fiscal years ended December 31, 2015 and 2014,
> and in the subsequent interim period through August 30, 2016, there also were no
> reportable events as that term is described in Item 304(a)(1)(v) of Regulation S-K
> of the rules and regulations of the Securities and Exchange Commission ("SEC"),
> except that Ernst & Young's report with respect to First NBC's internal control
> over financial reporting as of December 31, 2015 contained an adverse opinion on
> the effectiveness of First NBC's internal control over financial reporting as a
> consequence of the identified material weaknesses disclosed in greater detail in
> Item 9A of First NBC's Annual Report on Form 10-K for the year ended
> December 31, 2015.

In a letter also dated September 2, 2016, EY stated that it was in agreement with the foregoing

statements.

220.    On September 16, 2016, FNBC filed a Form 8-K with the SEC disclosing that

Defendant Ryan had been removed as Chairman of the Board of Directors and replaced in that

role by Shivan Govindan.  In addition, Defendant Verdigets was removed as CFO and replaced

by Albert J. Richard III, whose base salary compensation was increased to $345,000.  Defendant

Verdigets was demoted to the role of Treasurer.  FNBC also announced that the date of its annual

meeting of shareholders had been set as of November 17, 2016—more than 30 calendar days

from the first anniversary of the previous shareholder meeting.  This necessitated setting a new

deadline for the submission of shareholder proposals.

221.    On September 10, 2016, FNBC announced that it was unable to file its Form 10-Q for the third quarter in a timely fashion due to the resignation of its previous auditors, EY.

222.    On October 3, 2016, FNBC filed a Form 8-K with the SEC disclosing that, as of September 28, 2016, FNBC had received a Notice from Nasdaq stating that it was not in compliance with its previously-agreed timetable to file quarterly reports on Form 10-Q for the first and second quarters of 2016.  This made FNBC common stock subject to suspension from trading on the Nasdaq on October 7, 2016.  FNBC stated that it intended to request a hearing before the Nasdaq which would automatically stay the delisting process for 15 days.

223.    On October 20, 2016, FNBC publicly filed its Form 10-Q for the third quarter of 2016.  In this report, FNBC disclosed that it had been informed by the Federal Reserve Bank and the Louisiana Office of Financial Institutions (OFI) that it had been deemed to be in "troubled condition" under the relevant banking regulations.  Upon the filing of the second quarter 2016 Form 10-Q, EY's services to the Holding Company ceased.  EY was performing services related to the subject matter of this Complaint until that time.

224.    On November 10, 2016, FNBC disclosed that it was unable to file its third quarter 2016 Form 10-Q in a timely fashion "as a result of the resignation of its previous auditor and the time associated with retaining a new auditor." FNBC further disclosed that it anticipated, as compared to the third quarter of 2015, "an increase in noninterest expense associated with impairment of tax credit entities and professional fees related to its 2015 audit and litigation."

225.    On November 17, 2016, FNBC filed a Form 8-K with the SEC disclosing that it had entered into a Consent Order with the FDIC and the OFI.  The Consent Order requires FNBC to take certain actions, including:

- "review the Bank's management, its loan review and problem loan identification processes, and its loan portfolio policy and procedures; formulate a strategic plan (including a plan to sustain adequate liquidity), a plan to reduce classified assets, a capital plan to meet and maintain certain minimum capital levels, and a profit and budget plan; enhance internal controls; and hold additional on-balance sheet liquidity";

- "enhance its on-balance sheet liquidity on a near-term basis to achieve certain progressively higher benchmarks, including as a percentage of total deposits and total liabilities"; and

- "submit a plan to achieve and maintain a Tier 1 Leverage Capital ratio equal to or greater than 10 percent of the Bank's Average Total Assets, a Tier 1 Risk-Based Capital ratio equal to or greater than 13 percent of the Bank's Total Risk-Weighted Assets, and a Total Risk-Based Capital ratio equal to or greater than 15 percent of the Bank's Total Risk Weighted Assets."

226.    The Consent Order indicates that, under the Officer Defendants' control, FNBC had been transformed from a profitable community banking chain based on sound principles into a "troubled" institution whose future as a going concern has been cast in serious doubt. Indeed, in the same filing, FNBC disclosed that it had had to retain the services of two investment banks to explore "all strategic options" to advance the interests of FNBC and its shareholders. The Consent Order required the Bank to reman "Well Capitalized" until the order was rescinded.

227.    On December 1, 2016, Defendant Ryan was removed in his role as CEO of the Bank and of the Holding Company. However, he was allowed to remain at both institutions in the role of President, and to continue serving on the Boards of Directors of the Bank and the Holding Company.

228.    On December 6, 2016, FNBC disclosed that it had taken action to separate the offices of CEO and President. FNBC disclosed that Defendant Ryan would remain as President and Director, while a new CEO would be appointed on an interim basis.

229.    On January 3, 2017, FNBC disclosed that it had appointed Crowe Horwath LLP as its new independent auditor for the year ended December 31, 2016, and to finalize financial

results for the third and fourth quarters of 2016.

230.   On January 31, 2017, the Holding Company filed a Form 8-K disclosing its "preliminary conclusion that it expects to record a material valuation allowance with respect to its deferred tax asset at December 31, 2016."

231.   On February 9, 2017, the FDIC sent the Bank a Prompt Corrective Action notification letter stating that the Bank had fallen within the "Significantly Undercapitalized" capital category.  This notification letter required the Bank to file a capital restoration plan, which it did on March 22, 2017.

232.   In March 2017, the Bank recognized a $45 million write-down against retained earnings on its tax credit investments.

233.   On March 21, 2017, the Holding Company again received a notice from the Nasdaq stating that the Holding Company was not in compliance with the listing rules due to its delay in filing a Form 10-K for 2016.

234.   On April 7, 2017, FNBC disclosed that Defendant Ryan had resigned his positions as President and Director effective April 6, 2017.

235.   On April 18, 2017, First NBC Bank was closed by OFI, and the FDIC was appointed as receiver for the Bank.  As reported by the Holding Company on a Form 8-K issued that day, "[t]he [Holding] Company's principal asset is the capital stock that it owns in the Bank, and, as a result of the closure of the Bank, the Company has no material remaining tangible assets."

236.   On April 24, 2017, FNBC filed an 8-K disclosing that:

Although the determination is preliminary and subject to the completion of additional procedures, on April 21, 2017, the Audit Committee of the Board of Directors (the "Audit Committee") and management of the Company concluded

that certain annual and interim period consolidated financial statements, as of and for the periods ended June 30, 2016 and prior thereto, require restatement and should no longer be relied upon. Similarly, related press releases and earnings releases, as well as management's report on the effectiveness of internal control over financial reporting as of such periods, should no longer be relied upon.

The Company has made this determination based on its evaluation of the internal and external reviews of its loan portfolio, the adequacy of the allowance for loan losses with respect to such loans and the appropriate periods in which any impairment with respect to such loans should be recognized. The Company is continuing to assess and quantify these and other potentially significant matters, including the impact that its loan portfolio evaluation may have on the Company's previous conclusions regarding the carrying values of deferred tax assets and other tax motivated investments during such prior periods. The impact of these assessments is expected to be reflected in the restated financial statements. At this time, the Company has determined that the consolidated financial statements for the year ended December 31, 2015, as well as each of the interim periods within 2016 and 2015, require restatement. The Company requires additional time to determine the extent to which additional prior periods may be subject to restatement.

237.   Therefore, shortly following FNBC's retention of new, competent auditors, FNBC had determined that its restated audited financial statements approved by and prepared in consultation with EY only eight months earlier now needed to be restated yet again and could no longer be relied upon.

238.   On April 26, 2017, the FDIC sent a notification letter informing First NBC Bank that it was "Critically Undercapitalized," effective as of April 10, 2017.

239.   First NBC Bank failed on April 28, 2017. Just prior to the failure of First NBC Bank, external auditors determined that the majority of its deferred tax asset totaling $400 million would need to be charged off or recognized as significantly impaired.

240.   Finally, on May 11, 2017, the Holding Company's Board commenced a voluntary bankruptcy case under Chapter 11 of the Bankruptcy Code.

241.   As noted above, the Inspector General issued its Report in November, 2017.

**X.     The Auditor Defendants Fail to Conduct their Audits of FNBC in Accordance with Applicable Professional Standards**

242.    EY audited the financial statements of FNBC for the years ended December 31, 2011, 2012, 2013, 2014, and 2015, and issued unqualified (or "clean") auditor's reports thereon. EY's unqualified auditor reports were dated March 29, 2013, March 31, 2014, March 31, 2015, and August 25, 2016. EY also audited FNBC's internal controls for the years ended December 31, 2014 and 2015, and issued an unqualified report for 2014. Based on information and belief, EY provided various services to FNBC from on or about the inception of FNBC's business in 2006, up until approximately the end of 2016.

243.    During the years 2012 through 2015, the fees paid to EY by FNBC were reported to be as follows:

| Year | Audit Fees | Tax Fees | Audit Related Fees | All Other Fees | TOTAL |
|------|-----------|----------|--------------------|----------------|-------|
| 2012 | $851,066 | $143,125 | $1,322,600 | - | $2,316,791 |
| 2013 | $513,599 | $165,500 | $418,025 | - | $1,097,124 |
| 2014 | $1,636,649 | $134,000 | $73,200 | $3,100 | $1,846,949 |
| 2015 | $5,027,309 | $222,450 | - | $1,500 | $5,251,259 |

244.    Based on information and belief, FNBC also paid EY substantial additional fees in periods before and after those reflected in the above table.

245.    When EY issued auditor's reports to FNBC, in accordance with GAAS, EY was charged with the responsibility of opining as to whether FNBC prepared its financial statements in accordance with GAAP. However, as evidenced by FNBC's disclosures regarding the issues contained in FNBC's 2015 Form 10-K and in FNBC's 8-K filed April 24, 2017, FNBC's financial statements from at least 2011 through the end of EY's engagement failed in almost all respects to comply with GAAP.

246.    Specifically, EY and the other Auditor Defendants should have recognized and informed FNBC that, among other improper accounting practices, FNBC's financial statements were in violation of GAAP because they: (i) materially overstated, among other things, FNBC's net income, accumulated earnings, and total assets, and materially understated the expenses and/or impairment of its investments in tax credit entities, through use of the improper amortized cost method of accounting for its investments in tax credit entities; and (ii) failed to disclose FNBC's true risk exposure to the oil and gas industry, including failing to disclose the amount of its loan loss reserves that were attributable to the oil and gas industry and, in any event, failing to take any reserves with respect to its oil and gas industry exposure.

247.    The Auditor Defendants also should have recognized and informed FNBC that FNBC's internal controls were at all times wholly inadequate and that certain rogue FNBC employees engaged in a years-long scheme to fabricate financial transactions in order to defraud FNBC.

248.    Numerous red flags signaling problems with FNBC's accounting existed and were readily apparent had the Auditor Defendants been conducting their audits in accordance with GAAS. Indeed, in 2013, FNBC disclosed that "During 2012, we identified a material weakness in our internal control that related to the accounting for the deferred tax aspects of certain of our investments in the entities that generate tax credits," and further, that:

> After the issuance on April 30, 2012 of our audited financial statements for the year ended December 31, 2011, we determined that we were required to restate our previously issued 2011, 2010, and 2009 audited financial statements. The restatement was necessary to properly allocate among the appropriate periods an amount related to our deferred income taxes that was originally recorded and presented only as part of our 2011 results of operations. In connection with the restatement, we also recorded other adjustments, including our final fair value adjustments associated with the Central Progressive Bank acquisition, other identified but previously unrecorded errors that were known when we issued our

2011 audited financial statements, and other amounts that we identified after April 30, 2012 while preparing our 2011 income tax return. The cumulative effect of recording all of these adjustments was not material to our previously reported 2010 or 2011 net income. Our 2009 net income was reduced 23.2%, compared to amounts previously reported.

We determined that the errors that required the restatement were caused by a lack of a sufficient number of accounting employees with the appropriate technical skills and knowledge regarding the income tax accounting for our tax credit investments. We concluded that this was a material weakness in our internal control that related to the accounting for the deferred tax aspects of certain of our investments in the entities that generate the tax credits.

249.     The Auditor Defendants knew or should have known, as was repeatedly stated by FNBC and its executives, that the tax credit business was an "integral part of First NBC's commercial banking business" and "core to First NBC's corporate strategy." As such, the accounting for FNBC's investments in tax credit entities, and FNBC's internal controls concerning its tax credit business, should have been a red flag and a central focus for the Auditor Defendants from at least 2012 if not earlier.

250.     The Auditor Defendants also knew or should have known of the following additional red flags, which should have caused the Auditor Defendants to tailor their audits accordingly and to discover FNBC's related accounting errors and internal control weaknesses:

a.       FNBC was dominated by Defendant Ryan who made most, if not all, of the operational and executive decisions, and who was not effectively controlled by the board;

b.       FNBC pursued rapid and aggressive growth strategies resulting in growth from 2010 to 2016 that was substantially more than double its peer group average;

c.       FNBC was highly reliant on expensive and volatile funding sources; for example, in 2015 FNBC's cost of funds was 100 basis points higher than its peer group average;

d.      FNBC had inadequate risk management practices and experienced staffing shortages in accounting, reporting, and credit review personnel;

e.      FNBC had risky, large loan concentrations, which at one point led to four individual borrowers having loan relationships that each exceeded 25 percent of Tier 1 Capital;

f.      FNBC took on a high degree of risk by making large investments in an undeveloped market in trade receivables, which by 2015 had reached $250 million and represented more than 50 percent of total capital; and

g.      FNBC's heavy reliance on tax credit investments added significant complexity and risk to FNBC's financial position, with recognized tax benefits from tax credit investments accounting for 47 percent of net income by 2014.

251.    Thus, the Auditor Defendants recklessly ignored accounting improprieties, numerous red flags and material internal control deficiencies at FNBC, which should have alerted the Auditor Defendants to the fact that FNBC's audited financial statements violated GAAP, and were thus materially false and misleading.

252.    Despite the numerous GAAP violations evident in FNBC's audited financial statements during the Relevant Period, EY expressed unqualified opinions in the auditor's reports it issued, representing that FNBC's financial statements were presented fairly, in all material respects, and in accordance with GAAP for each of the years ended December 31, 2011, December 31, 2012, December 31, 2013, December 31, 2014, and December 31, 2015. Despite the numerous material weaknesses evident in FNBC's internal controls during the Relevant Period, EY expressed an unqualified opinion in the auditor's report it issued for the year ended December 31, 2014.

253.    However, contrary to EY's opinions, FNBC's audited financial statements were materially misstated at all times, and FNBC's internal controls suffered from material weaknesses at all times, as FNBC and EY have since acknowledged.

### A.    *The Auditor Defendants' Audits Are Not Conducted in Accordance with GAAS*

254.    Audit firms that provide opinions upon the financial statements of registrants with the SEC, including EY, are required to be registered with the Public Company Accounting Oversight Board ("PCAOB"). All such auditors are also subject to the professional standards adopted and promulgated by the PCAOB, which constituted the prevailing audit standards at all relevant times.[7]

255.    The fair presentation of financial statements in conformity with GAAP is the responsibility of a company's management. The external auditor's responsibilities are to (1) plan and perform an audit to obtain reasonable assurance about whether financial statements are free of material misstatement, whether caused by error or fraud, (2) express an opinion on "the fairness with which [such financial statements] present, in all material respects, financial position, results of operations, and its cash flows in conformity with [GAAP]" and (3) "to identify those circumstances in which such principles have not been consistently observed in the preparation of the financial statements of the current period in relation to those of the preceding period." AU 110, *Responsibilities and Functions of the Independent Auditor* ("AU 110"), AU 110.01-.02.

256.    Additionally, an auditor of an SEC-registered entity such as EY is also required to provide an opinion upon the effectiveness of the company's system of internal control over

---

[7] The Auditing Standards ("AUs") emanate from the AICPA Auditing Standards Board and were adopted by the PCAOB. Such standards are referred to as Generally Accepted Auditing Standards ("GAAS").

financial reporting. As discussed above, EY provided audit opinions that opined that FNBC's financial statements were free of material misstatement and that FNBC's internal control over financial reporting was working effectively. Specifically, EY issued unqualified opinions[8] in regard to the FNBC's annual financial statements in FNBC's S-1 relating to the years 2011 and 2012, and in the 2013, 2014, and 2015 Forms 10-K and also to the effectiveness of FNBC's internal control over financial reporting in the 2014 Form 10-K.

257.    A violation of any of the PCAOB standards, especially in the event that the financial statements of the entity being subjected to the audit are materially misstated – either because of the violation or for some other reason – represents a failure on the part of the auditor to have adequately complied with the applicable professional standards.

258.    In certifying FNBC's financial statements, EY represented that its audits were conducted in accordance with GAAS when, in fact, EY violated GAAS in numerous respects during the course of its audits. Had the Auditor Defendants in fact conducted their audits in accordance with GAAS they could and would have alerted FNBC and its directors and officers to FNBC's serious accounting problems in time for FNBC to take appropriate corrective actions and avoid or minimize future harm.

**B.**    ***The Auditor Defendants Fail to Exercise Due Professional Care and Professional Skepticism***

259.    The overarching obligations to which an auditor must adhere when performing procedures underlying the expression of an audit opinion are the exercise of due professional

---

[8] An unqualified opinion states that the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the entity in conformity with generally accepted accounting principles. This is the opinion expressed in the standard report… AU 508, *Reports on Audited Financial Statements* ("AU 508"), AU 508.10 (footnotes omitted).

care and professional skepticism. Auditing standards accepted and promulgated by the PCAOB require auditors to exercise due professional care in all phases of an audit, including the planning and performance of the audit, as well as in the preparation of the audit report. AU 230.01, .08.

260. The concept of due professional care is defined, in essence, as "…what the independent auditor does and how well he or she does it." AU 230.04. Further, AU 230 defines due professional care as "the degree of skill commonly possessed by other auditors" which requires an auditor to exercise "reasonable care and diligence" and "professional skepticism." AU 230.05, .07. Professional skepticism is described "an attitude that includes a questioning mind and a critical assessment of audit evidence." AU 230.07-.09.

261. The exercise of due professional care and professional skepticism underlies all phases of an auditor's process for carrying out his/her responsibilities of planning and performing an audit to obtain reasonable assurance about whether such financial statements are free of material misstatement (as described by AU 316), whether caused by error or fraud. Due professional care and professional skepticism are particularly important to an auditor's efforts to (1) determine areas to be tested and the nature, timing, and extent of the tests to be performed, (2) interpret the results of audit testing, and (3) evaluate audit evidence. AU 230.11.

262. The importance of the relationship between the exercise of professional skepticism and an auditor's consideration of the risk of material misstatement due to fraud is described by AU 316 in the following manner:

> Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the fraud risks. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity. Furthermore,

professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

AU 316.13.

263.    The Appendix to AU 316 provides numerous examples of fraud risk factors to be considered by an auditor as part of his/her assessment of the risk of material misstatement in an entity's financial statements due to fraud. AU 316.85. While fraud risk factors are not necessarily indicative of actual fraud, these risks factors trigger, in the context of a financial statement audit, heightened scrutiny on the part of the auditor. Thus, when an auditor is aware of risk factors from prior audits or has determined that fraud risk factors are present, he or she should respond, for instance, by modifying the nature, timing and extent of audit procedures performed. AS 13.14.

264.    If, after consideration of the aforementioned guidance, and after appropriately modifying his/her audit approach to respond to the existence of fraud risk factors, the auditor has determined that misstatements in the financial statements may be the result of fraud, the auditor is then required by AU 316 to do the following: (1) discuss the matter and approach for further investigation with an appropriate level of management, (2) if the fraud involves senior management or causes a material misstatement of the financial statements, report directly to the audit committee, (3) consider whether significant deficiencies exist that must be communicated to senior management and the audit committee, and/or (4) consider communicating other fraud risks it had identified. AU 316.81-.89.

265.    In FNBC's Registration Statement filed on April 8, 2013, FNBC's management disclosed material weaknesses related to accounting for investments in tax credit entities. As

evidenced by such disclosures and the subsequent material weaknesses disclosed in FNBC's 2015 Form 10-K, FNBC had numerous material weaknesses that were prevalent at all relevant times.

266.     Despite being aware of the fact that FNBC had identified a material weakness in its internal control over financial reporting relating to the accounting for investments in tax credit entities, and despite numerous other red flags as discussed above, the Auditor Defendants failed to: (1) exercise due professional care and a heightened level of professional skepticism, (2) sufficiently identify and/or address many of the risk factors identified within AU 316 about which they either had knowledge or should have had knowledge as a result of EY's role as external auditor, and (3) modify the nature and extent of its audit procedures in the face of known information, with respect to its review and audit procedures for the financial statements of FNBC.

267.     The Auditor Defendants failed, therefore, to satisfy the required criteria established within AU 230, AU 316, and AS 13, among others discussed below.

**C.     *The Auditor Defendants Fail to Properly Assess Audit Risk***

268.     Auditing Standard ("AS") 8 provides guidance on the auditor's consideration of audit risk when performing an audit of financial statements in accordance with the PCAOB. AS 8 states:

> [T]he auditor must plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement due to error or fraud. Reasonable assurance is obtained by reducing audit risk to an appropriately low level through applying due professional care, including obtaining sufficient audit evidence.

AS 8.03 (footnotes omitted).

269.     Audit risk is defined as the risk that the auditor expresses an inappropriate audit opinion when the financial statements are materially misstated. Further, audit risk is "a function of the risk of material misstatement and detection risk"[9] that exists in the context of an audit or that is created by audit procedures performed or not performed by the auditor. AS 8.04.

270.     AS 8 provides that the auditor is required to assess the risks of material misstatement at the financial statement level[10] and at the assertion level.[11] AS 8.05. The auditor then uses the assessed risk of material misstatement to determine the appropriate level of detection risk – or the risk that material misstatements in the financial statements will not be identified. As noted in AS 8, "[t]he higher the risk of material misstatement, the lower the level of detection risk needs to be in order to reduce audit risk to an appropriately low level." AS 8.10.

271.     During the course of their audits of FNBC, the Auditor Defendants failed to adequately identify and/or address particular audit risks emanating from all of the information of which they were aware and from particular audit issues that arose in connection with theirs planning and risk assessment of audit engagements.   The Auditor Defendants  failed to adequately address the risk that FNBC's financial statements might be materially misstated as a result of an identified and ongoing material weakness in its internal control over financial reporting.

---

[9] Detection risk is the risk that procedures performed by the auditor will not detect a misstatement that exists and that could be material. AS 8.09

[10] Risk of material misstatement at the financial statement level may be especially relevant to the auditor's consideration of the risk of material misstatement due to fraud. AS 8.06.

[11] Risk of material misstatement at the assertion level consists of *inherent* risk and *control* risk. Inherent risk refers to the susceptibility of an assertion to a misstatement that could be material before consideration of any related controls. Control risk refers to the risk that a misstatement could occur in an assertion and that could be material will not be prevented or detected on a timely basis by the company's internal control. AS 8.07.

**D.** ***The Auditor Defendants Fail to Properly Identify and Assess the Risk of Material Misstatement***

272.    AS 12 establishes requirements of the auditor regarding the process of identifying and assessing risks of material misstatement of the financial statements. AS 12.01. AS 12 requires the auditor to "perform risk assessment procedures that are sufficient to provide a reasonable basis for identifying and assessing the risks of material misstatement,[12] whether due to error or fraud," and offers guidance as to the design of further audit procedures." AS 12.04 (footnote added).

273.    As noted in this standard, the "risk of material misstatement can arise from a variety of sources, including external factors, such as conditions in the company's industry and environment, and company-specific factors, such as the nature of the company, its activities, and internal control over financial reporting." AS 12.05.

274.    AS 12 requires that certain audit procedures be performed to identify and appropriately assess the risks of material misstatement in financial statements, which includes consideration of both external factors and company-specific factors. The risk assessment procedures include:

a. Obtaining an understanding of the company and its environment;

b. Obtaining an understanding of internal control over financial reporting ;

\* \* \*

f. Inquiring of the audit committee, management, and others within the company about the risks of material misstatement.

---

[12] In an integrated audit, the risks of material misstatement of the financial statements are the same for both the audit of internal control over financial reporting and the audit of financial statements. The auditor's risk assessment procedures should apply to both the audit of internal control over financial reporting and the audit of financial statements. AS 12.06

AS 12.05.

275.    During their audits for the Relevant Period, the Auditor Defendants failed to appropriately identify and assess the risk of material misstatement of the financial statements by, among other things, ignoring and/or failing to adequately consider certain external and company-specific factors that would have impacted such risk.  This included, among the other red flags discussed above, (1) known deficiencies in FNBC's internal control over financial reporting, including the improper influence exerted by Defendant Ryan; and (2) previously-identified material weaknesses, especially in view of the information of which the Auditor Defendants were or became aware during the course of its engagement as set forth above.

276.    As discussed herein, the Auditor Defendants failed to conduct their audits of FNBC's financial statements in accordance with PCAOB standards. The Auditor Defendants failed to exercise due professional care and professional skepticism, and to act in good faith, by failing to (1) properly assess the risk of material misstatement due to error in accounting and financial reporting, including errors in the accounting for investments in tax credit entities, which had been a historic, recurring problem at FNBC, (2) properly assess the control environment and risk assessment elements of FNBC's internal control over financial reporting, including previously-identified material weaknesses relating to FNBC's investments in tax credit entities, and (3) appropriately respond to the presence of certain known audit and fraud risk factors and inherent risks particular to FNBC, including but not limited to the risk posed Ryan's improper influence over accounting and reporting matters.

**E.    *The Auditor Defendants Fail to Properly Plan Their Audits***

277.    AS 9 provides guidance on the auditor's responsibilities to properly plan the audit. *See, e.g.,* AS 9.04. Planning an audit includes establishing the overall audit strategy and

developing an audit plan -- which includes, planned risk assessment procedures and planned responses to the risks of material misstatement. AS 9.05. In developing the audit strategy and audit plan, the auditor should evaluate whether a number of matters are important to the company's financial statements and internal control over financial reporting. These matters include among other things:

- Knowledge of the company's internal control over financial reporting obtained during other engagements performed by the auditor;

- Matters affecting the industry in which the company operates, such as financial reporting practices, economic conditions, laws and regulations, and technological changes;

- Matters relating to the company's business, including its organization, operating characteristics, and capital structure;

- The auditor's preliminary judgments about materiality, risk, and, in integrated audits, other factors relating to the determination of material weaknesses;

- Control deficiencies previously communicated to the audit committee or management;

- Legal or regulatory matters of which the company is aware;

- The type and extent of available evidence related to the effectiveness of the company's internal control over financial reporting;

- Preliminary judgments about the effectiveness of internal control over financial reporting;

- Public information about the company relevant to the evaluation of the likelihood of material financial statement misstatements and the effectiveness of the company's internal control over financial reporting.

AS 9.07 (footnotes omitted).

278.    The auditor should also consider numerous factors which are relevant to the assessment of the risks of material misstatement associated with a particular location or business unit and to the determination of necessary audit procedures. These factors include:

c. The specific risks associated with the location or business unit that present a reasonable possibility of material misstatement to the company's consolidated financial statements;

* * *

f. The effectiveness of the control environment, particularly with respect to management's control over the exercise of authority delegated to others and its ability to effectively supervise activities at the location or business unit; and

g. The frequency, timing, and scope of monitoring activities by the company or others at the location or business unit.

AS 9.12.

279.   In regard to such risk assessments, when conducting an audit of the financial statements of a company holding investments in tax credit entities, as was the case with FNBC, the auditor should determine the extent to which audit procedures should be performed to verify that current, accurate information is available to obtain sufficient appropriate evidence to attain reasonable assurance about whether the consolidated financial statements are free of material misstatement. This includes determining the valuation of the entities, the various IRS regulations governing tax credits and entities setup to receive such credits, the number and diversity of entities invested in by FNBC, the legal structure of the entities and identified or unidentified VIEs, and the treatment of tax credits available to the entity. As such, the Auditor Defendants should have planned their audits in accordance with PCAOB standards, to include procedures to mitigate the risk of material misstatement in FNBC's financial statements relating to these areas, and the nature, timing, and extent of procedures related to auditing FNBC's investments in tax credit entities accordingly. AS 9.11.

280.   During the course of an audit, the auditor should modify the overall audit strategy and the audit plan, as necessary, if circumstances change significantly during the course of the audit, including changes that might arise from a revised assessment of the risks of material

misstatement or the discovery of a previously-unidentified risk of material misstatement. AS 9.15. In the case of FNBC, the Auditor Defendants were aware from at least 2012 that management had (1) a historic problem accounting for investments in tax credit entities, (2) there was a lack of sufficient, competent managers and staff in FNBC's accounting department with knowledge of GAAP for accounting for investments in tax credit entities, and (3) both a material weakness in internal control over financial reporting and material restatements in the December 31, 2012 Annual Report had been identified related to investments in tax credit entities. The Auditor Defendants were also aware that, throughout the Relevant Period, FNBC management touted FNBC's investments in tax credit entities "an integral part of First NBC's commercial banking business" and "core to FNBC's corporate strategy," and as something unique that differentiated FNBC from other banks. Thus, during the course of their audits throughout the Relevant Period, the Auditor Defendants should have been aware that misstatements in accounting for investment in tax credit entities was an extremely high risk area to their audits and altered their audit procedures and the type of audit evidence they obtained to mitigate such risk.

### F.   *The Auditor Defendants Act with Recklessness and Gross Negligence*

281.   The Auditor Defendants acted with gross negligence or recklessness in violating these most fundamental principles of GAAS, and in expressing its unqualified audit opinions regarding FNBC's financial statements and internal controls. Indeed, as discussed above, the Auditor Defendants' audits were so deficient that EY had no reasonable bases to issue its unqualified audit opinions upon which FNBC and its directors and officers would rely.

282.   In conducting their audits for the fiscal years ended December 31, 2011 through December 31, 2015, the Auditor Defendants had access to the files and key employees of FNBC at all relevant times. As a result of the auditing and other services it provided to FNBC, EY

personnel had access to FNBC's corporate headquarters throughout each year, and had continual access to and knowledge of FNBC's confidential internal corporate, financial, operating, and business information, and had the opportunity to (1) observe and review FNBC's business and accounting practices, and to (2) test FNBC's internal accounting information and publicly reported financial statements as well as FNBC's internal controls and structures.

283.    Based on this level of presence, access and involvement, the Auditor Defendants' failure to identify or correct FNBC's several material accounting errors and internal control weaknesses can only be the product of gross negligence or recklessness. FNBC and EY have now admitted that FNBC's financial statements during the Relevant Period did not comply with GAAP. Moreover, FNBC's disclosures, including those in its 2015 Form 10-K and April 24, 2017 Form 8-K establish pervasive failures of FNBC's audited financial statements to comply with the basic requirements of GAAP. Therefore, EY's unqualified opinions during the Relevant Period, stating that FNBC's financial statements did comply with GAAP, were incorrect and violated GAAS. Similarly, EY's unqualified opinion with respect to FNBC's internal controls during the Relevant Period was incorrect and violated GAAS

284.    Further, during the Relevant Period, EY provided FNBC with independent accounting, auditing and tax services, as well as with accounting advice and consultation regarding FNBC's annual and quarterly reports that FNBC filed with the SEC and publicly distributed. Through these additional services, EY had even greater knowledge of FNBC and access to FNBC's employees and records.

285.    According to FNBC's proxy statements, EY was paid a total of over $10 million for its services to FNBC from 2012 through 2015. This included payments of $2.31 million in 2012 ($851,066 in audit fees, $1,322,600 in audit-related fees, and $143,125 in tax fees), $1.1

million in 2013 ($513,599 in audit fees, $418,025 in audit-related fees, and $165,500 in tax fees), $1.85 million in 2014 ($1,636,649 in audit fees, $73,200 in audit-related fees, $134,000 in tax fees, and $3,100 in all other fees), and $5.25 million in 2015 ($5,027,309 in audit fees, $222,450 in tax fees, and $1,500 in all other fees).

286.    For the reasons set forth above, EY utterly failed in its role as auditor. the Auditor Defendants disregarded their duty to perform proper audits of FNBC and failed to take reasonable steps to ensure that EY's audit opinions were accurate.

## XI.   Further Facts Establish the Bad Faith, Disloyalty, and Deliberate Breaches of Fiduciary Duties by the Officer Defendants, in Conspiracy with the Bank's General Counsel

287.    As set forth herein, this Complaint is replete with facts demonstrating the Officer Defendants' intentional misconduct, improper receipt of personal benefits, knowing violation of law, disloyalty, bad faith, reckless disregard, gross negligence, and/or carelessness amounting to indifference to the best interests of the Holding Company.   In addition, Plaintiff alleges as follows:

288.    The Officer Defendants constituted the senior management of the Holding Company, and thus at all times were the ones with principal responsibility for ensuring that complete, accurate, and truthful information was conveyed to the Holding Company's Board. Notwithstanding this responsibility, the Officer Defendants caused incomplete, inaccurate, and materially false information to be conveyed to the Board as well as to officers and employees responsible for preparing FNBC's internal and public financial statements on which the Board would rely.

289.    Throughout the Relevant Period, the Officer Defendants Ryan and Verdigets also signed SOX certifications attesting that, among other things, (1) FNBC's financial statements did

not contain untrue statements of material fact or omit to state material facts necessary to make the statements made not misleading; (2) the financial statements fairly represented in all material respects the financial condition, results of operations, and cash flows of FNBC; and (3) they had designed and evaluated the effectiveness of FNBC's disclosure controls and procedures, including disclosing any change in the Holding Company's internal control over financial reporting.  These certifications by the Officer Defendants Ryan and Verdigets, which were signed each quarter identified above, not only assured the Holding Company's Board and the investing public that FNBC's financial results were accurate and free of misstatement, but also served to corroborate FNBC's assertions throughout the Relevant Period that any prior material weaknesses had been properly addressed.

290.   For example, despite the Officer Defendants' knowledge of the importance of FNBC's tax credit business to the Holding Company's results, and the Holding Company's prior restatement and material weakness with respect to this business, and despite certain Officer Defendants' explicit reassurances to the investing public and the Holding Company's Board, FNBC was forced on August 25, 2016 to restate its financial results for periods covering its entire history as a publicly traded company (and for prior periods as well), acknowledging that its prior financial statements were false *at the time they were issued.*  On that same occasion, the Holding Company was required to disclose that material weaknesses existed due to a "lack of a sufficient number of accounting personnel with the appropriate technical expertise and knowledge of the accounting for . . . investments in certain of its income tax related entities." Even *after* that date, the Holding Company was forced on April 24, 2017 to disclose that the prior year's restatement of financial results *themselves* could not be relied upon.

291.    The sheer magnitude of the 2016 restatement of financial results confirms the Officer Defendants' knowing participation in the misconduct.  As noted above, the restatement was massive, impacting by clearly material amounts each prior financial statement FNBC had issued as a public company, as well as prior periods.  For example, rather than the impairment of $19 million with respect to its investment in tax credit entities that the Holding Company had reported in its February 1, 2016, press release, FNBC's 2015 Form 10-K filed on August 25, 2016 disclosed that the correct impairment amount was $59.5 million—approximately three times the amount initially reported.  Further, while FNBC previously reported net income for 2015 of $67 million, FNBC admitted that it actually suffered a loss of $25 million—a monumental decrease of over $92 million.  As detailed above, FNBC was obliged to make significant negative adjustments to its previously-reported net income figures for 2013 and 2014.

292.    Additional circumstances establish the Officer Defendants' knowledge and deliberate toleration of material weaknesses in risk management, as well as the absence of any meaningful financial or accounting controls.  On March 22, 2019, the United States Attorney for the Eastern District of Louisiana filed a criminal information against Defendant St. Angelo, who served as the Bank's General Counsel from 2006 through April 2017.  *See United States of America v. Gregory St. Angelo*, Criminal Docket No. 19-00055 (E.D. La. filed Mar. 22, 2019).  The information alleged that St. Angelo had conspired with "Bank President A" (i.e., Ryan) and "Bank Officer B," known to be the Chief Creditor Officer (i.e., Burnell) to commit bank fraud.

293.    Specifically, the information alleged that by the time of the Bank's failure in April 2017, the Bank (through Ryan and Burnell) had approved loans for St. Angelo and entities controlled by him totaling $46.7 million and had paid $9.6 million to St. Angelo for numerous fraudulent tax credit investments.  The purpose of the conspiracy, according to the U.S.

Attorney, was for St. Angelo, Ryan, Burnell, and others "to enrich themselves unjustly" by disguising the true financial status of St. Angelo and his entities, and other borrowers, concealing the accurate performance of loans, and misrepresenting the nature of payments to St. Angelo and his entities."

294.    The information further alleges that St. Angelo submitted false and fraudulent financial statements to the Bank in connection with loan applications; that Ryan, Burnell, and others disguised St. Angelo's true financial condition by issuing new loans to him and his entities to pay older loans that St. Angelo was unable to repay, thereby making the new loans appear current and the old loans appear to have been satisfied.   Ryan, Burnell, and others also improperly extended the maturity dates on St. Angelo's loans, thereby avoiding having to downgrade the loans on the Bank's books.

295.    The information also alleges that Ryan, Burnell, and others funded fraudulent tax credit investments that the Bank purportedly made in St. Angelo's entities, whereas, in reality such "investments" merely were intended to funnel money from the Bank's general ledger to St. Angelo and his entities to allow him to make his loan payments and avoid overdrafts.   This technique, according to the information, was intended by Ryan and Burnell to justify a diversion of funds to St. Angelo and his entities.   Moreover, "on multiple occasions, [Burnell] directed the disbursement of payments to St. Angelo and certain Entities from First NBC Bank's general ledger, purportedly for tax credit investments, knowing that the tax credit investments were false."

296.    Further, according to the criminal information, Ryan caused the Bank to invest in and claim historic tax credits for a property owned by St. Angelo or his entities on Conti Street in New Orleans. ***Even after being informed by the Bank's outside counsel in late December 2010***

*that the property did not qualify for tax credits, Ryan caused the Bank to continue the arrangement*.  Beginning in August 2010 and continuing until at least May 2015, Ryan assisted St. Angelo in creating false and falsely-backdated documents purporting to show that the property had the features necessary to qualify for tax credits, including false purchase agreements concealing the true ownership of entities associated with the property.  All told, the payments that Ryan, St. Angelo, and Burnell caused the Bank to make to St. Angelo and his entities for tax credit investments totaled more than $9.6 million.

297.   The criminal information is explicit as to misconduct not only of Defendant St. Angelo but also that of Defendant Ryan (Bank President A) and Defendant Burnell (Bank Officer B):

> 19.   **Bank President A and Bank Officer B approved fraudulent tax credit investments for ST. ANGELO's properties routinely at month-end.  For example, on or about December 11, 2014, a  First NBC Bank employee mailed Bank Officer B requesting permission to cover ST. ANGELO'S overdrafts with tax credit money.  The employee asked Bank Officer B, "Are we out of tax credits for conti?  Do you know?"  Bank Officer B responded, "As long as we have a sharp pencil we are never out of tax credits," acknowledging that the tax credits were false.**  The bank employee responded, "LOL……I think that just made my day…."  Approximately ten days later, Bank Officer B approved a $450,000 debit to the First NBC Bank general ledger for a tax credit investment in 622 Conti, LLC [an entity controlled by St. Angelo].  Bank Officer B then approved a credit to the 616 Girod [another St. Angelo entity] deposit account of approximately $450,000, which covered overdrafts to certain Entities and went to ST. ANGELO's personal account at a different bank.
>
> * * *
>
> 21.   ST. ANGELO, Bank President A, and Bank Officer B knew that ST. ANGELO and the Entities did not qualify for these tax credits, and that the tax credits were merely a means to increase ST. ANGELO's cash flow to assist him in paying overdrafts and remaining current on his and certain Entities' loans with the bank.

298.    Ryan's and Burnell's dealings with St. Angelo are just one example of the misconduct by the Officer Defendants in concealing accurate information from the Holding Company's Board concerning the true financial status of the Bank and its controls over loans and other operations.  The U.S. Attorney also has alleged that Ryan conspired with contractor Jeffrey Dunlap to commit bank fraud.  *See United States of America v. Jeffrey Dunlap*, Criminal Docket No. 18-99 (E.D. La. filed May 14, 2018).

299.    In the Dunlap criminal information (to which Dunlap pleaded guilty on or about October 17, 2018), the United States alleged that Dunlap ran Phoenix Civil Contractors, LLC ("PCC"), both of which obtained loans from the Bank, with "Bank President A" (i.e., Ryan) serving as the loan officer thereof.  To secure the loans, which eventually totaled $22 million, PCC listed as collateral certain accounts receivable it had from "Company A," of which Ryan was a co-owner.

300.    The criminal information alleges that "Bank President A" (i.e., Ryan) personally assisted Dunlap and PCC in inflating their accounts receivable.  The purpose of this conspiracy was to generate more loans to Dunlap and PCC to, in part, fund Dunlap's and PCC's construction services on a 100-acre property in Slidell, Louisiana, owned by "Company A" and indirectly by Ryan.   On the promise that the property (as developed into a subdivision by Company) would be sold at a profit at which time Dunlap's and PCC's obligations on the loans could be resolved, Dunlap and PCC were enticed to provide services to Company A at no cost to it or Ryan.

301.    In the "Factual Basis" for his guilty plea, Dunlap stipulated to the following facts:

21.    *Employees of First NBC Bank would testify that Bank President A and his administrative staff kept a list of problem borrowers who consistently had overdrafts on their deposit accounts.*  Bank President A, who was the loan

officer for these borrowers, directed his administrative staff to monitor their overdrafts on a daily basis. ***The staff referred to the borrowers by the acronym "D.O.R.K.S.," because each letter represented a different borrower.  DUNLAP was the "D" in D.O.R.K.S.  This daily monitoring ensured that the D.O.R.K.S. were not on the month-end overdraft report to the Board of Directors.***  Bank President A was the only person who could approve the overdrafts and keep the D.O.R.K.S. from being on the month-end overdraft report.  By concealing the D.O.R.K.S.'s overdrafts, Bank President A hid the true status of their loans from the Board, bank regulators, and investors.

* * *

24.    Between 2009 and November 2016, DUNLAP and Bank President A periodically discussed inflating Phoenix's accounts receivable to justify incremental increases in the [letter of credit].  In these conversations, Bank President A instructed DUNLAP to inflate his accounts receivable in order to increase the borrowing base of the [letter of credit].  Bank President A also falsely assured DUNLAP that Phoenix's obligations to repay the [letter of credit] would be resolved when Company A completed and sold the 100-acre subdivision in St. Tammany Parish at a profit.

25.    ***Bank President A told DUNLAP that DUNLAP did not need to age his accounts receivable, meaning he did not need to identify how long the Phoenix accounts had been outstanding.  This direction contradicted bank policy and bank documents that DUNLAP signed***, specifically the Business Loan Agreements, which prohibited the bank from relying on accounts receivable to calculate a borrowing base if they could not be paid in full within 90 days.  Bank President A also instructed DUNLAP that he could list potential work as accounts receivable, as well as potential change orders.  DUNLAP knew from past practices this was not how to properly and truthfully list accounts receivable, but agreed to followed [sic] the instructions of Bank President A because of his authority and position at First NBC Bank, and because DUNLAP wanted to continue having his LOC funded.

302.    Ryan also was motivated to conceal the misstatements of the Bank's financial condition and weaknesses in its internal controls publicly, including to the Holding Company's Board, by the fact that nearly all of the Holding Company stock he owned, 435,000 shares out of a total of 475,000 shares, was pledged as collateral for various debt obligations, including real estate investments.  Since Ryan's loan from outside lenders were collateralized by his FNBC stock, if the value of the stock declined to levels below the loan amounts, Ryan could be forced

to sell his stock to repay the obligations (which likely would have further depressed the market price of his stock holdings) or post additional collateral.

303. In yet another instance, noted by the Inspector General in its Report, ***Ryan "obtained a $2 million personal loan from one of the [B]ank's borrowers, who had recently received a $9 million unsecured loan from the [B]ank*.**" Report at 5 (emphasis added). Moreover, as the Inspector General also noted, Ryan "[c]ontinued to make loan extensions and other risky credit and investment decisions during his tenure ***even when those activities were subject to examiner criticisms*.**" *Id*. (emphasis added).

304. As such, Ryan and the other Officer Defendants had a strong, unique, and personal motive to engage in the misconduct alleged herein; and they took advantage of the opportunities afforded them by their positions to inflate the Bank's and the Holding Company's reported financials and controls over risk and accounting systems for their personal benefit, thus breaching their duty of loyalty to the Holding Company.

305. In committing the wrongful acts alleged herein, the Officer Defendants and St. Angelo have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. St. Angelo conspired with the Officer Defendants with knowledge and intent that his actions would assist, aid, and abet the Officer Defendants in breaching their fiduciary duties to the Holding Company and cause direct harm to the Holding Company. St. Angelo's actions and conduct materially assisted, added to, and exacerbated the Officer Defendants' misconduct.

306. In furtherance of this plan, conspiracy, and course of conduct, the Officer Defendants and St. Angelo collectively and individually took the actions set forth herein. The purpose and effect of the conspiracy, was, among other things, to: (1) conceal the declining

financial condition of the Bank from the Holding Company's Board; (2) conceal and perpetuate the illegal and improper loan and investment practices being conducted by the Bank; (3) conceal and perpetuate the Bank's exposure to other improper investments; (4) induce the Holding Company's Board to continue injecting capital into the Bank; and (5) continue receiving improper and unjust personal benefits from their association with the Bank and the Holding Company, as alleged herein.

## XII.   Due to their Faulty Audits, the Auditor Defendants Fail to Timely Identify the Deficiencies in FNBC's Financial Reporting and Internal Controls, Causing Disastrous Damage to FNBC

307.   FNBC and its directors and officers, despite having paid substantial fees for the Auditor Defendants' auditing services, were left in the dark regarding the true nature of FNBC's financial position. As a result of the Auditor Defendants' negligence, malpractice, and breach of contract, FNBC and its directors and officers were unable to prevent FNBC from incurring losses that could have and would have been avoided if the Auditor Defendants had competently performed their duties.

308.   As detailed above, for much or all of its history FNBC's financial reporting was materially misstated, and FNBC suffered from several material weaknesses in its internal controls for financial reporting. Despite these deficiencies, and numerous red flags that should have alerted the Auditor Defendants to these deficiencies as described above, year after year EY informed FNBC that (1) EY had audited FNBC's financial statements, (2) that those financial statements presented fairly in all material respects FNBC's financial position, and (3) that EY possessed a reasonable basis for its opinion.

309.   An auditor exercising due professional care would have years earlier discovered and informed FNBC, at a minimum, that (i) FNBC's accounting for tax credit investments was

materially misstated, (ii) FNBC's accounting for its exposure to the oil and gas industry was materially misstated, (iii) FNBC suffered from several material weaknesses in internal control for financial reporting, and (iv) FNBC was being defrauded by rogue employees.

310.    Had FNBC been timely informed of these facts it could have and would have taken prompt remedial measures before these problems grew to unmanageable levels.

311.    FNBC's bankruptcy was ultimately caused by a combination of (i) losses directly incurred as a result of the above described problems, which due to the Auditor Defendants' negligence grew to extreme levels, and (ii) further losses incurred when First NBC Bank customers learned of the above described problems and pulled their deposits from the Bank.  The Auditor Defendants' negligent, belated detection of these problems, which allowed these problems to grow to unmanageable levels, was therefore the proximate cause of FNBC's failure and bankruptcy.

312.    Furthermore, the Auditor Defendants directly harmed FNBC by causing it to make imprudent contributions to its banking subsidiary.  Throughout its history FNBC contributed hundreds of millions of dollars to its banking subsidiary. The following table lists (in thousands of dollars) the amounts of such contributions as reported in two sources (i) FNBC's SEC filings, and (ii) an FDIC Office of Inspector General Material Loss Review of First NBC Bank:

| | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | 2008-09 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Contributions to subsidiary per FNBC SEC filings | 50,000 | - | 67,000 | 16,600 | 67,508 | 32,223 | - | 233,331 |
| Capital injections per FDIC report | 27,662 | 67,000 | - | 16,600 | 67,043 | 31,348 | 16,050 | 225,703 |

313.    Had the Auditor Defendants competently performed their duties and earlier alerted FNBC to its material accounting and internal control deficiencies involving First NBC Bank, then FNBC could have and would have ceased to contribute funds to First NBC Bank, thereby saving FNBC tens or hundreds of millions of dollars.

314.    The Auditor Defendants' negligence additionally harmed FNBC by causing it to incur additional accounting and audit expenses in order to remedy the numerous accounting and internal control deficiencies described above. If the Auditor Defendants had alerted FNBC to these problems earlier before they grew to unmanageable sizes, they could have been corrected at far lesser expense.

315.    The Auditor Defendants' negligence additionally harmed FNBC by causing it to incur additional litigation expenses relating to the numerous accounting and internal control deficiencies described above. FNBC was subject to various lawsuits as a result of the accounting failures described herein. If the Auditor Defendants had alerted FNBC to these problems earlier before they grew to unmanageable sizes, FNBC could have corrected them with zero, or far less, litigation expense.

## CLAIMS FOR RELIEF

### COUNT I

**Breach of Fiduciary Duties
for Deliberate Failure to Implement and Maintain
Effective Risk Management Procedures and Internal Controls**

**(Against all the Officer Defendants)**

316.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

317.    As officers of the Holding Company, each Officer Defendant owed to the Holding

Company fiduciary duties of care, loyalty, good faith, fair dealing, independence, oversight, and candor.  The Officer Defendants were required to discharge their duties in good faith, and with the diligence, care, judgment, and skill required under the law, including not acting with gross negligence (i.e., in reckless disregard of, or with carelessness amounting to indifference to the best interests of the Holding Company and involving a substantial deviation below the standard of care expected to be maintained by a reasonably careful person under the circumstances).

318.    These duties required each Officer Defendant to (1) devote sustained, affirmative attention to ensuring that effective internal controls were established and maintained over financial accounting and reporting; (2) exercise vigilant oversight to ensure that effective systems, procedures, and personnel were in place to enable the Holding Company and its subsidiaries properly to account for and accurately to report on the financial results of the Holding Company on a consolidated basis; (3) exercise vigilant oversight to ensure the implementation and maintenance of effective internal risk assessment and management functions that would enable the Holding Company and the Bank to assess and manage the risks in the Bank's loan practices and investments in tax credits and receivables, among others; (4) ensure that the Holding Company and its subsidiaries timely comply with regulations and directives from federal and state regulators; and (5) protect the Holding Company against the diminution in value of its interest in its primary subsidiary and most valuable asset—the Bank—by seeing to it that the Bank was managed properly.

319.    The Officer Defendants, in conspiracy with, and aided and abetted by, St. Angelo, breached these fiduciary duties in ways that constituted violations of their duty of loyalty, acts or omissions not in good faith, acts involving intentional misconduct, acts involving knowing violation of law, and/or transactions from which they derived improper personal benefits.  In so

112

doing, the Officer Defendants' conduct was the antithesis of the good faith, care, loyalty, and devotion to the best interests of the Holding Company and its constituents as required of corporate fiduciaries under applicable law.

320.    As a result of these aforesaid breaches, the Officer Defendants directly harmed the Holding Company in amounts to be proven at trial by causing a waste of the corporate assets of the Holding Company, needlessly depleting its funds on the Bank.  When the Bank was placed into receivership, the Holding Company, having exhausted its funds and access to capital, soon became insolvent.

321.    Plaintiff, on behalf of the Estate, is entitled to judgment against the Officer Defendants, jointly and severally, for the damage directly caused to the Holding Company thereby.

## COUNT II

### Breach of Fiduciary Duties
### for Failure to Provide Accurate and Complete
### Information to the Holding Company's Board

### (Against all the Officer Defendants)

322.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

323.    As officers of the Holding Company, each Officer Defendant owed to the Holding Company fiduciary duties of care, loyalty, good faith, fair dealing, independence, oversight, and candor.  The Officer Defendants were required to discharge their duties in good faith, and with the diligence, care, judgment, and skill required under the law, including not acting with gross negligence (i.e., in reckless disregard of, or with carelessness amounting to indifference to the best interests of the Holding Company and involving a substantial deviation below the standard

of care expected to be maintained by a reasonably careful person under the circumstances).

324.    These duties required each Officer Defendant to (1) provide accurate and complete information and disclosures to the Holding Company's Board regarding (a) the financial condition of the Holding Company and its subsidiaries, (b) the adequacy and effectiveness of the Holding Company's internal controls over financial accounting and reporting, (c) the adequacy and effectiveness of the systems, procedures, and personnel in place to enable the Holding Company and its subsidiaries properly to account for and accurately to report on the financial results of the Holding Company on a consolidated basis, and (d) the adequacy and effectiveness of internal risk assessment and management functions in place to enable the Officer Defendants and the Bank to assess and manage the risks in Bank's loan practices and investments in tax credits and receivables, among others; and (2) not make material misrepresentations and omissions in consolidated financial statements filed with the SEC and relied upon by the Holding Company's Board.

325.    The Officer Defendants, in conspiracy with, and aided and abetted by, St. Angelo, breached these fiduciary duties in ways that constituted violations of their duty of loyalty, acts or omissions not in good faith, acts involving intentional misconduct, acts involving knowing violation of law, and/or transactions from which they derived improper personal benefits.  In so doing, the Officer Defendants' conduct was the antithesis of the good faith, care, loyalty, and devotion to the best interests of the Holding Company and its constituents as required of corporate fiduciaries under applicable law.

326.    In direct violation of these duties, the Officer Defendants willfully ignored the obvious and pervasive problems with FNBC's internal control practices and procedures, and failed to make a good faith effort to correct the problems or their recurrence.  As directors and/or

executive officers of FNBC, the Officer Defendants were responsible for authorizing, or failing to monitor, these internal control and accounting processes.

327.     In reliance on the inaccurate information presented to it by the Officer Defendants about the financial condition of the Holding Company—information that was inaccurate because of, *inter alia*, the Officer Defendants' failures to cause to be implemented effective internal controls over financial accounting reporting—the Holding Company's Board authorized the improvident incurrence by the Holding Company of $60 million in new debt in the first quarter of 2015, which artificially prolonged the Holding Company's existence and caused it to incur additional losses.  The Officer Defendants' breaches of fiduciary duty were the proximate cause of these losses, the amounts of which are to be proven at trial.

328.     Plaintiff, on behalf of the Estate, is entitled to judgment against the Officer Defendants, jointly and severally, for the damage thus caused to the Holding Company.

**COUNT III**

**Breach of Fiduciary Duties
and Waste of Corporate Assets
by Wrongly Causing the Holding Company's Board
to Approve the Officer Defendants' Unearned Compensation of $8 Million
and to Inject $201 Million in Capital into the Bank from 2011 to 2015**

**(Against all the Officer Defendants)**

329.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

330.     As officers of the Holding Company, each Officer Defendant owed to the Holding Company fiduciary duties of care, loyalty, good faith, fair dealing, independence, oversight, and candor.  The Officer Defendants were required to discharge their duties in good faith, and with the diligence, care, judgment, and skill required under the law, including not acting with gross

negligence (i.e., in reckless disregard of, or with carelessness amounting to indifference to the best interests of the Holding Company and involving a substantial deviation below the standard of care expected to be maintained by a reasonably careful person under the circumstances).

331.  In connection with each of the proposed capital contributions by the Holding Company to the Bank in 2011, 2012, 2013, and 2015, the Officer Defendants had fiduciary duties to provide the Holding Company's Board with all relevant information and a reasonable opportunity to consider whether, in light of all the relevant information, it was in the Holding Company's best interest to infuse such capital into the Bank at that time.

332.  Instead, as previously described in this Complaint, the Officer Defendants withheld and concealed from the Holding Company's Board information which would have disclosed that the Bank was significantly undercapitalized as a result of poor risk management, general management, asset quality, and other scores of capitalization, that such undercapitalization was a direct result of the Officer Defendant's deliberate, reckless, bad-faith, and/or self-dealing failures of management, and that the Officer Defendants had no intention of maintaining adequate risk, internal, and accounting controls.  As a result, the Holding Company and/or its Board made the capital contributions in the years set forth above without consideration of critical and otherwise material information and without effective deliberations.  But for the Officer Defendants' breaches of their fiduciary duties herein, the Holding Company's Board would not have been induced to make the capital contributions.

333.  The Officer Defendants, in conspiracy with, and aided and abetted by, St. Angelo, breached these fiduciary duties in ways that constituted violations of their duty of loyalty, acts or omissions not in good faith, acts involving intentional misconduct, acts involving knowing violation of law, and/or transactions from which they derived improper personal benefits.  In so

116

doing, the Officer Defendants' conduct was the antithesis of the good faith, care, loyalty, and devotion to the best interests of the Holding Company and its constituents as required of corporate fiduciaries under applicable law.

334. In addition, the Officer Defendants caused the Holding Company's Board to pay them lucrative, unearned compensation packages totaling nearly $8 million.

335. The aforesaid breaches of fiduciary duty were the proximate cause of direct injury to the Holding Company in the amount of $209,086,081.

**COUNT IV**

**Conspiracy/Aiding and Abetting**

**(against Defendant St. Angelo)**

336. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

337. The Officer Defendants committed the independent torts of breach of fiduciary duty set forth above.

338. St. Angelo, with knowledge and intent that his actions would assist, aid, and abet the Officer Defendants in breaching their fiduciary duties to the Holding Company and cause direct harm to the Holding Company, did in fact provide material assistance to the Officer Defendants in so breaching their duties. St. Angelo's actions and conduct materially assisted, added to, and exacerbated the Officer Defendants' misconduct.

339. St. Angelo conspired and agreed with the Officer Defendants to commit and perpetuate their fiduciary breaches. The Officer Defendants committed their fiduciary breaches pursuant to their agreement and plan of action with St. Angelo. The purpose of the plan and agreement amounting to conspiracy was, among other things, to: (1) conceal the declining

financial condition of the Bank from the Holding Company's Board; (2) conceal and perpetuate the illegal and improper loan and investment practices being conducted by the Bank; (3) conceal and perpetuate the Bank's exposure to other improper investments; (4) induce the Holding Company's Board to continue injecting capital into the Bank; and (5) continue receiving improper and unjust personal benefits from their association with the Bank and the Holding Company, as alleged herein.

340.    As a proximate result of the conspiracy to which St. Angelo agreed, and towards which purpose he acted, resulting in the Officer Defendants' intentional breach of fiduciary duty, the Holding Company was directly harmed.

## COUNT V

## Breach of Contract

## (against Defendant EY)

341.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

342.    As set forth herein, in connection with EY's audits of FNBC, EY provided engagement letters directed to FNBC's Audit Committee in which EY agreed, among other things, to perform its audits in accordance with applicable professional standards and generally accepted auditing standards.

343.    As set forth herein, EY breached the contractual duties it owed to FNBC, and breached the express promises it made to FNBC in its engagement letters.

344.    At all relevant times, FNBC performed, or substantially performed, its material obligations under the engagement letters, including, without limitation, the payment of millions of dollars in fees and expenses to EY, and the provision of access to books and records of FNBC

and its subsidiaries in accordance with EY's requests.

345. As a direct and proximate result of EY's breach of contract as described herein, FNBC sustained substantial damages in an amount to be determined at trial.

## COUNT VI

### Accounting Malpractice and Professional Negligence

### (Against all the Auditor Defendants)

346. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

347. The Auditor Defendants owed FNBC a duty to exercise reasonable and professional care in the conduct of their audits of FNBC which included, among other things, the duty to perform their audits in accordance with applicable professional standards and generally accepted auditing standards.

348. As a result of the Auditor Defendants' accounting malpractice and professional negligence the Auditor Defendants' audits of FNBC fell below and breached the professional duty of due care that the Auditor Defendants owed to FNBC.

349. As set forth more fully herein, the Auditor Defendants' conduct fell below the standard of care in at least the following respects, among others:

a. the Auditor Defendants failed to exercise reasonable and professional care normally expected from members of the accounting and auditing profession with an attitude of professional skepticism;

b. the Auditor Defendants failed to obtain a reasonable understanding of the nature of FNBC's business, operations, accounting policies, objectives strategies, business risks,

internal controls (including information systems, financial controls, and monitoring), and reporting methods;

   c. the Auditor Defendants failed to plan and perform their audits to reduce audit risk to an acceptably low level given their understanding of FNBC's business and its internal workings;

   d. the Auditor Defendants failed to gather adequate and appropriate audit evidence upon which to base their audit reports, and failed to critically assess the audit evidence;

   e. the Auditor Defendants failed to alert FNBC's directors as soon as possible to material weaknesses or failures in FNBC's internal controls, to inadequate management assessments or evaluations of controls, and to any irregularities, illegal acts or actions by insiders indicative of false or fraudulent financial reporting;

   f. the Auditor Defendants failed to determine, based upon sufficient competent evidence, whether there was significant doubt as to whether FNBC would be able to continue as a going concern;

   g. the Auditor Defendants failed to determine whether FNBC's financial statements provided a true and fair view of FNBC's financial position and the results of FNBC's operations and cash flows for the Relevant Period in accordance with GAAP; and

   h. the Auditor Defendants issued false, misleading and unqualified audit reports which concealed their own malpractice and perpetuated the continued dissemination of materially misstated financial statements which did not comply with GAAP.

  350. The Auditor Defendants' accounting malpractice and professional negligence, which was reckless or at least gross, continued throughout the entire course of their work for FNBC.

351.     As a direct and proximate result of the Auditor Defendants' misconduct described herein, FNBC sustained substantial damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment in favor of Plaintiff, on behalf of the Estate, as follows:

A.     against the Officer Defendants, jointly and severally, on Count I of the Complaint, awarding damages in an amount to be proven at trial.

B.     against the Officer Defendants, jointly and severally, on Count II of the Complaint, awarding damages in an amount to be proven at trial.

C.     against the Officer Defendants, jointly and severally, on Count III of the Complaint, awarding damages in the amount of $209,086,081.

D.     against St. Angelo on Count IV of the Complaint, awarding damages in an amount to be proven at trial.

E.     against EY on Count V of this Complaint, awarding damages in an amount to be proven at trial.

F.     against the Auditor Defendants, jointly and severally, on Count VI of this Complaint, awarding damages in an amount to be proven at trial.

G.     All attorneys' fees and costs in the prosecution of this action as allowed by law.

H.     Pre-judgment and post-judgment interest as allowed by law.

I.     Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues and claims so triable.

Dated:   May 10, 2019.

O'BELL LAW FIRM, LLC

By:_____*/s/ Eric J. O'Bell*_____
Eric J. O'Bell (admitted to the Bar of this Court)
La. Bar No. 26693
*ejo@obelllawfirm.com*
Albert M. Myers, Of Counsel (*pro hac vice*
application to be filed)
*mearsly@gmail.com*
3500 N. Hullen Street
Metairie, LA 70002
Tel.: (504) 456-8677
Fax: (504) 456-8653

GLANCY PRONGAY & MURRAY LLP

By:_____*/s/ Brian P. Murray*_____
Brian P. Murray (*pro hac vice* application to be
filed)
*bmurray@glancylaw.com*
Garth Spencer (*pro hac vice* application to be
filed)
*gspencer@glancylaw.com*
230 Park Avenue, Suite 530
New York, NY 10169
(212) 682-5340
Tel.: (212) 682-5340
Fax: (212) 884-0988

-and-

CONGENI LAW FIRM, LLC

By:_____*/s Leo Congeni*_____
Leo Congeni (admitted to the Bar of this Court)
La. Bar No. 25626
*leo@congenilawfirm.com*
424 Gravier Street
New Orleans, LA 70130
Tel.:  (504) 522-4848

*Attorneys for Plaintiff*

122