# Exhibit B

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 19-55** |
| **v.** | * | **SECTION: "J":** |
| **GREGORY ST. ANGELO** | * | |

*   *   *

### FACTUAL BASIS

1.     The Defendant, **GREGORY ST. ANGELO** (hereinafter "**ST. ANGELO**"), has indicated that he intends to plead guilty as charged to Count One, that is, conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, of the Bill of Information pending against him.

2.     The United States and **ST. ANGELO** do hereby stipulate and agree that the allegations in the Bill of Information and the following facts are true and correct and that, should this matter have proceeded to trial, the Government would have proven them beyond a reasonable doubt, through the introduction of competent testimony and admissible tangible and documentary exhibits. This Factual Basis does not attempt to set forth all of the facts known to the United States at this time. The limited purpose of this Factual Basis is to demonstrate that there exists a sufficient legal basis for **ST. ANGELO**'s guilty plea. By their signatures below, the parties expressly agree that there is a factual basis supporting the Defendant's guilty plea. The parties also agree that this Factual Basis may, but need not, be used by the United States Probation Office and the Court in determining the applicable advisory guideline range under the United States Sentencing Guidelines or the appropriate sentence under 18 U.S.C. § 3553(a).

AUSA
Defendant
Defense Counsel

## I.   **FIRST NBC BANK**

3.      At all times material to the Bill of Information, First NBC Bank was a financial institution, as defined in Title 18, United States Code, Section 20, and a member of the Federal Deposit Insurance Corporation ("FDIC") with federally insured deposit accounts.

4.      First NBC Bank was established in or about 2006, with its headquarters in New Orleans, Louisiana, within the Eastern District of Louisiana, and with branch offices in Louisiana, Mississippi, and Florida.

5.      First NBC Bank was the wholly-owned subsidiary of First NBC Bank Holding Company. Beginning in May 2013, First NBC Bank Holding Company was a publicly-traded company listed on the NASDAQ stock exchange. On April 28, 2017, First NBC Bank was closed by the Louisiana Office of Financial Institutions ("LOFI").

6.      Bank President A was a founder of First NBC Bank and acted as its president and Chief Executive Officer from on or about May 2006, until on or about December 2016.

7.      From in or around 2006 through April 2017, Bank Officer B was employed by First NBC Bank as its Chief Credit Officer, and was responsible for, among other things, the overall quality of the bank's lending function; the bank's credit policies and administration; its loan recovery and collection efforts; and its monitoring and managing of past due loans, including the approval of the bank's internal list of past due loans.

8.      As a financial institution, First NBC Bank was subject to regulatory supervision by the FDIC and LOFI, charged with supervising and regulating First NBC Bank to ensure that it engaged in safe and sound banking practices and complied with federal and state banking laws.



AUSA
Defendant
Defense Counsel

9.      First NBC Bank was also required to submit to periodic safety and soundness examinations conducted by the FDIC and LOFI. First NBC Bank was required to report information regarding past due loans to the FDIC and LOFI in advance of these examinations, which affected the regulators' conclusions regarding the First NBC Bank's financial condition.

10.     In addition, First NBC Bank engaged external auditors tasked with evaluating the accuracy of the bank's financial statements related to, among other things, the bank's loan portfolio and investments.

## II.   ST. ANGELO'S RELATIONSHIP WITH FIRST NBC BANK

11.     At all times material to the Bill of Information, the Defendant, **ST. ANGELO**, was an attorney and resided in St. Tammany Parish, which is within the Eastern District of Louisiana. **ST. ANGELO** was a member, owner, or otherwise exercised control of the following entities, among others, all of which were Louisiana business entities: St. Angelo Investment Company, LLC; Premier Information Systems, Inc.; St. Fitz, LLC; 616 Girod, LLC; LMH Properties, LLC; Lismore Properties, LLC; Conti Development, LLC; La Nasa, St. Angelo & La Nasa, LLC; and Annadele, Inc. (collectively "the Entities").

12.     From in or around 2006, through April 2017, **ST. ANGELO** had a banking relationship with First NBC Bank individually and through some of the Entities. **ST. ANGELO** obtained loans at First NBC Bank through various other individuals and businesses as nominees (the "Nominee Loans") and used the loan proceeds for **ST. ANGELO**'s and the Entities' benefit, and sometimes for the benefit of nominees.

AUSA
Defendant
Defense Counsel

13.    At a time unknown but prior to in or around July 2009, through in or around September 2016, Bank President A acted as the loan officer for **ST. ANGELO**, the Entities, and some of the Nominee Loans.

14.    From in or around September 2006 through in or around September 2016, **ST. ANGELO** was the general counsel of First NBC Bank, providing general legal advice and services, including, but not limited to transactional work, legal research, litigation, and collections. In or around September 2016, **ST. ANGELO**'s contract with First NBC Bank was allowed to expire.

15.    By the time First NBC Bank failed in late April 2017, the balances on the loans issued to **ST. ANGELO** and the Entities, totaled approximately $46.7 million. In addition, by the time First NBC Bank failed, it had paid **ST. ANGELO** approximately $9.6 million for purported tax credit investments.

### III.    <u>THE BANK FRAUD CONSPIRACY</u>

16.    Beginning at a time unknown to the United States Attorney, but no later than September 2006, through in and around April 2017, in the Eastern District of Louisiana and elsewhere, **ST. ANGELO** and others known and unknown to the United States Attorney, did knowingly and willfully combine, conspire, confederate, and agree to commit offenses against the United States of America, that is: to knowingly and with intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, and to obtain any of the moneys, funds, credits, and assets, owned by, and under the custody or control of First NBC Bank, by means of false and fraudulent pretenses, representations, and promises, relating to a material fact, in violation of Title 18, United States Code, Section 1344.

AUSA
Defendant
Defense Counsel

## IV.    MANNER AND MEANS OF THE CONSPIRACY

17.    The manner and means by which **ST. ANGELO**, Bank President A, and others sought to accomplish the purpose of the conspiracy included the following:

18.    Bank President A, Bank Officer B, and others disguised **ST. ANGELO**'s and the Entities' true financial condition by renewing and increasing loans and lines of credit, paying off matured loans with new loans, making loan payments with loan proceeds, and using loan proceeds to cover overdrafts. This practice made it falsely appear that **ST. ANGELO**'s and certain Entities' loans were performing.

19.    **ST. ANGELO**, Bank President A, Bank Officer B, and others provided First NBC Bank with materially false and fraudulent financial statements, collateral summaries, and other documents that, among other things, overstated the value of **ST. ANGELO**'s and the Entities' assets and understated their liabilities. The materially false and fraudulent financial statements, collateral summaries, and other documents disguised **ST. ANGELO**'s and the Entities' true financial condition.

20.    **ST. ANGELO** and Bank President A also caused First NBC Bank to make two loans to **ST. ANGELO** for the purpose of renovating properties 4 Everett Place and 618 Conti Street, in New Orleans, when in fact those proceeds were used to pay some overdrafts in **ST. ANGELO**'s or the Entities' accounts at First NBC Bank and to pay **ST. ANGELO**'s personal expenses.

21.    **ST. ANGELO** and his co-conspirators obtained loans for individuals associated with **ST. ANGELO** as nominees ("the Nominee Loans"). These Nominee Loans benefitted **ST. ANGELO** and the nominees. Under this scheme, the nominees signed loan paperwork making

AUSA
Defendant
Defense Counsel

it appear that the nominee was taking out the loan. In fact, some proceeds from the Nominee Loans were used by **ST. ANGELO**, not the nominees, to pay **ST. ANGELO**'s existing debts to First NBC Bank for his and the Entities' expenses. **ST. ANGELO**, Bank President A, and Bank Officer B caused representatives of First NBC Bank to transfer the Nominee Loan proceeds to the Entities' deposit accounts.

22.     Bank President A, **ST. ANGELO**, Bank Officer B, and others created fake tax credit investments that First NBC Bank made in entities owned or purportedly owned by **ST. ANGELO**. In reality, Bank President A, **ST. ANGELO**, Bank Officer B, and others designed the fake tax credit investments to funnel money from First NBC Bank's general ledger to **ST. ANGELO** and the Entities, so he could make loan payments and cover overdrafts.

## A. False Risk Ratings

23.     Bank President A, Bank Officer B, and others created and placed in First NBC Bank's books and records of false credit memoranda, collateral summaries, and other documents related to **ST. ANGELO**'s and the Entities' loans. In reality, Bank President A, Bank Officer B, and others knew that **ST. ANGELO**'s true debts to First NBC Bank and others were far higher than reported on bank documents. They likewise knew that the collateral statements regarding **ST. ANGELO**'s and the Entities' loans falsely overstated the value of certain assets, including tax credit investments.

24.     **ST. ANGELO** and the Entities were regularly overdrawn on one or more First NBC Bank checking accounts each month, despite the fact that his monthly retainer at First NBC Bank rose steadily from $3,500 per month in 2006 to $40,000 a month in 2015, and First NBC paid him legal fees beyond the monthly retainer. Bank President A and Bank Officer B used **ST.**

AUSA
Defendant
Defense Counsel

ANGELO's cash flow from his legal practice to justify additional loans to **ST. ANGELO** and the Entities. Nevertheless, all of these retainer payments went into **ST. ANGELO**'s accounts at other banks, and very few were used to make loan payments. Bank President A and Bank Officer B were aware that **ST. ANGELO** did not use his retainer to pay his loan payments and kept this income at other banks.

25.     In addition to overdrafts in the Entities' accounts, **ST. ANGELO** and the Entities owed First NBC Bank monthly loan payments on his, the Entities', and the Nominee Loans that totaled in the hundreds of thousands of dollars each month. Bank Officer B and others regularly received written reports from bank employees tracking overdrafts and month-end payments due from **ST. ANGELO**, the Entities, and nominees. Bank President A, Bank Officer B, and **ST. ANGELO** frequently discussed **ST. ANGELO**'s inability to service the debt. This was, in part, because of bad loans that **ST. ANGELO** took on, at the request of Bank President A and Bank Officer B, in order to improve the overall asset quality of the bank.

26.     On or about June 26 and 27, 2011, Defendant **ST. ANGELO**, Bank Officer B, and Bank President A, emailed about **ST. ANGELO** being unable to repay approximately $800,000 in overdrafts and loan payments by month-end. **ST. ANGELO** sent Bank Officer B and Bank President A a document purporting to memorialize an agreement in 2008 between **ST. ANGELO** and Individual Y to extinguish debt **ST. ANGELO** owed to Individual Y in exchange for 36 postdated checks, each for $100,000. **ST. ANGELO** wrote, "I'm sending this to you now in the event that you need to document anything for the Board." Bank Officer B responded by asking if Individual Y had agreed to cover **ST. ANGELO**'s $800,000 payments due in four days. **ST. ANGELO** then wrote that Individual Y required another series of postdated checks, as well as a

AUSA
Defendant
Defense Counsel

meeting with Bank President A to ensure First NBC Bank would honor **ST. ANGELO**'s postdated checks. As a result, **ST. ANGELO** wrote, "You, [Bank President A], and I should probably meet to decide whether or not that is the best course of action. We all know that my cash flow can not support $100,000 payments. Do we really want to commit to another year's worth of overdrafts? There may be some better options out there. Let's discuss."

27.    On or about June 28, 2011, Bank Officer B emailed Bank President A stating that he was sitting with **ST. ANGELO** "trying to come up with a solution for his month-end overdrafts" of approximately $800,000. Bank Officer B referenced an earlier discussion between Bank President A and **ST. ANGELO**, in which Bank President A stated he did not want Individual Y to advance **ST. ANGELO** the money to cover overdrafts. Bank Officer B then asked Bank President A, "Any thoughts?" Two days later, Bank President A authorized a new Nominee Loan for $500,000 falsely stating the proceeds would "fund the build out of check cashing outlets." First NBC Bank then deposited $499,750 of the loan proceeds into one of the Entities' accounts. The same day, Bank President A authorized a new loan to **ST. ANGELO** for $500,000 falsely stating the proceeds would be used to "redevelop [] of 616 Girod." These two loans covered the overdraft and past due loan payments for **ST. ANGELO**, the Entities, and Nominee Loans at month-end.

28.    On or about November 28, 2011, a First NBC Bank employee emailed Bank Officer B a list of loans that had matured in October 2011. The email included loans, totaling approximately $2.3 million, where the listed borrowers were Nominee A and Nominee B. The email described those loans, as well as others in the name of other nominees, as "Greg affiliated." Bank President A was listed as the loan officer on one of the loans held in the name of Nominee B. Despite knowing that **ST. ANGELO** was responsible for repaying these Nominee Loans, Bank

AUSA
Defendant
Defense Counsel

President A and Bank Officer B caused these loans to be omitted from the credit package describing **ST. ANGELO**'s financial status, thereby disguising his true financial position.

29.     On or about September 29, 2013, a bank employee sent an email after 9 p.m. to Bank President A and Bank Officer B alerting them that **ST. ANGELO**'s and certain of the Entities' overdrafts and loan payments totaled approximately $497,208. The bank employee asked whether Bank President A would be waiving the $48,977.37 in late charges. Bank President A approved an additional $1 million dollar loan for **ST. ANGELO** and the Entities to cover the overdrafts and loan payments. Bank President A stated that the loan consolidation needed to close by the last day of the month so that **ST. ANGELO** and the Entities would not be on the month-end past due or overdraft reports.

30.     In mid-March 2015, a bank employee emailed Bank Officer B that **ST. ANGELO** and certain of the Entities would owe approximately $648,983 by the end of March. Upon receiving this email, Bank Officer B immediately emailed **ST. ANGELO**, "You are approaching $700M!!!" Shortly thereafter, First NBC Bank originated a $1 million loan to cover the overdraft with the stated purpose of "working capital."

## B.  False Personal Financial Statements

31.     **ST. ANGELO** and Bank President A annually submitted false personal financial statements to First NBC Bank in support of **ST. ANGELO** and the Entities' loans. These personal financial statements overstated his assets and understated his liabilities. The purpose of creating false personal financial statements was to "paper" **ST. ANGELO** and the Entities' loan files to mislead the FDIC and LOFI examiners into thinking that **ST. ANGELO**'s net worth was greater than it was.

AUSA
Defendant
Defense Counsel

32.     Despite their awareness of **ST. ANGELO**'s cash flow shortfall and outside debt service, Bank Officer B continued to give **ST. ANGELO**'s loan an average risk rating. Bank President A and Bank Officer B knew this risk rating was false and continued using it to conceal the condition of **ST. ANGELO**'s and the Entities' loans.

33.     In a personal financial statement dated July 27, 2015, **ST. ANGELO** overstated real estate owned and the value of his law practice and business, Premier Information Systems, by more than $1 million. The 2015 personal financial statement was included in First NBC Bank's books and records to support loan advances approximately six times. The 2015 personal financial statement did not disclose liabilities associated with Nominee Loans, which totaled approximately $19 million, at the end of 2014. Nor did it include a mortgage of $1.5 million on the building located at 618 Conti Street. The personal financial statements used appraised values that **ST. ANGELO**, Bank President A, and others knew were not current. It also omitted certain assets and other material information. **ST. ANGELO**, Bank President A, and others knew that information in the 2015 personal financial statement was false.

34.     For example, in the 2015 personal financial statement, **ST. ANGELO** listed as an asset, the building at 622 Conti Street as having a value of $7 million. He also listed the building at 616 Girod as having a value of $2.3 million. **ST. ANGELO** knew that these statements were false because six months earlier, Bank Officer B emailed **ST. ANGELO** appraisals for 616 Girod and 622 Conti. The values were much lower. The appraiser had valued 616 Girod at $1.6 million and 622 Conti at $2.2 million. Bank Officer B stated in the email "Sit down and read below. Maybe a stiff drink will help." **ST. ANGELO** responded "1.) I hope the credit will be reviewed [by the examiners] before [the appraisal] arrives; and 2.) [Bank President A] is going to shred [the

AUSA
Defendant
Defense Counsel

appraiser]." Despite this knowledge, **ST. ANGELO** signed the 2015 personal financial statement certifying its accuracy.

### C. <u>False Statements About Loan Purposes</u>

35.     In addition to presenting false personal financial statements to First NBC Bank, Bank President A, Bank Officer B, **ST. ANGELO**, and others executed loan documents knowing the stated purpose was false. For example, in or around November 30, 2015, Bank President A approved a loan ending in 3995 to St. Angelo Investment Company, LLC for $1 million. The stated purpose of the loan was to finance the renovation of 4 Everett Place, and the building located at 618 Conti Street. The initial $592,000 disbursement on the loan covered $166,483 in overdrafts to **ST. ANGELO**'s deposit account ending in 1455. With the exception of two payments totaling approximately $48,975, which went toward the construction of 4 Everett Place, **ST. ANGELO** used the loan proceeds to pay additional overdrafts and finance personal expenses. After the initial disbursement on this loan, Bank President A approved incremental increases on the loan five times in a six-month period. By June 2016, Bank President A had approved funding the loan for $4 million, and First NBC Bank had disbursed approximately $3.9 million to **ST. ANGELO**'s entity, St. Angelo Investment Company, LLC for the same stated reasons: working capital associated with expenses on 4 Everett Place and 618 Conti Street. In fact, **ST. ANGELO** only used a small percentage of the loan for its intended purpose. He continued to use the proceeds to pay overdrafts, stay current on other loans, pay nominees, fund his personal bank account at JPMorgan Chase, and finance personal expenditures that his salary and income alone could not cover.

36.     On or about January 28, 2016, **ST. ANGELO**'s First NBC Bank account ending in 1455 was overdrawn by $344,952 due, in part, to checks he wrote to Nominee A for $111,120,

AUSA
Defendant
Defense Counsel

Nominee C for $169,910, and himself for $98,600. On or about January 29, 2016, Bank President A approved another loan ending in 8978 to **ST. ANGELO**'s entity, 616 Girod, LLC, for $715,000. The loan documents falsely stated that the purpose was to renovate 4 Everett Place. First NBC Bank disbursed $665,168 of loan proceeds into the account ending in 1455, and none of the proceeds were used to renovate 4 Everett Place. **ST. ANGELO** used $289,874 to pay other First NBC Bank loans and $372,952 to cover overdrafts at First NBC Bank and elsewhere, including the $98,600 check deposited into his JPMorgan Chase account. At the time, his JPMorgan Chase account balance was negative $57,012.28, caused, in part, by personal expenses. Over the next nine months, Bank President A increased the loan twice until it reached approximately $2,215,000 and was fully disbursed. The purpose of the loan changed to "working capital to purchase Our Lady of Lourdes Church on 2400 Napoleon Avenue." A significant portion of the proceeds of this loan was used for purposes unassociated with the stated purpose of the loan, including payments to certain nominees, and payments to Individual Y.

### D. Nominee Loans

37.     Between 2006 and 2017, Bank President A, Bank Officer B, and others conspired with **ST. ANGELO** to permit him to use Nominee Loan proceeds to cover his and his Entities' loan payments and overdrafts. It was part of the scheme that **ST. ANGELO**'s associates would obtain loans as nominee borrowers. The Nominee Loans, in fact, benefitted **ST. ANGELO**, who used the Nominee Loan proceeds to pay his overdrafts or existing debts to First NBC Bank and others. The Nominee Loans also benefitted First NBC Bank because they were used, at times, to prop-up other troubled borrowers to allow the bank to avoid downgrading the loans or reporting them as impaired. Bank President A and Bank Officer B were aware that the Nominee Loans

AUSA
Defendant
Defense Counsel

benefitted **ST. ANGELO** and the bank by hiding the true condition of **ST. ANGELO**'s and the Entities' loans, as well as the true financial condition of other troubled borrowers.

### E.  False Tax Credit Investments

38.     Under federal law governing historic tax credits, an owner of real estate is eligible to receive tax credits on certain historic properties. In order to qualify for federal historic tax credits for a commercial property, an individual or entity must own the property in question or be the long-term lessor for a term exceeding 39 years after the date the property is placed in commerce. If an entity qualifies for tax credits, it can use the credits to offset its tax liability in future years. First NBC Bank could benefit from the tax credit offset only by becoming a member of the entity entitled to the credit.

39.     Beginning at a time unknown but in or around July 2010, **ST. ANGELO**, Bank President A, and Bank Officer B conspired to cause First NBC Bank to disburse money to **ST. ANGELO** and/or the Entities under the guise that the bank was investing in tax credits that **ST. ANGELO** or the Entities owned. In reality, neither **ST. ANGELO** nor the Entities ever earned any tax credits, and First NBC Bank never had any basis to obtain any tax credits from **ST. ANGELO**'s or the Entities' properties. **ST. ANGELO** and Bank President A created fraudulent documents, regarding the false tax credit scheme, that were placed in First NBC Bank's records. The true purpose of the false tax credit investments was to funnel money to **ST. ANGELO** and the Entities to repay outstanding loan balances and overdrafts, and avoid downgrading, classifying, or reporting **ST. ANGELO**'s and the Entities' loan relationships as losses for the bank. The false tax credit scheme also allowed Bank President A to circumvent the bank's normal credit underwriting and approval process.

Page **13** of 22

AUSA
Defendant
Defense Counsel

*622 Conti Street*

40.     On or about March 12, 2004, when **ST. ANGELO** performed legal services for First Bank and Trust, he entered a 30-year lease agreement to lease the building located at 622 Conti Street in the French Quarter through his entity St. Angelo Investment Company. At the time, Bank President A was the president of First Bank & Trust and suggested that **ST. ANGELO** take over the lease from the prior tenant who was in default of the lease agreement. Bank President A told **ST. ANGELO** he could make a lot of money by leasing the building.

41.     From on or about April 26, 2006 through in or around 2018, **ST. ANGELO** was often in default of the lease terms and was notified in writing by the owners, an entity called 622 Conti, LLC, that he was in breach. **ST. ANGELO** repeatedly entered into negotiations with 622 Conti, LLC to avoid eviction. Neither **ST. ANGELO** nor the Entities ever owned 622 Conti Street or were members of 622 Conti, LLC.

42.     Starting in 2010, **ST. ANGELO**, Bank President A, and Bank Officer B began transferring First NBC Bank funds to **ST. ANGELO** based on fake tax credit investments First NBC Bank purportedly made to renovate the 622 Conti building. At this time, **ST. ANGELO** and the Entities' annual debt service to First NBC Bank was $888,805, and his total loan balance at First NBC Bank was approximately $12 million. These figures exclude debt service on the Nominee Loans. Further, the Entities' deposit accounts were regularly overdrawn at this time.

43.     To address **ST. ANGELO**'s growing overdraft and cash flow problems, Bank President A and **ST. ANGELO** began using fake tax credit investments to use bank money to pay **ST. ANGELO's** and the Entities' overdrafts and loan payments.

AUSA
Defendant
Defense Counsel

44.     For example, in July 2010, **ST. ANGELO**'s Premier Information Systems checking account #***1180 was overdrawn by approximately $484,752.63. On or about July 30, 2010, Bank President A, Bank Officer B, and **ST. ANGELO** caused the general ledger of First NBC Bank to be debited by $500,000, using a debit ticket that read, in part, "Inv. Int 622 Conti LLC" and "Per [Bank Officer B]." The misleading phrase "Inv. Int 622 Conti LLC" referred to the source of the funds. That same day, $500,000 was credited to **ST. ANGELO**'s Premier Information Systems checking account #***1180 using a credit ticket that read, in part, "From Inv Int 622 Conti LLC...per [Bank Officer B]." These funds were not used toward First NBC Bank's investment in 622 Conti LLC. Rather, the funds covered the $484,752.63 in overdrafts that **ST. ANGELO** and the Entities had incurred in July 2010 and made **ST. ANGELO**'s and the Entities' loan payments. This transaction made it appear that **ST. ANGELO**'s or the Entities' loans were performing and his accounts were current.

45.     On or about August 12, 2010, **ST. ANGELO**'s Premier Information Systems checking account #***1180 was overdrawn by $258,202.84. The account had become overdrawn because, among other things, **ST. ANGELO** wrote a $69,568.29 check to another bank for loan payments; a $6,670.11 check to that same bank for loan payments, with memo line "[Nominee A] payment"; and a $2,154.24 check to the same bank for loan payments. Each of these items was paid on or about August 2, 2010, causing account #***1180 to become overdrawn. In addition, the account was overdrawn because **ST. ANGELO** wrote a check on or about August 4, 2010 to himself for $38,400 and a $6,250 check on or about August 9, 2010 to Nominee A. On or about August 13, 2010, Bank President A, Bank Officer B, and **ST. ANGELO** caused the general ledger of First NBC Bank to be debited by $400,000, using a debit ticket that falsely read, in part, "Inv.

AUSA
Defendant
Defense Counsel

Int 622 Conti LLC" and "Per [Bank Officer B]." That same day, a $400,000 credit was added to **ST. ANGELO**'s Premier Information Systems checking account #***1180, reading, in part "Inv. Int. 622 Conti, LLC" and "Per [Bank Officer B]." These funds covered the $258,202.84 in overdrafts described above. In addition, on August 13, 2010 the funds paid $83,917.27 towards **ST. ANGELO**'s and the Entities' loans, using a debit ticket that read in part, "Per [Bank Officer B]."

46.    **ST. ANGELO**, Bank President A, and Bank Officer B expanded their false tax credit investment scheme by executing a series of false and fraudulent agreements to purchase tax credits for 622 Conti, LLC. These fake tax credit purchase agreements were designed to conceal the fact that Bank President A was funneling First NBC Bank funds to **ST. ANGELO** to cover his overdrafts and make loan payments. Beginning in late 2010, after the July and August 2010 payments, purportedly for tax credit investments, **ST. ANGELO** and Bank President A signed a document entitled "Agreement to Purchase Tax Credits, 622 Conti, LLC (revised)." The document referenced the July 2010 payment of $500,000 from First NBC Bank and the August 2010 payment of $600,000. **ST. ANGELO** further falsely signed the document as "Managing Member" of 622 Conti, LLC, even though he and Bank President A knew that **ST. ANGELO** was not, and never was, a member of 622 Conti, LLC. This fraudulent Agreement to Purchase Tax Credits, along with the debit and credit tickets described in paragraphs 44 and 45 above, were placed in the files of First NBC Bank.

47.    After **ST. ANGELO** and Bank President A executed this initial Agreement to Purchase Tax Credits relating to 622 Conti Street, Bank President A and **ST. ANGELO** executed seven additional false documents entitled "Agreement to Purchase Tax Credits" relating to 622

AUSA
Defendant
Defense Counsel

Conti Street, LLC. **ST. ANGELO** signed each of these documents, knowing that he was falsely signing as a member of 622 Conti, LLC and that based on his lease term, he was not entitled to claim any tax credits. Further, **ST. ANGELO** and Bank President A knew that the true purpose of the Agreements to Purchase Tax Credits was to funnel money to **ST. ANGELO** and not for any legitimate tax credit or investment purpose.

48.     In total, between July 2010 and June 2015, Bank President A and **ST. ANGELO** entered into eight agreements entitled "Agreement to Purchase Tax Credits" that purported to be investments in 622 Conti, LLC. The below disbursements were used cover overdrafts and loan payments:

| Date | Amount | Account Balance Prior to Funds |
|------|--------|-------------------------------|
| 7/30/2010 | $500,000.00 | ($484,752.63) |
| 8/13/2010 | $400,000.00 | ($258,201.84) |
| 8/31/2010 | $200,000.00 | ($87,878.47) |
| 10/29/2010 | $340,000.00 | ($517,765.39) |
| 7/29/2011 | $450,000.00 | ($167,274.77) |
| 8/31/2011 | $600,000.00 | ($302,046.45) |
| 9/30/2011 | $750,000.00 | ($442,507.93) |
| 10/31/2011 | $272,000.00 | deposited in nominee account |
| 7/31/2014 | $830,639.00 | ($468,765.23) |
| 8/29/2014 | $570,685.56 | ($278,851.52) |
| 9/30/2014 | $438,200.00 | ($437,292.29) |
| 10/31/2014 | $453,000.00 | ($171,865.90) |
| 11/25/2014 | $450,000.00 | ($139,201.16) |
| 12/23/2014 | $450,000.00 | ($1,104.67) |
| 2/13/2015 | $500,000.00 | $144,597.53 |
| 5/28/2015 | $315,732.00 | $10,829.65 |

49.     For each agreement listed above, bank records demonstrate that funds were debited from First NBC Bank's general ledger and transferred to **ST. ANGELO** or the Entities' First NBC

AUSA
Defendant
Defense Counsel

deposit accounts. These debits from the First NBC Bank general ledger were approved by Bank President A and Bank Officer B.

*The Addition of 616 Girod Street & Annadele*

50.     The tax credit fraud scheme expanded to involve two additional properties, a building at 616 Girod Street, in New Orleans, and a restaurant named "Annadele" on Chestnutt Street, in Covington. In or about November 2010, **ST. ANGELO** and Bank President A signed a document entitled "Agreement to Purchase Tax Credits 616 Girod, LLC and Annadele, LLC (revised)." The document stated that the two entities "will spend approximately $4,700,000 on the renovation of their respective buildings located at 616 Girod, New Orleans, Louisiana and 75418 Chestnut[]," that is, the Annadele property in Covington, Louisiana. This document purported to show that First NBC Bank would pay 616 Girod, LLC and Annadele, LLC $1,692,000 in exchange for a 99% ownership interest in these two entities for five years after the above-listed properties received certificates of occupancy. In fact, on or about March 17, 2016, **ST. ANGELO** sold the property located at 616 Girod Street, before First NBC Bank could claim the tax credits it had purchased under to the 2010 agreement. **ST. ANGELO** never applied for tax credits for either property.

51.     In total, Bank President A and **ST. ANGELO** executed three false tax credit purchase agreements that purported to be investments relating to Annadele and 616 Girod. However, the below disbursements were used to cover overdrafts and loan payments:

AUSA
Defendant
Defense Counsel

| Date | Amount | Acct Bal Prior to Funds |
|------|--------|-------------------------|
| 9/30/2010 | $575,000.00 | ($373,671.62) |
| 10/29/2010 | $482,000.00 | ($517,765.39) |
| 11/30/2010 | $610,000.00 | ($408,465.81) |
| 2/28/2011 | $475,000.00 | ($290,889.68) |

*Knowledge that St. Angelo Could Not Claim Tax Credits on 622 Conti as Lessee*

52.     On or about December 28, 2010, First NBC Bank's outside counsel informed **ST. ANGELO** and Bank President A that the potential tax credits in 622 Conti, LLC, which First NBC Bank had supposedly sought to purchase, could not in fact be claimed, because **ST. ANGELO** neither owned the property nor had a long enough lease.

53.     In October of 2011, Bank President A submitted additional false documents to First NBC Bank based on the false representation that **ST. ANGELO** was entitled to tax credits for 622 Conti. On or about October 3, 2011, Bank President A authored a memorandum, with numerous false statements, concerning **ST. ANGELO**'s borrowing relationship with First NBC Bank, and he caused it to be placed in the loan files of First NBC Bank. These false statements included, among others, that **ST. ANGELO** had "earned historic tax credits of approximately $4,532,000 on the renovation of [622 Conti Street] (First NBC will purchase these credits for approximately $3,512,000 once the renovation is complete)." The memorandum further falsely stated that **ST. ANGELO**'s "collateral pool[] has been enhanced substantially by the value of the tax credits associated with the Conti and Girod renovation." In fact, Bank President A knew that First NBC Bank would be unable to use or claim the tax credits as an asset because **ST. ANGELO** was ineligible for the credits.

AUSA
Defendant
Defense Counsel

54.     On or about March 7, 2013, First NBC Bank's external auditors requested the operating agreement and cost certification for 622 Conti. In response, on March 19, 2013, Bank President A asked First NBC Bank's outside tax attorney to email a copy of an operating agreement between 622 Conti LLC and a First NBC Bank subsidiary, that she had previously drafted in 2010. On March 25, 2013, a First NBC Bank employee emailed **ST. ANGELO** a copy of Bank President A's handwritten edits to the operating agreement, dated December 1, 2010, in which Bank President A replaced 622 Conti, LLC with St. Angelo Investment Company, LLC.

55.     Shortly thereafter, an employee of First NBC Bank sent First NBC Bank's external auditors a falsified version of the 2010 operating agreement, purporting to be between the First NBC Bank subsidiary and St. Angelo Investment Company, LLC, except that one part of the document mistakenly left in the name of 622 Conti LLC. The falsified operating agreement provided to the external auditors was backdated to January 1, 2009 and was signed by Bank President A and **ST. ANGELO**. Bank President A backdated the operating agreement to make it appear that it was effective before First NBC Bank disbursed false tax credit money to **ST. ANGELO** in July 2010.

56.     In December of 2014 a First NBC Bank employee emailed Bank Officer B requesting permission to cover **ST. ANGELO**'s overdrafts with tax credit money. The employee asked Bank Officer B, "Are we out of tax credits for conti? Do you know?" Bank Officer B responded, "As long as we have a sharp pencil we are never out of tax credits," acknowledging that the tax credits were a fiction. The bank employee responded, "LOL…..I think that just made my day…." Approximately ten days later, Bank Officer B approved a credit to the 616 Girod

AUSA

Defendant

Defense Counsel

deposit account of approximately $450,000, which covered overdrafts to certain Entities and went to **ST. ANGELO's** personal account.

57.     On or about March 27, 2015, Bank President A's assistant emailed Bank Officer E, copying Bank President A, informing Bank Officer E an executed Agreement to Purchase Tax Credits for 622 Conti, LLC was attached. Bank President A's assistant stated "Bank President A would appreciate your sending this to the auditors." Later that day, Bank Officer E emailed the fraudulent Agreement to Purchase Tax Credits for 622 Conti, LLC to the auditors.

58.     In or around 2016, First NBC Bank's external auditors began loan reviews of **ST. ANGELO**, the Entities, and nominees. Specifically, they began to ask questions about the false investments in 622 Conti, LLC. On or about March 6, 2016, an auditor requested information from Bank President A about First NBC Bank's purported investment in 622 Conti. On that same date, Bank President A forwarded the email to **ST. ANGELO**. Six minutes later, **ST. ANGELO** responded, "I see that [Bank Officer C] is copied. I'm sure he isn't saying anything positive about it." At or about 3:00 AM on March 7, 2016, Bank President A responded, "You are totally paranoid. [The auditor] is dealing with me not [Bank Officer C] because I am the only one involved. They questioned that also and I explained that this was one of our first deals, we had no tax credit department, and each loan officer handled their own deal as part of the loan process."

59.     On or about March 21, 2016, an external auditor requested documents from a First NBC Bank employee, to review First NBC Bank's entire relationship with **ST. ANGELO**. The request specifically listed eleven loans, but asked for records for certain **ST. ANGELO** and nominee loans. On the same day, the auditor's request was forwarded to Bank Officer B. On or

AUSA
Defendant
Defense Counsel

about March 22, 2016, Bank Officer B forwarded the auditor's request to **ST. ANGELO**, saying "It had to happen. See below. [The audit firm] are now looking at you."

60.    Between July 2010 and April 28, 2017, when First NBC Bank was closed, Defendant **ST. ANGELO**, Bank President A, and others caused First NBC Bank to pay **ST. ANGELO** approximately $9.6 million, purportedly in exchange for tax credit investments in 622 Conti, Annadele, and 616 Girod, knowing that the bank was unable to realize the tax credits

61.    Various records, including income tax returns, IRS filing records, bank records, audio and video recordings, and documents and tangible objects would be introduced at trial to prove the facts as set forth above. In addition, the testimony of employees and agents of the Federal Bureau of Investigation, the Federal Deposit Insurance Corporation, Office of Inspector General, and other competent witnesses would be introduced at trial to prove the facts set forth above.

**APPROVED AND AGREED TO:**

_____

SHARAN E. LIEBERMAN
NICHOLAS D. MOSES
MATTHEW R. PAYNE
J. RYAN McLAREN
Assistant United States Attorneys

_____          Date  6/27/19

PHILLIP WITTMANN
Attorney for Defendant St. Angelo

_____          Date  6/28/19

PETER THOMSON
Attorney for Defendant St. Angelo

_____          Date  6/27/19

GREGORY ST. ANGELO
Defendant                                           Date  6/27/19

AUSA
Defendant
Defense Counsel