FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA.

2018 MAY 14  P 3: 29

WILLIAM W. BLEVINS
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

### BILL OF INFORMATION FOR CONSPIRACY TO COMMIT BANK FRAUD AND NOTICE OF BANK FRAUD FORFEITURE

**18-99**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL DOCKET NO.** FELONY |
| **v.** | * | **SECTION:** SECT. B MAG. 1 |
| **JEFFREY DUNLAP** | * | **VIOLATION:** 18 U.S.C. § 1349 |
| | * | |
| * | * | * |

The United States Attorney charges that:

### COUNT 1 – Conspiracy to Commit Bank Fraud

#### A. AT ALL MATERIAL TIMES HEREIN:

1.    First NBC Bank was a financial institution, as defined in Title 18, United States Code, Section 20, and a member of the Federal Deposit Insurance Corporation ("FDIC") with federally insured deposit accounts.

2.    First NBC Bank was established in or about 2006, with its headquarters in New Orleans, Louisiana, which was within the Eastern District of Louisiana, and branch offices in Louisiana, Mississippi, and Florida.

Fee _____ USM
_____ Process_____
X Dktd
_____ CtRm
_____ Doc.

GOVERNMENT EXHIBIT
A
PENGAD 800-431-6989

3.      First NBC Bank was the wholly-owned subsidiary of First NBC Holding Company. Bank President A was a founder of First NBC Bank and acted as its president and Chief Executive Officer from on or about May 2006, until on or about December 2016.

4.      In or around May 2013, First NBC Holding Company became a publicly-traded company listed on the NASDAQ.

5.      On or about April 28, 2017, First NBC Bank was closed by the Louisiana Office of Financial Institutions. The FDIC was named Receiver.

6.      Company A was a company owned by Bank President A and Business Owner B.

7.      Company A owned approximately 100 acres of land in St. Tammany Parish, Louisiana. Bank President A and Business Owner B planned to develop this property.

8.      Phoenix Civil Contractors, LLC ("PCC") was a construction company located in Slidell, Louisiana, which was within the Eastern District of Louisiana.

9.      The defendant, **JEFFREY DUNLAP**, was a contractor, and an owner and founder of PCC.

10.     From in or around approximately March 2009, through April 2017, PCC and **JEFFREY DUNLAP** had a banking relationship with First NBC Bank.

11.     From in or around approximately July 2009, through in or around September 2016, Bank President A acted as the loan officer for PCC and **JEFFREY DUNLAP**. Bank President A reviewed and approved new loans, lines of credit, and advances or incremental increases for PCC and **JEFFREY DUNLAP**. After Bank President A stopped acting as loan officer for **JEFFREY DUNLAP** and PCC, he continued to exercise approval authority on their loans and lines of credit through in or around November 2016.

12.     PCC's largest loan was a revolving line of credit with an account number ending in 9321 ("the LOC"). The LOC was secured, in part, by PCC's accounts receivable. The LOC's borrowing base was calculated as eighty-percent of PCC's eligible accounts receivable.

13.     PCC and the defendant, **JEFFREY DUNLAP**, had an obligation to provide accurate accounts receivable statements prior to any advances, renewals, or increases on the LOC. When **JEFFREY DUNLAP** and PCC submitted financial statements and accounts receivable for PCC to support advances, renewals, or increases on the LOC, Bank President A caused these supporting documents to be placed into First NBC Bank's records.

14.     From in or around approximately July 2009, through November 2016, PCC listed Company A on its accounts receivable statements submitted to First NBC Bank, as collateral securing the LOC.

15.     By the time First NBC Bank failed in late April 2017, the balance on the LOC was approximately $22 million.

**B.     CONSPIRACY TO COMMIT BANK FRAUD:**

From in or around July 2009, through in and around December 2016, in the Eastern District of Louisiana and elsewhere, the defendant, **JEFFREY DUNLAP**, and others known and unknown to the United States Attorney did knowingly and willfully combine, conspire, confederate, and agree to commit offenses against the United States of America, that is: to knowingly and with intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, and to obtain any of the moneys, funds, credits, and assets, owned by, and under the custody or control of First NBC Bank, by means of false and fraudulent pretenses, representations, and promises, relating to a material fact, in violation of Title 18, United States Code, Section 1344.

C.    **THE PURPOSE OF THE CONSPIRACY:**

The purpose of the conspiracy was for the defendant, **JEFFREY DUNLAP**, Bank President A, and others to unjustly enrich themselves, disguise the true financial status of PCC, and conceal the accurate performance of the LOC. The defendant, **JEFFREY DUNLAP**, Bank President A, and others sought to fraudulently obtain money from First NBC Bank, in part, so that Bank President A and Owner B could continue using PCC on projects involving Company A. As a result, Bank President A and Owner B would not have to use their own funds to pay PCC for work involving Company A.

D.    **MANNER AND MEANS OF THE CONSPIRACY:**

The manner and means by which the defendant, **JEFFREY DUNLAP**, and others sought to accomplish the purpose of the conspiracy included the following:

1.    The defendant, **JEFFREY DUNLAP**, Bank President A, and others provided First NBC Bank with materially false and fraudulent documents and financial statements, which, among other things, overstated the value of PCC's accounts receivable.

2.    The materially false and fraudulent financial statements, accounts receivable, and other documents disguised PCC's true financial condition from First NBC Bank, bank regulators, investors, and others.

3.    In or around March 2009, the defendant, **JEFFREY DUNLAP**, Bank President A, and others discussed that the defendant would perform construction services for Company A.

4.    In or around July 2009, Bank President A agreed to lend funds to PCC through the LOC issued by First NBC Bank.

5.    Between 2009 and November 2016, **JEFFREY DUNLAP** and Bank President A, periodically discussed falsely inflating PCC's accounts receivable to justify incremental

4

increases in the LOC. In these conversations, Bank President A instructed the defendant to falsely inflate his accounts receivable in order to increase the borrowing base of the LOC. In these conversations, Bank President A falsely assured **JEFFREY DUNLAP** that PCC's obligations on the LOC would be resolved when Company A completed and sold the 100-acre subdivision in St. Tammany Parish at a profit.

6.      On or about January 31, 2012, for the purposes of fraudulently securing an advance on the LOC, the defendant, **JEFFREY DUNLAP**, emailed Bank President A's assistant "Up to date receivables" for PCC totaling approximately $5.7 million. The list of accounts receivable included false and inflated values. The list also included amounts owed by Company A to PCC.

7.      Less than three hours later, at the direction of Bank President A, the defendant, **JEFFREY DUNLAP**, sent a revised document that further falsely increased PCC's accounts receivable by approximately $559,000. That same day, Bank President A, knowing that accounts receivable on the list were false, approved a Loan Advance Request on the LOC, causing First NBC Bank to deposit $175,160 in proceeds into PCC's depository account at First NBC Bank.

8.      On or about June 26, 2015, for the purposes of fraudulently receiving an advance on the LOC, the defendant, **JEFFREY DUNLAP**, sent a list of receivables by email to Bank President A's assistant. The list of accounts receivable included false and inflated values. The list also included amounts owed by Company A to PCC.

9.      On or about June 29, 2015, at the direction of Bank President A, the defendant, **JEFFREY DUNLAP**, sent a revised list of receivables to Bank President A's assistant. The receivables reported in this list were falsely inflated by approximately $830,000. On or about June 30, 2015, Bank President A, knowing the receivables were false, approved the advance on the LOC, causing First NBC Bank to deposit $804,000 in loan proceeds into PCC's

depository account at First NBC Bank.

10.    On or about January 27, 2016, the defendant, **JEFFREY DUNLAP**, submitted a false and fraudulent financial statement and an inflated list of accounts receivable to First NBC Bank in order to fraudulently induce First NBC Bank to increase the LOC by approximately $1 million. On or about January 27, 2016, Bank President A approved a $1 million advance on the LOC, when he was fully aware the PCC financial statement and the accounts receivable supporting the increase were false.

11.    Between on or about January 29, 2016 and on or about February 19, 2016, First NBC Bank deposited approximately $1,038,000 in PCC's depository account at First NBC Bank, based in part on the false representations of PCC's accounts receivable.

12.    Based on the false and fraudulent accounts receivable and financial statements caused by **JEFFREY DUNLAP** and Bank President A, by April 28, 2017, First NBC Bank had advanced more than $22 million on the LOC to PCC.

All in violation of Title 18, United States Code, Section 1349.

## BANK FRAUD FORFEITURE

1.    The allegations contained in Count 1 of this Bill of Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(2)(A).

2.    Upon conviction of the offense in violation of Title 18, United States Code, Section 1349 set forth in Count 1 of this Bill of Information, the defendant, **JEFFREY DUNLAP**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violation(s).

3.    If any of the property described above, as a result of any act or omission

6

of the defendant:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 982(a)(2)(A) and 28 U.S.C. § 2461(c).

DUANE A. EVANS
UNITED STATES ATTORNEY

SHARAN LIEBERMAN
Assistant United States Attorney

HAYDEN M. BROCKETT
Assistant United States Attorney

New Orleans, Louisiana
May 14, 2018

7

No. _____

# United States District Court

### FOR THE

EASTERN _____ DISTRICT OF _____ LOUISIANA

---

UNITED STATES OF AMERICA

*vs.*

JEFFREY DUNLAP

---

BILL OF INFORMATION
FOR CONSPIRACY TO
COMMIT BANK FRAUD

Violation(s): 18 U.S.C. § 1349

---

Filed _____, 20 18

_____, *Clerk.*

By _____, *Deputy*

_____
*Assistant United States Attorney*
SHARAN E. LIEBERMAN

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA. gK

2019 MAR 22   A 9: 51

WILLIAM W. BLEVINS
CLERK

# FELONY

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

### BILL OF INFORMATION FOR CONSPIRACY TO
### COMMIT BANK FRAUD AND NOTICE OF FORFEITURE



| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL DOCKET NO.** |
| **v.** | * | **SECTION:** SECT.   MAG. 2 |
| **GREGORY ST. ANGELO** | * | **VIOLATION: 18 U.S.C. § 1349** |
| | * | |

\*   \*   \*

The First Assistant United States Attorney, Michael M. Simpson, as the Attorney for the

United States, acting on the authority conferred by Title 28, United States Code, Section 515,

(hereinafter, "the Attorney for the United States") charges that:

### COUNT 1 – Conspiracy to Commit Bank Fraud

**A.    AT ALL MATERIAL TIMES HEREIN:**

1.    First NBC Bank was a financial institution, as defined in Title 18, United States

Code, Section 20, and a member of the Federal Deposit Insurance Corporation ("FDIC") with

federally insured deposit accounts.

```
X  Fee      USA
   Process
X  Dktd
   CtRmDep
   Doc. No.
```

2.      First NBC Bank was established in or about 2006, with its headquarters in New Orleans, Louisiana, within the Eastern District of Louisiana. At various times, First NBC Bank maintained branch offices in Louisiana, Mississippi, and Florida.

3.      First NBC Bank was the wholly-owned subsidiary of First NBC Bank Holding Company. Bank President A was a founder of First NBC Bank and acted as its president and Chief Executive Officer from in or around May 2006, until in or around December 2016.

4.      From in or around 2006 through April 2017, Bank Officer B was employed by First NBC Bank as its Chief Credit Officer, and was responsible for, among other things, the overall quality of the bank's lending function; the bank's credit policies and administration; its loan recovery and collection efforts; and its monitoring and managing of past due loans, including the approval of the bank's internal list of past due loans.

5.      In or around May 2013, First NBC Bank Holding Company became a publicly-traded company listed on the NASDAQ.

6.      On or about April 28, 2017, First NBC Bank was closed by the Louisiana Office of Financial Institutions. The FDIC was named Receiver.

7.      The defendant, **GREGORY ST. ANGELO ("ST. ANGELO")**, was an attorney and resided in St. Tammany Parish, within the Eastern District of Louisiana. **ST. ANGELO** was a member or officer of, or otherwise exercised control over, the following entities, among others: St. Angelo Investment Company, L.L.C., Premier Information Systems, Inc., St. Fitz, L.L.C., LMH Properties, L.L.C., Lismore Properties, L.L.C., Conti Development, L.L.C., Annadele, Inc., 616 Girod, L.L.C., and La Nasa, St. Angelo, and La Nasa, L.L.C. (collectively, the "Entities").

2

8.      From in or around 2006, through April 2017, **ST. ANGELO** had a banking relationship with First NBC Bank individually and through certain Entities.

9.      From in or around July 2006, through in or around September 2016, Bank President A acted as the loan officer for **ST. ANGELO** and certain Entities.

10.     From in or around September 2006, through in or around September 2016, **ST. ANGELO** was the general counsel of First NBC Bank, providing general legal advice and services, including, but not limited to, transactional work, legal research, litigation, and collections.

11.     In connection with applications for loans from First NBC Bank, **ST. ANGELO** had an obligation to provide accurate financial statements prior to any advances, renewals, or increases in loans extended to him and certain Entities.

12.     When **ST. ANGELO** submitted personal financial statements to First NBC Bank on his behalf or on behalf of certain Entities, he and others, including, Bank President A, and Bank Officer B, caused these supporting documents to be placed into First NBC Bank's records.

13.     By the time First NBC Bank failed in late April 2017, the balances on loans issued to **ST. ANGELO** and certain Entities totaled approximately $46.7 million, and First NBC Bank had also paid **ST. ANGELO** approximately $9.6 million for purported tax credit investments.

## B.      CONSPIRACY TO COMMIT BANK FRAUD:

Beginning at a time unknown to the Attorney for the United States, but at least in or around 2006, through in and around April 2017, in the Eastern District of Louisiana and elsewhere, the defendant, **GREGORY ST. ANGELO,** and others known and unknown to the Attorney for the United States, did knowingly and willfully combine, conspire, confederate, and agree to commit offenses against the United States of America, that is: to knowingly and with the intent to defraud,

3

execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, and to obtain any of the moneys, funds, credits, and assets, owned by and under the custody or control of First NBC Bank, by means of false and fraudulent pretenses, representations, and promises, relating to a material fact, in violation of Title 18, United States Code, Section 1344.

**C.    THE PURPOSE OF THE CONSPIRACY:**

The purpose of the conspiracy was for the defendant, **ST. ANGELO**, Bank President A, Bank Officer B, and others to enrich themselves unjustly by disguising the true financial status of **ST. ANGELO,** the Entities, and other borrowers, concealing the accurate performance of loans, and misrepresenting the nature of payments to **ST. ANGELO** and certain Entities.

**D.    MANNER AND MEANS OF THE CONSPIRACY:**

The manner and means by which the defendant, **GREGORY ST. ANGELO**, Bank President A, Bank Officer B, and others sought to accomplish the purpose of the conspiracy included the following:

1.    **ST. ANGELO**, Bank President A, Bank Officer B, and others provided First NBC Bank with materially false and fraudulent documents and personal financial statements, which, among other things, overstated the value of **ST. ANGELO**'s and the Entities' assets, understated their liabilities, and omitted material information.

2.    The materially false and fraudulent personal financial statements, collateral summaries, and other documents concealed **ST. ANGELO**'s and the Entities' true financial condition.

3.    Bank President A, Bank Officer B, and others disguised **ST. ANGELO**'s and the Entities' true financial condition by, among other things, issuing new loans to **ST. ANGELO** and certain Entities to pay older loans that **ST. ANGELO** was unable to repay and

4

to cover his overdrafts. The new loans then appeared to be current, while the old loans and overdrafts appeared to have been paid. In reality, the new loans were designed to avert the downgrading or impairment of **ST. ANGELO**'s and several Entities' loans and to avoid reporting them as nonperforming or losses to the bank.

4.      Another means the conspirators used to disguise **ST. ANGELO**'s and the Entities' true financial condition was to extend the maturity date of older loans on which **ST. ANGELO** was unable to make payments, which allowed First NBC Bank to avoid downgrading, impairing, or reporting the loans as nonperforming or losses to the bank.

5.      Bank President A, Bank Officer B, and others funded fraudulent tax credit investments that First NBC Bank purportedly made in certain Entities owned by **ST. ANGELO**. In reality, the supposed investments simply funneled money from First NBC Bank's general ledger to **ST. ANGELO** and certain Entities, so that **ST. ANGELO** could make his loan payments and cure overdrafts, and so the bank could avoid downgrading, impairing, or reporting the loans as nonperforming or losses to the bank.

6.      On multiple occasions, Bank President A and **ST. ANGELO** executed false documents entitled "Agreements to Purchase Tax Credits" designed to make it appear that First NBC Bank was paying **ST. ANGELO** money in exchange for ownership interests in entities supposedly owned by **ST. ANGELO**. In reality, these agreements were a way for Bank President A, Bank Officer B, and **ST. ANGELO** to justify the diversion of bank funds to **ST. ANGELO** and certain Entities to cure overdrafts and avoid reporting requirements. On multiple occasions, Bank Officer B directed the disbursement of payments to **ST. ANGELO** and certain Entities from First NBC Bank's general ledger, purportedly for tax credit investments, knowing that the tax credit investments were false.

7.      Yet another means by which Bank President A, **ST. ANGELO**, Bank Officer B,

5

and others concealed the true financial condition of **ST. ANGELO**'s loans was to lend funds to **ST. ANGELO**'s associates as nominees. Bank President A and **ST. ANGELO** caused the nominees to sign loan documents, making it appear that the nominee entity was taking out the loan solely for its own use. In truth and in fact, often the loan proceeds were paid to **ST. ANGELO** or the Entities, not the nominees, and were, in part, used to pay **ST. ANGELO**'s and the Entities' existing debts to First NBC Bank or to enrich **ST. ANGELO**.

8.    **ST. ANGELO**, Bank President A, and Bank Officer B caused employees of First NBC Bank to transfer the nominee loan proceeds directly to **ST. ANGELO**'s or the Entities' deposit accounts, when **ST. ANGELO**, Bank President A, and Bank Officer B knew the loans were not solely for the nominee, but benefitted **ST. ANGELO**, who was not named in the loan documents or listed as a guarantor.

9.    Beginning in or around March 2004 and continuing through the present, **ST. ANGELO** entered into a 30-year lease agreement where one of the Entities, St. Angelo Investment Company, L.L.C., leased a building located at 622 Conti Street in New Orleans, Louisiana.

10.    From in or about February 2006 through the present, 622 Conti, LLC was the owner and lessor of the property located at 622 Conti Street, and **ST. ANGELO** and St. Angelo Investment Company, LLC paid rent to 622 Conti, LLC. **ST. ANGELO** and the Entities were neither owners nor were they members of 622 Conti, LLC.

11.    In July and August of 2010, **ST. ANGELO**'s Premier Information Systems checking account was overdrawn by more than $730,000. It was overdrawn approximately $480,000 in July and approximately $250,000 in August. In each respective month, Bank President A, Bank Officer B, and **ST. ANGELO** caused a debit from the First NBC Bank general ledger to cover the overdrafts. The debit tickets falsely stated the debited amounts of

$500,000 and $400,000 were for an investment in 622 Conti LLC, "per [Bank Officer B]." Shortly after each debit, the money was credited to the Premier Information Systems checking account in the same amounts as the corresponding general ledger debits. By on or about August 30, 2010, **ST. ANGELO**'s Premier Information Systems checking account was again overdrawn, this time by approximately $87,878.47.

12. On or about December 28, 2010, First NBC Bank's outside counsel informed **ST. ANGELO** and Bank President A that **ST. ANGELO** could not legally claim historic tax credits for the property at 622 Conti Street. They were both informed that **ST. ANGELO**'s current lease was too short to qualify for the tax credits. They were further informed that, in order to qualify for the proposed tax credits, either 1) **ST. ANGELO**'s lease on 622 Conti Street had to be extended; or 2) **ST. ANGELO** had to purchase 622 Conti Street from the current owner. At no point between December 2010 and the present was the end date of the lease extended. At no point did **ST. ANGELO** or the Entities own the property at 622 Conti Street or have any membership in 622 Conti, LLC.

13. Despite this knowledge, in or around March 2013, Bank President A and **ST. ANGELO** created false and fraudulent operating agreements, purporting to show that First NBC Bank would be investing in historic tax credits for the rehabilitation of 622 Conti Street. One such operating agreement was falsely backdated to January 1, 2009, and purportedly showed that **ST. ANGELO**'s Entity, St. Angelo Investment Company, L.L.C., was entitled to claim tax credits on the building. This false and backdated document was forwarded to external auditors.

14. In addition, beginning in or about August 2010 and continuing through a date unknown, but at least until in or about May 2015, Bank President A and **ST. ANGELO** executed multiple versions of false and fraudulent documents entitled "Agreement to Purchase Tax

7

Credits 622 Conti, LLC" (hereinafter, "False Purchase Agreements"). In these documents, **ST. ANGELO** and Bank President A falsely represented that **ST. ANGELO** was selling interests in 622 Conti, LLC, a company he did not own, to First NBC Bank in exchange for investments by the bank. The False Purchase Agreements also stated that 622 Conti, LLC would spend large sums of money on renovations to the 622 Conti Street building, and that 622 Conti, LLC had applied for and was eligible for federal and state historic tax credits. In reality, the payments listed in the False Purchase Agreements had been made to **ST. ANGELO** and the Entities, not 622 Conti, LLC, and were used primarily to pay existing debt at First NBC Bank, cover overdrafts, and benefit **ST. ANGELO**. **ST. ANGELO** falsely endorsed each False Purchase Agreement as the "Managing Member" of 622 Conti, LLC, an entity he did not own and of which he was not a member. Bank President A likewise endorsed each False Purchase Agreement, knowing that **ST. ANGELO** was not a member of 622 Conti, LLC.

15.     Defendant **ST. ANGELO** and Bank President A caused these False Purchase Agreements and others to be placed in the files of First NBC Bank.

16.     On or around March 27, 2015, Bank President A requested that a bank employee email the False Purchase Agreements to an external auditor.

17.      In total, the payments that Bank President A, **ST. ANGELO**, and Bank Officer B caused First NBC Bank to make to **ST. ANGELO** and certain Entities, purportedly for tax credits related to 622 Conti Street, totaled more than $7.3 million.

18.     In addition, Bank President A and **ST. ANGELO** caused more than $2.3 million in fraudulent payments to be made by First NBC Bank to **ST. ANGELO** and certain Entities, purportedly for tax credit investments in additional properties owned and controlled by **ST. ANGELO**: Annadele restaurant in Covington, Louisiana and a building located at 616 Girod Street in New Orleans, Louisiana. **ST. ANGELO** never applied for or received any tax credits

for these properties. Both Bank President A and **ST. ANGELO** knew that these properties did not qualify for tax credits. Nevertheless, Bank President A and **ST. ANGELO** executed false tax credit purchase agreements for Annadele and 616 Girod and caused these fake agreements to be placed in the bank's books and records. **ST. ANGELO** and Bank President A signed these additional fraudulent purchase agreements to avoid the downgrading, classification, non-accrual, or impairment of **ST. ANGELO** and certain Entities' loans.

19.     Bank President A and Bank Officer B approved fraudulent tax credit investments for **ST. ANGELO**'s properties routinely at month-end. For example, on or about December 11, 2014, a First NBC Bank employee emailed Bank Officer B requesting permission to cover **ST. ANGELO**'s overdrafts with tax credit money. The employee asked Bank Officer B, "Are we out of tax credits for conti? Do you know?" Bank Officer B responded, "As long as we have a sharp pencil we are never out of tax credits," acknowledging that the tax credits were false. The bank employee responded, "LOL.....I think that just made my day...." Approximately ten days later, Bank Officer B approved a $450,000 debit to the First NBC Bank general ledger for a tax credit investment in 622 Conti, LLC. Bank Officer B then approved a credit to the 616 Girod deposit account of approximately $450,000, which covered overdrafts to certain Entities and went to **ST. ANGELO**'s personal account at a different bank.

20.     By the time First NBC Bank went into receivership in April of 2017, Bank President A, **ST. ANGELO**, and Bank Officer B had caused First NBC Bank to make more than $9.6 million in fraudulent payments to **ST. ANGELO** or the Entities, purportedly to purchase and invest in false tax credits.

21.     **ST. ANGELO**, Bank President A, and Bank Officer B knew that **ST. ANGELO** and the Entities did not qualify for these tax credits, and that the tax credits were merely a means to increase **ST. ANGELO**'s cash flow to assist him in paying overdrafts and remaining current

on his and certain Entities' loans with the bank.

All in violation of Title 18, United States Code, Section 1349.

## BANK FRAUD FORFEITURE

1.      The allegations contained in Count 1 of this Bill of Information are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(2)(A).

2.      Upon conviction of the offense in violation of Title 18, United States Code, Section 1349 set forth in Count 1 of this Bill of Information, the defendant, **GREGORY ST. ANGELO**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violation(s).

3.      If any of the property described above, as a result of any act or omission of the defendant:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third party;

        c.      has been placed beyond the jurisdiction of the court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property which cannot be divided without
                difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

10

21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section

982(b)(1) and Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 982(a)(2)(A) and 28 U.S.C. § 2461(c).

MICHAEL M. SIMPSON
Attorney for the United States
Acting under authority conferred
by 28 U.S.C. § 515

SHARAN E. LIEBERMAN
Assistant United States Attorney

MATTHEW R. PAYNE
Assistant United States Attorney

NICHOLAS D. MOSES
Assistant United States Attorney

J. RYAN MCLAREN
Assistant United States Attorney

New Orleans, Louisiana
March 22, 2019

11

No. _____

# United States District Court

## FOR THE

EASTERN _____ DISTRICT OF _____ LOUISIANA

UNITED STATES OF AMERICA

vs.

GREGORY ST. ANGELO

BILL OF INFORMATION
FOR CONSPIRACY TO
COMMIT BANK FRAUD

Violation(s):   18 U.S.C. § 1349

Filed _____, 20 19

By _____, Clerk.

_____, Deputy

SHARAN E. LIEBERMAN
Assistant United States Attorney

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA.

2019 MAY 15  P  1: 20

WILLIAM W. BLEVINS
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**FELONY**

## BILL OF INFORMATION FOR CONSPIRACY TO
## COMMIT BANK FRAUD AND NOTICE OF FORFEITURE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL DOCKET NO.** **19 - 00090** |
| **v.** | * | **SECTION:** **SECT. I MAG. 1** |
| **KENNETH CHARITY** | * | **VIOLATION: 18 U.S.C. § 1349** |
| | * | |

\*     \*     \*

The First Assistant United States Attorney, Michael M. Simpson, as the Attorney for the

United States, acting on the authority conferred by Title 28, United States Code, Section 515,

(hereinafter, "the Attorney for the United States") charges that:

### COUNT 1 – Conspiracy to Commit Bank Fraud

**A.     AT ALL MATERIAL TIMES HEREIN:**

1.     First NBC Bank was a financial institution, as defined in Title 18, United States

Code, Section 20, and a member of the Federal Deposit Insurance Corporation ("FDIC") with

federally insured deposit accounts.

Fee ____USA____
Process_____
X   Dktd_____
____ CtRmDep_____
____ Doc. No._____

2. First NBC Bank was established in or about 2006, with its headquarters in New Orleans, Louisiana, which was within the Eastern District of Louisiana. At various times First NBC Bank maintained branch offices in Louisiana, Mississippi, and Florida.

3. First NBC Bank was the wholly-owned subsidiary of First NBC Bank Holding Company. Bank President A was a founder of First NBC Bank and acted as its president and Chief Executive Officer from in or around May 2006, until in or around December 2016.

4. In or around May 2013, First NBC Bank Holding Company became a publicly-traded company listed on the NASDAQ.

5. On or about April 28, 2017, First NBC Bank was closed by the Louisiana Office of Financial Institutions. The FDIC was named Receiver.

6. From in or around February 2007 through in or around April 2017, the defendant, **KENNETH CHARITY ("CHARITY")**, had a banking relationship with First NBC Bank, individually and through certain entities.

7. Nominee D was a physician and friend of **CHARITY**'s who lived and practiced medicine in the Washington, D.C. suburbs. Nominee D was not **CHARITY**'s sister by blood, marriage, or adoption.

8. Nominee D was the sole member of MO78255, a limited liability company, registered with the Louisiana Secretary of State, and domiciled in Mandeville, LA.

9. **CHARITY** was the sole member of the limited liability companies DMK Group Three, DMK Group Five, 190W1515, DMK Acquisitions & Properties, and 21W104, and had power of attorney to act on behalf of MO78255 (collectively "the Entities").

2

10.     Nominee D was not a signatory on any of the accounts held by **CHARITY** or the Entities at First NBC Bank.

11.     From in or around February 2007 through in or around September 2016, Bank President A acted as **CHARITY**'s loan officer and the loan officer to the Entities.

12.     The defendant, **CHARITY**, had an obligation to provide accurate personal financial statements and collateral summaries prior to any advances, renewals, or increases in loans extended to him or the Entities.

13.     When **CHARITY** submitted financial statements to First NBC Bank on his own behalf or on behalf of the Entities, he and others, including, Bank President A, caused these supporting documents to be placed into First NBC Bank's records.

14.     By the time First NBC Bank failed in late April 2017, the balances on the loans issued to **CHARITY** and the Entities totaled more than $18 million.

**B.      CONSPIRACY TO COMMIT BANK FRAUD:**

Beginning at a time unknown to the Attorney for the United States, but at least in or around 2006, through in and around April 2017, in the Eastern District of Louisiana and elsewhere, the defendant, **KENNETH CHARITY**, and others known and unknown to the Attorney for the United States, did knowingly and willfully combine, conspire, confederate, and agree to commit offenses against the United States of America, that is: to knowingly and with intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, and to obtain any of the moneys, funds, credits, and assets, owned by, and under the custody or control of First NBC Bank, by means of false and fraudulent pretenses, representations, and promises, relating to a material fact, in violation of Title 18, United States Code, Section 1344.

3

C.    **THE PURPOSE OF THE CONSPIRACY:**

      The purpose of the conspiracy was for the defendant, **CHARITY**, Bank President A, and others to unjustly enrich themselves by disguising the true financial status of **CHARITY** and the Entities, concealing the accurate performance, and misrepresenting the purpose of the loans made to **CHARITY** and the Entities.

D.    **MANNER AND MEANS OF THE CONSPIRACY:**

      The manner and means by which the defendant, **CHARITY**, and Bank President A, and others sought to accomplish the purpose of the conspiracy included the following:

*False Personal Financial Statements*

    1.    The defendant, **CHARITY**, Bank President A, and others provided First NBC Bank with materially false and fraudulent personal financial statements, which, among other things, overstated the value of **CHARITY**'s assets, understated his liabilities, and omitted material information. In truth and in fact, no such trust existed.

    2.    For example, personal financial statements signed by **CHARITY** in 2010, 2011, and 2012, falsely claimed that **CHARITY** had assets from his father's trust in the amount of $350,000.

    3.    A personal financial statement signed by **CHARITY** in 2010 and 2011 falsely listed that **CHARITY** and the Entities were entitled to millions of dollars from a government program. In truth and in fact, these were only projections of possible grant proceeds that never materialized.

    4.    Schedules appended to the personal financial statements in 2010, 2011 and 2012 falsely included income from rental properties on residential units that had never been rented. Both Bank President A and **CHARITY** were aware that these rental income schedules were false.

4

5.      Bank President A advised **CHARITY** on how to complete the personal financial statements, suggesting he include assets that both **CHARITY** and Bank President A knew were false and overstated.

6.      The materially false and fraudulent personal financial statements, collateral summaries, and other documents disguised **CHARITY**'s true financial condition.

*Loan Masking*

7.      Bank President A and others disguised **CHARITY**'s true financial condition by, among other things, issuing new loans to **CHARITY** and the Entities, which would pay older loans that **CHARITY** was otherwise unable to repay. The new loans would then appear to be current and performing, while the old loans appeared to have been paid. In reality, **CHARITY** had insufficient income and cash flow to support his debt at First NBC Bank. Bank President A was well-aware that **CHARITY** was unable to repay his loans, yet Bank President A continued to falsely represent in bank records that **CHARITY** and his Entities were profitable.

*False Statements About Loan Purpose*

8.      An additional manner and means of carrying out the conspiracy was that **CHARITY**, Bank President A, and others repeatedly lied in bank loan documents about the purpose of loans that Bank President A approved for **CHARITY** and the Entities.

        a.      *Decatur Street Canopy*

9.      In or around July 2008, **CHARITY**, through one of the Entities, DMK Group Three LLC, purchased the commercial property located at 620 Decatur Street in the French Quarter using loan proceeds from First NBC Bank. Nominee D was listed as a guarantor on the loan. From on or about March 30, 2012 through on or about April 31, 2017, a beignet shop leased the space from **CHARITY** and his Entity.

10.     In August of 2014, Bank President A approved a loan increase of approximately

5

$980,000 for **CHARITY** and Nominee D to enclose the outdoor patio at the beignet shop and improve gas stations owned by certain of the entities. **CHARITY** signed a disbursement sheet stating that the purpose of the loan was to finance renovations to 620 Decatur Street and three gas stations. In truth and in fact, Bank President A applied a significant portion of the loan proceeds to cover **CHARITY**'s overdrafts, which included personal expenses.

11.     In or around December 2015, Bank President A approved a second loan for **CHARITY** for $500,000, falsely stating the proceeds would be used to enclose the outdoor patio at 620 Decatur Street and improve three gas stations. Nominee D was a guarantor on the loan. **CHARITY** signed a disbursement sheet stating that he would use the loan proceeds to finance the renovations to 620 Decatur and three gas stations. In truth and in fact, Bank President A applied the loan proceeds to cover **CHARITY**'s overdrafts, which included personal expenses.

12.     In or around August 31, 2016, Bank President A approved a third loan increase for $500,000 to enclose the outdoor patio at 620 Decatur Street. **CHARITY** signed a disbursement sheet stating that he would use the loan proceeds to enclose the patio. In truth and in fact, Bank President A applied the loan proceeds to cover **CHARITY**'s loan payments and overdrafts, which included personal expenses. Specifically, between August 31, 2016, and December 8, 2016, there were approximately 47 disbursements into **CHARITY**'s account ending in 2440, totaling roughly $476,555.27.

                    b.     *Lake Terrace Shopping Center*

13.     In or around 2007, **CHARITY,** through one of the Entities, purchased the Lake Terrace Shopping Center in New Orleans East using loan proceeds from First NBC Bank. **CHARITY** sold the shopping center to a developer in February of 2016.

14.     During the time that **CHARITY** owned the shopping center, **CHARITY** and

6

Bank President A represented to First NBC Bank that **CHARITY** needed additional loan proceeds to develop the property. Also during this time, **CHARITY** and Bank President A represented to First NBC Bank and others that development of the shopping center was about to begin or that it would soon be completed.

15.     Contrary to these representations, the shopping center was never developed and was cited for blight in 2012. As late as December 2015, Bank President A falsely and fraudulently represented to an auditor that the shopping center was under construction or close to being finished. When **CHARITY** sold the shopping center in February 2016, it was in such a state of disrepair that the City of New Orleans included as a condition of the sale that the new owner demolish the property within 60 days of the purchase.

16.     Loan proceeds that were supposed to go toward development of the shopping center went into an account controlled by **CHARITY**. **CHARITY** spent money from this account on, among other things, service of his swimming pool and attorney's fees.

*Nominee Loans*

17.     Yet another means by which Bank President A, **CHARITY**, and others concealed the true financial condition of **CHARITY**'s loans was by using Nominee D as a guarantor on some of **CHARITY**'s and the Entities' loans. **CHARITY**, Bank President A, and others fraudulently characterized Nominee D as **CHARITY**'s sister and often disbursed loan proceeds falsely representing that Nominee D was willing to guarantee or be the primary borrower on the loan. In truth and in fact, Nominee D was unaware of the true purpose of the loans, many of which were disbursed prior to her signing any loan documentation. Further, she was unaware that the loan proceeds were used to finance **CHARITY**'s personal spending habits and make loan payments.

7

All in violation of Title 18, United States Code, Section 1349.

## BANK FRAUD FORFEITURE

1.      The allegations contained in Count 1 of this Bill of Information are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(2)(A).

2.      Upon conviction of the offense in violation of Title 18, United States Code, Section 1349 set forth in Count 1 of this Bill of Information, the defendant, **KENNETH CHARITY**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violation(s).

3.      If any of the property described above, as a result of any act or omission of the defendant:

          a.      cannot be located upon the exercise of due diligence;

          b.      has been transferred or sold to, or deposited with, a third party;

          c.      has been placed beyond the jurisdiction of the court;

          d.      has been substantially diminished in value; or

          e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

8

All pursuant to 18 U.S.C. § 982(a)(2)(A) and 28 U.S.C. § 2461(c).

MICHAEL M. SIMPSON
Attorney for the United States
Acting under authority conferred
by 28 U.S.C. § 515

SHARAN E. LIEBERMAN
Assistant United States Attorney

MATTHEW R. PAYNE
Assistant United States Attorney

NICHOLAS D. MOSES
Assistant United States Attorney

J. RYAN MCLAREN
Assistant United States Attorney

New Orleans, Louisiana
May 15, 2019

No. _____

# United States District Court

### FOR THE

EASTERN _____ DISTRICT OF _____ LOUISIANA _____

UNITED STATES OF AMERICA

*vs.*

KENNETH CHARITY

BILL OF INFORMATION
FOR CONSPIRACY TO
COMMIT BANK FRAUD

Violation:

18 U.S.C. § 1349

*Filed* _____ , 20 19

_____ , *Clerk.*

*By* _____ , *Deputy*

_____
*Assistant United States Attorney*
SHARAN E. LIEBERMAN